UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

KATHY E. EMERY,

    Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

    Defendant.
_____/

FILED by _____ D.C.
APR 15 2014
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA – MIAMI

PLAINTIFF DEMANDS TRIAL BY JURY

Kathy E. Emery
<u>Mailing Address</u>:
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650

## COMPLAINT

COMES NOW, Plaintiff, Kathy E. Emery, and hereby files her Complaint against the Defendant, ALLIED PILOTS ASSOCIATION, and says:

### I. JURISDICTION AND VENUE

1. Plaintiff Kathy E. Emery brings this action against defendant Allied Pilots Association (the "APA") The suit is based upon defendants breach of its duty of fair representation, under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 (1976) *et seq,*

### II. PARTIES

2. Plaintiff, Kathy Emery ("Emery"), is a citizen of the United States, who resides in the State of Florida. At all times relevant to the facts and claims asserted herein, plaintiff is and had been a member in good standing of the defendant Allied Pilots Association and a pilot who is covered under the Collective Bargaining Agreement between American Airlines, Inc., ("American") and the Allied Pilots Association.

3. Defendant Allied Pilots Association (the "APA") is a labor organization with its principal office in the State of Texas. The APA has been accorded exclusive recognition, and is the exclusive representative of the pilot employees in the service of American Airlines, Inc., ("American" or "AA") and is entitled to act for, and negotiate collective bargaining agreements covering all pilots in the bargaining unit.

## III.   INTRODUCTION

Kathy E. Emery brings this action against the Allied Pilots Association (the "APA") for the Defendants Breach of its Duty of Fair Representation owed to her in relation to the APA Equity Distribution Allocation and Award.

American Airlines ("American") gave American Airlines pilots a 13.5% "Equity Stake" in the new American Airlines which was estimated by the Allies Pilots Association ("APA" or the "Union") to be worth approximately 1.2 billion dollars. American permitted the APA to distribute the equity shares among its pilots conditional upon the APA's indemnification of American Airlines for any legal challenges brought by any pilot or group of pilots relating to equity distribution. Currently, there is a $10,000,000. set aside for such challenges.

This action is based upon the APA's arbitrary, discriminatory and bad faith treatment of Plaintiff in the APA Equity Distribution Scheme. The APA Equity Distribution Eligibility and Allocation Award finalized in November 2013 treated Plaintiff less favorably than other similarly situated pilots. The APA actions have and will continue to have a disported impact on Plaintiff in comparison to other American Airlines pilots. Other similarly situated pilots were Awarded equity shares worth an estimated $125,000 to $150,000. I was awarded a much smaller number of shares worth and estimated $23,000.

## III.   STATEMENT OF FACTS

### Employment History

4.   On September 2, 1992 Plaintiff Kathy Emery was hired as a Commercial Pilot for American Airlines, Inc. Prior to that date Plaintiff had enjoyed a successful career as a pilot for Pan American World Airways (Pan Am)

5.   Plaintiff was hired by American Airlines after Pan Am ceased operations in 1991.

[3]

6. When Plaintiff was hired by American, she was a highly qualified individual and had always held a FAA First Class Medical Certificate.

### Disability History

7. After more than ten (10) years of service with American Airlines, Plaintiff was medically disqualified from performing duties as a pilot following a required medical evaluation, conducted by the company.

8. In April 2003 Plaintiff filed for long-term disability benefits under the American Airlines Pilot Retirement Benefit Program.

9. Prior to approving Plaintiff's benefits, American Airlines Corporate Medical Director, Thomas H. Bettes, M.D. Dr., directed Plaintiff to contact and begin treatment with an American Airlines assigned physician, Dr. Enrique M. Suarez. Initiating this treatment and following Dr. Suarez recommendations was a pre-condition for receipt of disability benefits and eventual medical clearance to return to work. Failure to comply with AA's directives would subject Plaintiff to terminations for insubordination.

10. After Plaintiff initiated treatment with Dr. Suarez, Dr. Bettes approved Plaintiff for long term disability benefits under the Program, effective March, 2003.

11. During the next four years, Plaintiff satisfied all Program requirements and continuously received monthly disability benefits, including continuous medical care and treatment for her disability from Dr. Suarez, who regularly provided American's medical department with updates regarding Plaintiff's condition.

## Termination of LTD Benefits

12. On January 25, 2007, notwithstanding American's full knowledge of Plaintiff's medical condition and direct contact with her treating physician, Dr. Bettes terminated Plaintiff's disability benefits without prior notice and without requesting any additional documentation from her doctors.

13. Plaintiff's disability benefits were automatically stopped when Dr. Bettes, notified American Airlines Pension Plan Administration, "that medical information pertaining to the continuation of Plaintiff's long term disability benefits had been requested and due to lack of substantiation disability benefits cease on January 31, 2007."

14. Plaintiff received notice from Dr. Bettes that disability benefits are being terminated ex post facto. The notice stated in part, "it cannot be established, that you continue to remain disabled and unable to pursue obtaining your FAA medical certificate with the goal of returning to your job as a pilot for American Airlines."

15. Upon Plaintiff's receipt of that notice, Plaintiff immediately contacted American Airlines Medical Department and AA's Disability Nurse Case Manager, Jeanne Spooned seeking further clarification.

16. Plaintiff was informed that no additional information would be provided and Plaintiff's only recourse was to file an administrative appeal with American Airlines Pension Benefits Department (PBAC).

17. On February 28, 2007 Plaintiff wrote Dr. Bettes a letter requesting further clarification and requesting that he schedule her for a FAA First Class Medical and AA Medical Clearance to return to work (RTW), pursuant to Section 20 and other provisions of the CBA.

18. Dr. Bettes never responded to Plaintiff's letter.

19. Plaintiff also contacted the Miami Flight Office who advised her that she should direct all inquiries to Dr. Bettes, American Airlines Corporate Medical Director.

## The Disability Appeal

20. August 2007, Plaintiff appealed the adverse benefit determination with AA's Pension Benefits Administration Committee (the "PBAC") which appeal was denied on October 22, 2007

21. The denial notice stated in part, "As a result of your appeal request, the PBAC determined that discontinuance of long term disability benefits was both proper and in accordance with the provisions of the Plan."

22. The decision further stated, that Western Medical Evaluators, Inc. (a medical consulting company under contract with American Airlines) determined that the evidence presented does not document your continued disability or receipt of continued appropriate medical care.

23. This, despite the fact that since 2003 through the decision date, Plaintiff was under the care of a physician selected and assigned to her by American Airlines (See ¶ 6 above) and was fully compliant with all treatment recommendations.

24. In rendering its decision, the PBAC purported to rely on evaluations made by Western Medical Evaluators ("WME"), to determine the clinical validity of Plaintiff's disability based only on a "peer review."

25. Citing WME's peer review report, on October 22, 2007 the PBAC upheld Dr. Bette's termination of Plaintiff's benefits.

26. Over three years later, Plaintiff discovered that WME was not a clinical source, but was instead a small workers-compensation claims processor that worked for companies

and insurers. WME's history during the period of FO Emery's peer review was riddled with fraud.

27. The medical license of WME's principal and Corporate Medical Director, Dr. Howard Douglas, had been revoked by the Texas Medical Board for "dishonorable, and unprofessional conduct likely to defraud or deceive public in the future, and professional failure to practice medicine in an acceptable manner consistent with public welfare."

28. In July of 2008, WME was sued by Capital Funding Solutions, Inc. in the US District Court, FLSD, Case No. 08-61106-SEITZ, for "perpetrating two separate and distinct fraudulent schemes," which consisted of acts of medical claim fraud, and billing fraud, involving false claim forms and altered claim forms. These acts were committed from January 2007 through July 2008, during the precise time-frame American Airlines PBAC Committee used WME to review pilot's disability claims.

29. Significantly, in that case, former WME employees testified that WME paid doctors 120% of their normal fee to wrongfully deny claimant's benefits, that WME's principal directed employees to perform illegal acts, and that WME's principal would not wait on doctors to complete reports, and instead would create and sign the evaluation report herself.

30. In August 2008, WME was permanently shut down by the Texas State Insurance Board and WME and its principals were charged with felony workers compensation claim and billing fraud and subsequently convicted and sentenced.

31. In response to requests for medical information from doctors whose names are depicted on pilot's reports; these doctors were unable to produce any medical records. In Plaintiff's case the doctor stated that her signature had been electronically affixed to reports without her knowledge and consent, for which she had no medical records.

32. During the period of time from 2004 through 2007, Americans defined benefit pension plans were grossly under-funded.

33. American's annual SEC 10K Report shows substantial pension funding obligations ranging from $2.1 billion to $2.5 billion.

34. This report also acknowledged American understands that due to substantial pension funding obligation, it would need access to additional funding and that the inability of American to obtain additional funding would have a material negative impact on the ability of American to sustain its operations over the long-term.

35. During discovery in several pilots ERISA cases, FO Emery has learned that American Airlines created a Disability Nurse Case Management Cost Savings Program.

36. FO Lawrence Meadows obtained deposition testimony from key individuals in American's medical department and human resources department, including Jeanne Spooned and human resources senior budgeting analyst Susan Roberson, who admitted that the Cost Savings Program was administered by the American medical department overseen by AA's Corporate Medical Director, Thomas Bettes, M.D.

37. Nurse Spoon tracked the cost savings data on spreadsheets she compiled. Documentation from Nurse Spoon to Roberson indicates that the spreadsheets were used to calculate cost savings using two dates-the benefit termination date and the estimated return to work date of disabled American pilots.

38. Cost savings from AA Medical's premature termination of pilots disability benefits and WME's decisions to uphold these terminations were tracked on Nurse Spoon's spread sheets.

39. During the period of time from 2005 through 2008, Defendant, Allied Pilots Association also sought to significantly reduce its disability costs under the APA's voluntary disability plan.

40. Several revisions were made to the APA Disability Income Plan (Loss of License) in order to reduce costs of the plan.

41. In 2008 the Loss of License Plan was terminated by the APA and replaced with the Pilot Occupational Disability Plan.

42. During the same period of time, Plaintiff had a claim for APA disability benefits under the APA Loss of License Plan. Not unlike American, Defendant APA failed to pay all disability benefits under the plan and failed to administer the claim within the time prescribed by law. So in 2011, after a protracted claim process lasting nearly eight years, Plaintiff filed suit against Defendant APA to enforce her rights under ERISA.

43. On April 17, 2013, Judgment was granted in favor of Plaintiff Kathy Emery against the Defendant APA in the amount of $47,058.29 for pre judgment interest on delayed benefit payments on her ERISA action.

44. On November 5, 2013, an order was entered awarding Plaintiff Kathy Emery prevailing party costs in the matter.

45. During this period of time, the APA issued the Equity Distribution Summary Document memorializing the decisions that the APA Board of Directors (BOD) made concerning the APA equity distribution.

## Terminated Awaiting Grievance

46. By letter dated November 12, 2006, from Captain Tom Hynes, Managing Director of Flight Miami, Plaintiff was advised, "As a result of your failure to qualify for Long Term

Disability, you are on unauthorized leave of absence." A hearing was scheduled to discuss Plaintiff's plan to return to work on November 20, 2007.

47. At the onset of the hearing held by Captain Brian Fields, Base Manger-Chief Pilot Miami, Plaintiff was handed letter dated November 20, 2007, signed by Captain Fields, directing Plaintiff to take all steps necessary to return to work... and directing her to contact AA Medical to coordinate clearance to active duty no later than November 30, 2007. The letter further threatened Plaintiff with termination stating, "Failure to comply with this directive will be considered a violation of American Airlines Rules and Regulations, Rule 7, insubordination and <u>will result in immediate termination</u>.

48. At the hearing Plaintiff informed Captain Fields of her disability history with American Airlines as described above and of her immediate desire to return to work.

49. Plaintiff also testified at the hearing about her prior attempts beginning in February 2007 to coordinate with AA Medical for medical clearance to return to work.

50. Plaintiff, requested and Captain Fields agreed to intercede on Plaintiff's behalf and scheduled an appointment with American Airlines Corporate Medical Director, Thomas Bettes for the purpose of getting her FAA First Class Medical and return to work clearance.

51. Following the hearing, by e-mail to Plaintiff's Miami Union Representatives, Captain Fields confirmed that Plaintiff was in compliance with AA's November 20, 2007 directive and confirmed her scheduled appointment with Dr. Bettes for December 12, 2007.

52. In that e-mail Captain Fields further stated that Plaintiff's failure to appear at the scheduled appointment would be considered insubordination, thereby subjecting Plaintiff to immediate termination. (See ¶ 18 above)

53. December 10, 2007 the APA prepared a Grievance, signed by Plaintiff protesting the hearing conducted November 20, 2007 and Company's violation of the CBA and past practices (in connection with among other things) improperly removing Plaintiff from disability, improperly investigating her, placing her on an "unauthorized" leave of absence while failing to place Plaintiff on a proper pay status of PW.

54. December 12, 2007, Plaintiff appeared as scheduled for her appointment with Dr. Bettes, but he would not conduct the required medical evaluation as directed by Captain Fields nor did he grant Plaintiff medical clearance to RTW.

55. During discussions with Dr. Bettes, Plaintiff requested she be placed on a proper paid status, PW or Awaiting Training or be granted a reasonable accommodation.

56. Dr. Bettes advised Plaintiff those pilots unable to hold a First Class medical may be assigned temporary non-flying positions while on active pay status.

57. Plaintiff who is a qualified individual was neither offered nor granted a reasonable accommodation by American Airlines that as Dr. Bettes suggested had been given to other pilots.

58. September 18, 2008, Counsel for Plaintiff, filed an ERISA suit against American Airlines, Inc., pursuant to 29 U.S.C. § 1001, *et.seq.* seeking among other things, past due long-term disability benefits.

59. Beginning in or around June 2008 American Airlines initiated an investigation following Plaintiff's complaint to American Airlines Business Ethics & Compliance Department alleging unfair treatment and discrimination. [Case No. 803035660].

60. On March 18, 2009 the APA, submitted Plaintiff's Grievance No: 07-082 to the System Board of Adjustment seeking to place Plaintiff of a proper paid status of PW or Awaiting Training.

61. Plaintiff's internal business ethics Complaint No. 8030356601 was assigned to investigator Michael Chianese, who was instructed to contact Kathy Koorenny, APA legal "because it appears there is some history"

62. Michael Chianese reported that he spoke with David Gilbert, Miami Flight Administration Manager, who falsely advised him that,

> *"she refused to substantiate her disability, including not showing up for a required medical evaluation, and therefore she is not eligible for her FAA Certification. Dr. Bettes requested medical info on 1/25/07 that was not provided and her LTD Benefits were ceased on 1/31/07 per AA Medical, of which she had 180 days to file an appeal, which she didn't do. Gilbert has reams of documentation on this issue.*

63. Based on patently false information provided by Dave Gilbert and without ever speaking to Kathy Emery, Mr. Chianese determined that the allegations were unsubstantiated and closed the case with no action.

64. Plaintiff was wrongfully terminated by American Airlines "without just cause" effective October 18, 2007, a date which pre-dates her company grievance.

65. Plaintiff was not provided notice of termination prior to terminating employment status and still has not been provided with the notice of termination by either American or the Allied Pilots Association.

66  Plaintiff's termination was improper under the terms of the pilots CBA.

67. Plaintiff's grievance challenging her employment status seeks to place Plaintiff in a proper paid status, such as PW or Awaiting Training, which can only be held by an active American Airlines employee.

68. On March 18, 2009, The APA submitted Plaintiff's grievance to the Five-Member System Board of Adjustment, which was to be scheduled for arbitration.

69. The arbitration had not yet been scheduled when American Airlines filed

Bankruptcy on November 29, 2011.

70. The APA which is the certified collective bargaining representative, under the Railway Labor Act, for American Airlines pilots, filed a Proof of Claim #8331 on July 13, 2012 against the debtor American Airlines for claims related to grievances involving APA and/or its member pilots that rise from conduct or breaches of the 2003-2008 CBA (including the supplemental Agreements) and other separate agreements between American and the APA.

71. November 16, 2012, APA and Debtor entered into a Letter of Agreement (<u>Settlement Consideration and Bankruptcy Protection</u>) providing for among other things, the settlement of claims of APA, on behalf of itself or the pilots represented by the APA, against American.

72. The Agreement which was incorporated into the new Collective Bargaining Agreement excluded all pending grievances with the exception of the most serious grievances.

Plaintiff's grievance No. 07-082 was one of the named grievances incorporated by settlement into the new Collective Bargaining Agreement.

73. FO Emery's APA Grievance No. 07-082 has not been completed. Currently, FO Emery is awaiting notice from the APA of the scheduled arbitration date before the 5 Member System Board of Adjustment.

### The APA Equity Distribution

74. With the U.S. Bankruptcy Judge's approval of the new Collective Bargaining Agreement the APA secured a 13.5% equity stake in the reorganized airline.

75. In anticipation of receiving that equity interest estimated to be worth as much as $1.2 billion dollars, the APA established an Equity Distribution Committee charged with making

recommendations on the division and distribution of the equity interest.

76. The APA Equity Distribution, APA Board of Directors-Approved Eligibility and Allocation document dated April 3, 2013 memorialized and finalized the decisions that the APA Board of Directors (BOD) made concerning the equity distribution, including silo structure, allocation and eligibility criteria.

77. The APA created a Dispute Resolution Process (DRP) to enable pilots to challenge the equity distribution if they thought it was unfair or unreasonable. The APA internal dispute resolution process allowed for only limited discovery and expedited arbitration.

78. The APA did not notify FO Emery about the APA Equity Distribution who learned about it only by happenstance, during a casual call from a fellow pilot.

79. Not only did the APA initially notify Kathy Emery about the Equity Distribution, the APA did not include her in the Equity Distribution, even though she clearly and unambiguously met the Special Status Eligibility Criteria memorialized in the final Equity Distribution-APA Board of Directors-Approved Eligibility and Allocation dated April 3, 2013, section (i) *Terminated Awaiting Grievance*.

80. Pursuant to the published *Terminated Awaiting Grievance* criteria for "special status" situations a pilot who has been terminated by the Company as of January 1, 2013 but has not completed the grievance process will be considered an active pilot for the distribution. (emphasis added).

81. Appendix C, to the Equity Distribution document clearly shows that ACTIVE pilots for the purposes of the distribution are entitled to *full eligibility*.

82. This means that the pilot is eligible for all (4) silos of the Equity Distribution. Here

the evidence is clear. FO Emery has been wrongfully terminated by the Company as of January 1, 2013 but has not completed the grievance process initiated by the APA on December 10, 2007.

83. The APA Board of Directors made a policy decision to treat pilots *Terminated Awaiting Grievance* as active pilots for the purpose of the equity distribution.

84. However, without the Board of Directors having amended the Equity Distribution eligibility criteria in anyway, after FO Emery's Challenge had been submitted, and after the dispute proceedings began, the APA narrowed the eligibility criteria to mean only those pilots terminated for cause that were awaiting grievance, deliberately excluding FO Emery who was wrongfully terminated without cause.

85. There were thirteen pilots that had been terminated by the Company as of January 1, 2013 that had not yet completed the company grievance process including Plaintiff.

86. Of those thirteen pilots Plaintiff is the only one that was not made fully eligible for the Equity Distribution. These pilots, including one or more terminated without cause were awarded all four silos valued at approximately $130,000.00

87. Plaintiff was granted only two silos one with a $0.00 value, for a total of approximately $20,000.00, a difference in excess of $100,000.00

88. In regard to Equity Distribution, the APA BOD had a legal responsibility to represent all of its pilot members and to ensure that the distribution was fair and reasonable, non-arbitrary, non-discriminatory, and made in good faith.

89. The APA failed in their legal responsibility to fairly represent Kathy Emery with regard to the APA Equity Distribution, when, in an effort to defeat Kathy Emery's right to a fair allocation of the APA Equity Distribution funds, the APA, (a) claimed no duty of representation

to her; (b) knowingly took a position inconsistent with and in contradiction to Kathy Emery's pending Grievance No. 07-082; (c) knowingly took a position inconsistent with and in contradiction to APA president Lloyd Hill's submission of Kathy Emery's grievance to the 5 member System Board of Adjustment; (d) falsely claimed Kathy Emery had been removed from the seniority list pursuant to the collective bargaining agreement, and then sought to defeat her challenge because she was not on the seniority list; I sought to defeat her challenge because she was not receiving LTD benefits; (f) falsely claimed that Kathy Emery's grievance does not seek her reinstatement as an employee of American; (g) misrepresented that Ms. Emery was dropped from the seniority list pursuant to Section 11.D of the CBA; (h) knowingly took a position inconsistent with and in contradiction to DFW Base Grievance 12-012 and LGA Base Grievance 11-054; (i) argued in bad faith that FO Emery should not be treated as terminated awaiting grievance because she was not terminated for cause; (j) misled the arbitrator to believe that FO Emery was appropriately terminated in accordance with the CBA under 11.D; (k) failed in their duty of candor to the arbitrator; (l) treated FO Emery less favorably than other similarly situated pilots; (m) treated FO Emery who was wrongfully terminated, without cause less favorably than pilots terminated for cause (i.e., insubordination, felony convictions, testing positive for alcohol, testing positive for drugs, etc…); (n) unreasonably assumed that FO Emery who has been terminated w/o cause, awaiting grievance (inactive) more than 5 yrs. Is unlikely to return to active flying, while assuming pilots terminated for cause, awaiting grievance (inactive) more than 5 years is likely to return to active flying); (o) failed to afford FO Emery the benefit of presumptions afforded other pilots"; (p) stated under oath that TAG pilot status is given to "active" pilots who have been terminated by the company." while failing to disclose that

TAG pilot status was given to inactive pilots who have been terminated by the company, including pilots unable to hold a FAA First Class Medical).

## IV. CAUSE OF ACTION

### COUNT I: BREACH OF THE DUTY OF FAIR REPRESENTATION IN VIOLATION OF THE RAILWAY LABOR ACT

90. Plaintiff incorporates the allegations contained in Paragraphs above as if fully stated herein and says further that:

91. The failure of the Defendants to allocate fairly the proceeds of the APA Board of Directors approved Equity Distribution to Plaintiff is a breach of the APA's duty to fairly represent Kathy Emery.

92. The effect of Defendants' failure to fairly represent in the allocation of the same payment of benefit as is enjoyed by similarly-situated pilot members of the APA is in violation of the Railway Labor Act.

93. The Equity Distribution Decision and Award dated October 15, 2013 determined that Kathy Emery would be denied payments from the APA Equity Distribution that other similarly situated pilots will receive or have received..

94. But for the arbitrary, discriminatory and deliberate, bad faith actions of the APA, Kathy Emery would have enjoyed the same payment of benefit as is enjoyed by active members and similarly-situated pilot members of the APA.

## V. PRAYER FOR RELIEF

**WHEREFORE,** Kathy Emery respectfully request that the Court enter judgment in her favor against the Allied Pilots Association for damages resulting from the breach of duty of fair representation of FO Emery, consisting, among other things, of compensation for benefits lost

due to the discriminatory allocation of benefit monies requiring Defendant to make FO Emery whole by awarding unpaid benefits allowed other similarly situated pilots (plus interest), and cost of suit;

      i.    Award such further relief as the Court deems just and proper.

Respectfully submitted this 15th day of April, 2014.

_/s/ Kathy E Emery_
Kathy E. Emery
Mailing Address
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650