# Exhibit 1

Case 9:14-cv-80518-DTKH   Document 14-1   Entered on FLSD Docket 08/28/2014   Page 2 of
159
Case 9:11-cv-81123-KLR   Document 66   Entered on FLSD Docket 12/27/2012   Page 1 of 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-81123-Civ-Ryskamp/Hopkins

KATHY E. EMERY,

                          Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

                          Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE has come before this Court upon an Order referring all pre-trial matters to the

undersigned United States Magistrate Judge (DE 21). The Court has before it Plaintiff's Motion for

Summary Adjudication as to the Standard of Review (DE 20);[1] Defendant Allied Pilots

Association's Motion for Summary Judgement (DE 40); Plaintiff's Response (DE 52);[2] and

_____

[1]This filing included Plaintiff's Motion for Protective Order and Plaintiff's Motion for
Summary Adjudication as to the Standard of Review (DE 20). The undersigned previously
denied Plaintiff's Motion for Protective Order (DE 26). Defendant treated Plaintiff's Motion for
Summary Adjudication as to the Standard of Review as Plaintiff's Motion for partial summary
judgement. *See* Defendant's Memorandum in Opposition to Plaintiff's Motion for Protective
Order and for Partial Summary Judgement (DE 23); Defendant's Motion for Summary
Judgement, p. 10, n. 3 (DE 40). Plaintiff did not file another dispositive motion.

[2]Plaintiff also filed her Affidavit in support of the Motion for Summary Judgment on
October 30, 2012 (DE 58). The District Court previously had extended Plaintiff's time to
respond to Defendant's Motion for Summary Judgment until October 5, 2012. (DE 49).
Therefore, Plaintiff's Affidavit was filed well after this deadline.
    Defendant moved to strike the Affidavit as untimely. (DE 60). Plaintiff subsequently
filed a Sur-Reply to the Motion for Summary Judgement without seeking leave of Court. (DE
61). Plaintiff also responded to the Motion to Strike (DE 62), and Defendant replied (DE 63, 64)

Defendant's Reply (DE 53). For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Summary Adjudication as to the Standard of Review (DE 20) should be **DENIED**, and Defendant Allied Pilots Association's Motion for Summary Judgement should be **DENIED in PART and GRANTED in PART**.

## BACKGROUND

Plaintiff filed this suit *pro se* in state court on September 13, 2011, and Defendant removed it to this Court on October 7, 2011. (DE 1). The Complaint alleges that Defendant failed to fully pay Plaintiff's long-term disability benefits in violation of the terms of the plan and of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002 *et seq.*, which entitles Plaintiff to additional benefits under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B); and failed to provide Plaintiff plan documents in violation of Section 502(c)(1), 29 U.S.C. § 1132(c). (DE 1-2). Plaintiff also seeks prejudgment interest on unpaid disability benefits pursuant to Section 502(a)(3)(B) of ERISA, 29 U.S.C. § 1132(a)(3)(B), and attorney's fees pursuant to Section

---

seeking to strike both the Affidavit and the Sur-Reply.

The Local Rules require that "[a]ll materials in support of any motion, response, or reply, including affidavits and declarations, shall be served with the filing." S.D. Fla. L. R. 7.1(c). Local Rules also require a party to seek leave of court to file a sur-reply. *See id.* While the court's decision to grant permission to file a sur-reply is purely discretionary, it may not be appropriate to disallow a sur-reply if new materials or arguments were presented in the reply. *See First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 Fed. App'x 777, 788 (11th Cir. 2008). However, allowing sur-replies as a regular practice would put the court in the position of "refereeing an endless volley of briefs." *See Fedrick v. Mercedes-Benz USA, LLC*, 366 F.Supp. 2d 1190, 1997 (N.D. Ga. 2005) (cited with approval in *First Specialty Ins. Corp.*, 300 Fed. App'x at 788).

Plaintiff's Affidavit was filed untimely. Further, Plaintiff failed to seek leave of Court to file a Sur-Reply in violation of the Local Rules. Also, Defendant limited the Reply in support of its Motion for Summary Judgement to the issues Plaintiff raised in her Response. Therefore, Plaintiff would not have been entitled to leave to file a Sur-Reply if she followed the proper procedure. Accordingly, Plaintiff's Affidavit (DE 58) and Sur-Reply (DE 61) should be stricken from the record.

502(g)(1), 29 U.S.C. § 1132(g)(1). (DE 1-2).

In the Motion for Summary Judgement, Defendant argues that Plaintiff's claims are untimely, that she has received all of the benefits she was entitled to, and that Defendant timely provided Plaintiff all required documents as well as other documents, which Defendant had no obligation to turn over. According to Defendant, Plaintiff is not entitled to interest and attorney's fees.

Plaintiff responds that she, a former American Airlines pilot, increased her benefits from $3,600 per month to $4,800 per month when she was still on active duty with the airline, but that Defendant only paid her benefits based on the $3,600 per month election. Plaintiff asserts that the statute of limitations was tolled while she pursued administrative remedies. Plaintiff also argues that she can recover statutory damages for Defendant's failure to timely provide plan documents, interest on benefits that Defendant paid retroactively several years later, and attorney's fees.

## DISCUSSION

Rule 56 (c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The issue for the court is "whether the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the burden of establishing the absence of a genuine issue as to any material fact. *Id.* If the moving party meets its burden, it is up to the non-moving party to proffer "specific facts showing that there is a genuine issue for trial" and that "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Celotex*

*v. Catrett*, 477 U.S. 317, 324 (1986).

In reviewing the evidence, the court must accept non-moving party's evidence as true and draw all justifiable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255. Further, the court must not make credibility determinations or weigh the evidence when considering whether summary judgment is proper. *Id.*

**1. Claim for additional benefits under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B)**

There is no dispute that Defendant Allied Pilot's Association's (APA) benefits plan ("Plan") at issue in this case is governed by ERISA. The Plan employs a claims processor to make initial determinations of the claims, which can be appealed to the Plan's Benefits Review and Appeals Board ("BRAB").

Plaintiff applied for disability benefits due to being diagnosed with a disqualifying medical condition on March 27, 2003. (DE 20-1, p. 6). On November 21, 2003, the Plan's claims processor sent Plaintiff a letter confirming its prior determination that Plaintiff was not on active flight status when she increased her level of benefits to $4800 per month, and, therefore, that Plaintiff's disability plan was reduced to $3600 per month. (DE 20-1, p. 11). The letter also advised Plaintiff of her right to appeal the decision to the BRAB within 180 days. (DE 20-1, p. 11). Plaintiff asserts that she did not receive the letter until May of 2004.

On May 31, 2004 Plaintiff appealed to the BRAB Defendant's claims processor's determination that she was not eligible to receive benefits based on her election of the $4800 per month level of benefits. (Exh. 8 to Def.'s Mot. for Summary Judgement (DE 41-2, pp. 116-18)). On July 16, 2004, Mr. Knoerr, Director of Benefits for Defendant APA, sent Plaintiff a letter

explaining that BRAB denied her appeal on this issue. (Exh. 11 (DE 41-2, pp. 188-89)). The letter

quoted the language of the Plan, and explained that when Plaintiff requested to increase her benefit

level under the disability Plan, Plaintiff was not on Active Flight Status under the terms of the Plan,

and, therefore, was not eligible for the increase. The letter concluded that this was the final step in

the Plan's claim appeal process, and that because Plaintiff's claim had been "partially denied," and

she has exhausted the Plan's administrative appeal process, she had the right to bring a civil action

under section 502(a) of ERISA.

Plaintiff claims that the letter did not provide her an adequate notice of the denial of her

appeal because the decision denying the appeal was based on erroneous information, and because

the letter did not include a copy of the decision signed by the BRAB's voting members. Also,

Plaintiff seems to contend that the statue of limitations was tolled while she pursued administrative

remedies in the form of appeals to the Defendant. Subsequently to the appeal described above,

Plaintiff appealed adverse decisions relating to her benefits being subject to a twelve-month

elimination period and denial of the refund of contributions during the elimination period; denial of

the claim for entitlement to benefits for the full 96-months period based on visual strabismus; and

denial of continuation of benefits due to late application for Social Security benefits. Defendant

informed Plaintiff of the decision on her latest appeal in a letter dated March 27, 2012. Defendant

began paying Plaintiff's benefits of $3600 per month approximately in July of 2004. (DE 20-1, p.

17).

At the time Plaintiff filed her initial appeal, the Plan did not contain a time limitation for

bringing civil actions following a denial of an appeal. (Exh. 2 Def.'s Mot. for Summary Judgement

(DE 41-2)). The Plan was amended effective October 1, 2005 to include a provision stating that no

action at law or in equity can be brought to recover benefits under the Plan more that three (3) years

after the Plan's final decision on the participant's benefit appeal. *Id.* at p. 54.

ERISA does not provide a statute of limitations. *Bennett v. Metropolitan Life Ins. Co.*, 383

Fed. App'x 870, 872 (11th Cir. 2010).[3]  Courts either apply the contractual provision, if it is

reasonable, or borrow a closely analogous state limitations period. *Id.* (applying contractual period

of three (3) years as reasonable).  For claims under section 502(a)(1)(B) of ERISA, courts should

borrow state statute of limitations for the breach of contract claims. *See Harrison v. Digital Health*

*Plan*, 183 F.3d 1235, 1241 (11th Cir. 1999) (applying Georgia's statute of limitations for an action

on a written contract for a claim brought in Georgia).

Plaintiff is a resident of Florida, and her base when she was employed by American Airlines

was in Miami.  In Florida,[4] the statute of limitations is five (5) years for an action on a written

contract. Fla. Stat. §95.11(2)(b); *Hoover v. Bank of America*, 286 F.Supp. 2d 1326, 1333 (M.D. Fla.

2003)(applying Florida five-year statute of limitations period to a claim under section 502(a)(1)(B)

of ERISA, and North Carolina statute of limitations to events that predated ERISA and occurred in

North Carolina)  aff'd by 127 Fed.App'x 470, 2005 WL 107041, for text see 2005 WL 80957.

Under ERISA a claim does not accrue until an application for benefits is denied. *Hoover*,

286 F.Supp. 2d at 1333 (citing *Paris v. Profit Sharing Plan for Emp. of Howard B. Wolf, Inc.*, 637

---

[3]In the Eleventh Circuit, unpublished opinions are not binding precedent but may be cited
as persuasive authority. U.S. Ct. of App. 11th Cir., Rule 36-2.

[4]The APA is located in Texas.  The equivalent Texas statute is four (4) years. *Dye v.
Associates First Capital Corp. Cafeteria Plan*, 243 Fed. App'x 808, 809 (5th Cir. 2007) (citing
Tex. Civ. Prac. & Rem. Code § 16.004).

F.2d 357, 361 (5th Cir. Feb. 17, 1981)[5]).  Also, "[t]he law is clear in this circuit that plaintiffs in

ERISA actions must exhaust available administrative remedies before suing in federal court." *Counts*

*v. American Gen. Life and Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997).  It is not settled

whether the statute of limitations is tolled while plaintiff pursues administrative remedies.  *See*

*Radford v. Gen. Dynamics Corp.*, 151 F.3d 396, 400 (5th Cir. 1998) (holding that tolling ERISA's

statute of repose governing breach of fiduciary duty claims was not appropriate even in light of a

requirement to exhaust administrative remedies); *Amos v. Hartford Life and Acc. Ins. Co.*, CV-08-

BE-2165-M, 2009 WL 1804989 (N.D. Ala. June 24, 2009) (declining to follow *Radford*, and finding

that statute of limitations for a claim for benefits was tolled while plaintiff pursued administrative

remedies); *Jeffries v. Trustees of Northrop Grumman Savings & Inv. Plan*, 169 F.Supp. 2d 1380,

1382 (M.D.Ga.2001) (same for a breach of fiduciary duty claim).

     Here, on July 16, 2004 Defendant denied Plaintiff's appeal of the claim that she should

receive benefits based on her $4800 per month election.  (DE 41-2, p. 188 of 248).  The letter

explained the reason for the denial, clearly stated that Defendant intended to take no further steps

regarding this issue, and instructed Plaintiff that she had a right to file suit under ERISA.  *Id.*

Plaintiff filed this suit more than seven (7) years later.  Even if Plaintiff's claim accrued not when

the claim was initially denied, but when she exhausted her administrative remedies on July 16, 2004,

and if Florida statute of limitations, which is the most generous of all potentially applicable ones,

is applied, Plaintiff's claim is untimely.  There is no authority supporting Plaintiff's position that the

statute of limitations should be tolled while she pursued administrative remedies unrelated to this

---

[5]The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), adopted as binding precedent all decisions of the Fifth Circuit rendered prior to October 1, 1981.

claim.[6]   Therefore, there is no genuine issue of material fact in relation to the claim for benefits

asserted in this case. Consequently, the Court need not reach the issue of the appropriate standard

of review raised in Plaintiff's Motion for Summary Adjudication as to the Standard of Review (DE

20).

### 2. Claim for penalties for failure to timely furnish plan documents under section 502(c), 29 U.S.C. § 1132(c), and the remaining claims

According to ERISA, "[t]he administrator shall, upon written request of any participant or

_____

[6]For example in Florida, statutes of limitations can be tolled by:
(a) Absence from the state of the person to be sued.
(b) Use by the person to be sued of a false name that is unknown to the person
entitled to sue so that process cannot be served on the person to be sued.
(c) Concealment in the state of the person to be sued so that process cannot be
served on him or her.
(d) The adjudicated incapacity, before the cause of action accrued, of the person
entitled to sue. In any event, the action must be begun within 7 years after the act,
event, or occurrence giving rise to the cause of action.
(e) Voluntary payments by the alleged father of the child in paternity actions
during the time of the payments.
(f) The payment of any part of the principal or interest of any obligation or
liability founded on a written instrument.
(g) The pendency of any arbitral proceeding pertaining to a dispute that is the
subject of the action.
(h) The period of an intervening bankruptcy tolls the expiration period of a tax
certificate under s. 197.482 and any proceeding or process under chapter 197.
(i) The minority or previously adjudicated incapacity of the person entitled to sue
during any period of time in which a parent, guardian, or guardian ad litem does
not exist, has an interest adverse to the minor or incapacitated person, or is
adjudicated to be incapacitated to sue; except with respect to the statute of
limitations for a claim for medical malpractice as provided in s. 95.11. In any
event, the action must be begun within 7 years after the act, event, or occurrence
giving rise to the cause of action.
Fla. Stat. § 95.051(1).
Disability does not toll the statute of limitations prescribed by section 95.11. Fla. Stat. §
95.051(2).

Case 9:14-cv-80518-DTKH   Document 14-1   Entered on FLSD Docket 08/28/2014   Page 10 of
159
Case 9:11-cv-81123-KLR   Document 66   Entered on FLSD Docket 12/27/2012   Page 9 of 16

beneficiary, furnish a copy of the latest updated summary,[5] plan description, and the latest annual

report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments

under which the plan is established or operated."   29 U.S.C. §1024(b)(4).   In turn, section

502(a)(1)(A) of ERISA states that an administrator,

> who fails or refuses to comply with a request for any information which such
> administrator is required by this subchapter to furnish to a participant or beneficiary
> (unless such failure or refusal results from matters reasonably beyond the control of
> the administrator) by mailing the material requested to the last known address of the
> requesting participant or beneficiary within 30 days after such request may in the
> court's discretion be personally liable to such participant or beneficiary in the amount
> of up to $100 a day from the date of such failure or refusal, and the court may in its
> discretion order such other relief as it deems proper.

29 U.S.C. §1132(c)(1)(B).

The penalty amount was subsequently changed from $100 to $110 per day.   *Byars v. Coca-*

*Cola Co.*, 517 F.3d 1256, 1270 (11th Cir. 2008) (citing 29 C.F.R. § 2575.502c-1 (2007)).   The

imposition of the penalty is within the discretion of the district court.   29 U.S.C. §1132(c); *Hunt v.*

*Hawthorne Assoc., Inc.*, 119 F.3d 888, 914 (11th Cir. 1997).

Plaintiff is not required to show any prejudice, but prejudice may be considered as a factor

when deciding whether a penalty should be assessed.   *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488,

1494 (11th Cir. 1993).   The penalty is punitive in nature, and is designed to punish the violator rather

than to compensate the plaintiff.   *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1231 (11th

Cir. 2002).

Federal regulations require plans to establish procedures for claims handling and for appeals

of adverse benefit determinations, and to provide claimants copies of all materials relevant to their

claims.   29 C.F.R. § 2560.503-1.   However, only formal legal documents governing the plan fall

---

[5]Comma is included in the original.

within "other instruments under which the plan is established or operated," which can subject the administrator to a statutory penalty, and all materials relevant or pertinent to a claim are not included in this definition. *See, e.g., Byars v. Coca-Cola Co.*, 01-CV-3124-TWT, 2006 WL 2523095, at *6-8 (Aug. 28, 2006) affirmed in relevant part, vacated in part by *Byars v. Coca-Cola Co.*, 517 F.3d 1256, 1270 (11th Cir. 2008) (failure to produce documents that may be required to be furnished under 29 C.F.R. § 2560.503-1 does not subject an administrator to statutory penalties under § 502(c) of ERISA, 29 U.S.C. § 1132(c)); *Moody v. Skaliy*, 05-CV-2337-JEC, 2007 WL 1496691, at *8-9 (N.D. Ga. Mar. 27, 2007) affirmed by *Moody v. Skaliy*, 289 Fed.Appx. 361, 363 (11th Cir. 2008); *Ferree v. Life Ins. Co. of North Am.*, 05-cv-2266-WSD, 2006 WL 2025012, at *3-6 (N.D. Ga. Jul. 17, 2006). Therefore, failure to furnish a claimant all claims procedures, policies, and documents created during claim review should not subject the administrator to statutory per diem penalties. *See Ferree*, 2006 WL 2025012, at *3-6.

Defendant argued that Plaintiff did not identify any specific requests, and that all requested information was timely furnished to her. In response, Plaintiff only stated that she requested plan documents on multiple occasions, and that Defendant failed to provide them to her or provided them late, but does not identify any specific requests. However, in the late filed Affidavit (DE 58) and accompanying exhibits, Plaintiff identifies twenty-four (24) requests to the APA and its claims processors, which allegedly were not properly responded to, and which, therefore, should subject Defendant to statutory penalties. As mentioned earlier, the Affidavit was untimely and should be stricken from the record. However, even if the Affidavit is considered, Defendant's Motion for Summary Judgement on this claim is due to be granted.

Plaintiff 's Affidavit indicates that the requests for documentation were included as Exhibit

33. (DE 58-6). However, Exhibit 33 does not contain copies of all requests upon which Plaintiff relies. Several requests were made in person or over the telephone, and the statute only provides for penalties for failure to respond to written requests.

Further, in the written requests that are included, Plaintiff seeks claim handling policies and materials Defendant generated during the claim handling process rather than plan documents. For example, in the letter to the claims processor dated January 7, 2010, Plaintiff acknowledges that she received the plan booklet, but goes on to state that certain claim file documents were not provided to her. (DE 58-7, p. 4). Likewise, in the letter dated November 5, 2009, Plaintiff acknowledges that she was sent a copy of the claim file, but states that it was incomplete. (DE 58-6, p. 47). Even if Defendant was obligated by the regulations to fulfill Plaintiff's requests, any failure to provide claim file documents cannot subject Defendant to the statutory per diem penalty. Accordingly, even if Plaintiff's late filed Affidavit is considered, there is no genuine issue of material fact.

**3. Claim for prejudgment interest under section 502(a)(3), 29 U.S.C. § 1132(a)(3)**

A claim for prejudgment interest on unpaid benefits pursuant to Section 502(a)(3) must be predicated upon "either a violation of ERISA or the enforcement of a plan provision or an ERISA provision." *Green v. Holland*, 480 F.3d 1216, 1224 (11th Cir. 2007). In *Green*, the Eleventh Circuit left open the question whether a stand-alone claim for accrued interest where benefits were withheld in violation of either a benefit plan or ERISA itself would be cognizable under § 502(a)(3) on a theory of equitable restitution, and found that plaintiff's claim for interest had no chance of success because he failed to show a violation of the plan or of ERISA. *Green*, 480 F.3d 1224-28. Plaintiff in *Green* received a lump sum payment reflecting the past eight years of pension benefits after the plan diligently and in good faith undertook to determine plaintiff's eligibility to receive them. *Id.*

Here, Plaintiff argues that Defendant did not timely adjudicate her claims in violation of the regulations promulgated under ERISA, which are incorporated into the terms of the Plan, and withheld Plaintiff's benefits for over five years. The crux of the dispute centers on Plaintiff's allegations that the Plan had documentation reflecting Plaintiff's diagnosis of visual strabismus since at least 2005 along with the contact information for Plaintiff's ophthalmologists and an authorization to obtain her medical records, and even Plaintiff's records from Drs. Weiss and Chao, Plaintiff's vision doctors. Def.'s Statement of Facts, ¶¶ 27-39 (DE 41); Pl.'s Decl. ¶¶ 27-39 (DE 52). Yet, Defendant claims that no medical records relating to a visual impairment were available, and the claim for benefits on this basis was tolled until approximately 2009 when the claims processor denied it. *Id.* BRAB ultimately granted Plaintiff's appeal on this issue, and in December of 2010 she received retroactive benefits covering May, 2006 through December, 2010. *Id.*

The question becomes whether Plaintiff's alleged facts, taken as true, establish either a violation of the terms of the Plan, or of ERISA. The Plan, which became effective in August 2004, warns that failure to provide accurate medical information may unnecessarily deny claim processing and may result in denial of the claim, and states that the claimant is responsible for assisting the claims processor if permission to obtain medical information is required. (DE 41-2, p. 40 of 248). It also states in relevant part:

Claims Process
The Claims Processor has the responsibility for completing the claims process. Except for a claim appeal, APA will not revisit decisions made by the Claims Processor. The Claims Processor will generally complete the claims process within forty-five (45) days from the date that claim form is received. If the claim is denied, in whole or in part, the Claims Processor shall provide a written notice of denial within forty-five (45) days of the date the claim is received. This forty-five (45) day period may be extended an additional thirty (30) days if more time is needed for claim processing and the Claims Processor notifies the claimant during the initial

forty-five (45) day period.

Notice of any extension beyond the initial forty-five (45) days must explain the standards on which the entitlement to a benefit is based, the unresolved issues regarding the claim and the additional information needed to resolve those issues. If such an extension is necessary due to the claimant's Physician(s)'s or medical provider(s)'s failure to submit the information necessary to decide the claim, the notice of extension will specifically describe the required information, and the claimant will be afforded at least 45 days from receipt of the notice within which to provide the specified information or ensure that the claimant's Physician(s) or medical provider(s) provide it. The 30-day extension period will not begin until the claimant has provided the requested information.

If, prior to the end of the first 30-day extension period, the Claims Processor determines that a decision cannot be rendered due to matters beyond its control, the period for making the determination may be extended up to an additional thirty (30) days. In this case, the Claims Processor will notify the claimant, prior to the expiration of the first 30-day extension period, of the circumstances requiring the additional extension and the date when the Claims Processor expects to render a decision. If the period of time to process the claim must be extended because of the Plan Participant's failure to submit information necessary to a full and fair decision on the claim, the notice will also state that the period for making the decision will be tolled from the date on which the notification of the extension is sent to the Plan Participant until the date on which the Plan Participant responds to the request for additional information.

(DE 41-2, p. 41 of 248).

The Plan likewise states that it was designed to help pilots through periods of prolonged disability, and provides for monthly benefit payments. (DE 41-2, p. 32 of 248).

The Court is obligated to take Plaintiff's assertion that Defendant or its claims processor had not only Plaintiff's medical records, but also her ophthalmologists' contact information and a release to obtain her medical records, as true. The claim was tolled due to lack of medical records for several years. It is true that Plaintiff's original claim simply stated that she was applying for benefits due to a "disqualifying medical condition." (DE 41-2, p. 193 of 248). Plaintiff also suffered from depression, and Defendant initially paid her benefits on this basis. However, it is evident from the

correspondence that Defendant submitted, that it was aware of the visual strabismus diagnosis at least as of February 14, 2005, and thereafter considered this diagnosis to be a condition which could qualify Plaintiff for additional benefits. (DE 41-2, pp. 240, 242-43 of 248).

While the Plan allows tolling of the claim until the claimant responds to the request for additional information, it also squarely places the responsibility to complete the claims process on the claims processor, and provides that a claim can be denied for failure to provide medical records. Defendant's claims processor here did not complete the claims process for several years in violation of the terms of the Plan listed above. If medical records were indeed lacking, claims processor could have denied the claim, which would have enabled Plaintiff to appeal the decision, according to the terms of the Plan. Tolling a claim for such a prolonged period of time is not in keeping with the Plan's explicit purpose to assist participants who are unable to earn income as pilots and to provide monthly benefit payments. Therefore, Plaintiff can establish that Defendant violated the terms of the Plan.

While the Eleventh Circuit left open the question whether a stand-alone claim for accrued interest where benefits were withheld in violation of either a benefit plan or ERISA itself would be cognizable under § 502(a)(3) on a theory of equitable restitution, it also noted that other Circuits allow such claims. *See Green v. Holland*, 480 F.3d 1216, 1226 n. 7 (11th Cir. 2007) (listing cases from the Second, Third, Eighth, and D.C. Circuits). Defendant argues that the fact that the Plan does not provide for payment of interest on delayed benefit payments forecloses Plaintiff's claim. However, the plan in *Green* likewise did not provide for such interest payments. 480 F.3d at 1223.

The decisions of the Supreme Court in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) and *Sereboff v. Mid Atlantic Med. Serv. Inc.*, 547 U.S. 356 (2006), likewise do not

foreclose a claim for interest on delayed payments. For example, the Third Circuit has considered the effect of *Knudson* on such a claim, and concluded that it is cognizable. *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 209-15 (3rd Cir. 2004). This reasoning is very persuasive. As the Eleventh Circuit noted in *Green*, *Sereboff* clarified and reiterated that a "suit to recover a specific, identifiable asset in the possession of a defendant would constitute a valid equitable restitution claim, and that therefore such a claim would be permissible under ERISA § 502(a)(3)." 480 F.3d at 1225-26. Because *Skretvedt* would still stand in light of the ruling in *Sereboff*, a claim for interest on benefit payments voluntarily paid by the plan with a delay should be cognizable. Therefore, summary judgment is not appropriate on this claim.

**4. Claim for attorney's fees under section 502(g)(1), 29 U.S.C. § 1132(g)(1)**

Under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). However, a pro se litigant, even if he or she is an attorney, may not recover attorney's fees. *Kay v. Ehrler*, 499 U.S. 432 (1991). Therefore, it is not appropriate for a pro se litigant to recover fees under ERISA. *See Chaganti v. Ceridian Benefits Servs., Inc.*, 208 Fed. App'x 541, 548 (9th Cir. 2006).

Plaintiff in this case appears pro se. Therefore, she did not incur and cannot recover attorney's fees, and summary judgment is appropriate on this claim.

## CONCLUSION

In conclusion, **IT IS HEREBY RECOMMENDED THAT** Defendant's Motion to Strike (DE 60) be **GRANTED**; Plaintiff's Motion for Summary Adjudication as to the Standard of Review (DE 20) be **DENIED**; and Defendant Allied Pilots Association's Motion for Summary Judgement

(DE 40) be **DENIED** as to Plaintiff's claim for prejudgment interest pursuant to 29 U.S.C. § 1132(a)(3) (Count III), and **GRANTED** as to all other claims.

### <u>NOTICE OF RIGHT TO OBJECT</u>

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Kenneth L. Ryskamp, Senior United States District Court Judge for the Southern District of Florida. In light of the fact that this case is set for trial in January with the calendar call commencing on January 23, 2013, objections to this Report and Recommendation, if any, must be filed **within seven business (7) days** of being served with a copy of this Report and Recommendation. *United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978) (the time period for objections set out in 28 U.S.C. § 636(b)(1) is a maximum, not a minimum). Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. *See LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND SUBMITTED** in Chambers this 27 day of December 2012, at West Palm Beach in the Southern District of Florida.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Hon. Kenneth L. Ryskamp, Senior United States District Court Judge for the Southern District of Florida

Counsel of record

Kathy E Emery
1050 N.E. 91st Street
Miami, FL 33138

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No.: 11-CV-81123-RYSKAMP/HOPKINS


KATHY E. EMERY,

       Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

       Defendant.

_____/

## ORDER ADOPTING REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE

**THIS CAUSE** comes before the Court on the report of United States Magistrate Judge Hopkins **[DE 66]** entered on December 27, 2012.  Plaintiff filed objections **[DE 67]** to the Magistrate's report on January 9, 2013.  This matter is ripe for adjudication.

The Court has conducted a *de novo* review of the report, objections, and pertinent portions of the record.  Accordingly, it is hereby

**ORDERED AND ADJUDGED** that

     (1) The report of United States Magistrate Judge Hopkins **[DE 66]** be, and the same hereby is **RATIFIED, AFFIRMED and APPROVED** in its entirety;

     (2) Defendant's motion to strike **[DE 60]** is **GRANTED**;

     (3) Plaintiff's motion for summary adjudication **[DE 20]** is **DENIED**; and

1

(4) Defendant's motion for summary judgment **[DE 40]** is **DENIED** as to Plaintiff's claim for prejudgment interest pursuant to 29 U.S.C. § 1132(a)(3) (Count III) and **GRANTED** as to all other claims.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 11 day of January, 2013.

/s/ Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No.: 11-CV-81123-RYSKAMP/HOPKINS

KATHY E. EMERY,

      Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

      Defendant.

_____/

**FINAL JUDGMENT**

The Court incorporates the findings of fact and conclusions of law set forth in the Order adopting the Magistrate's report **[DE 66]** granting summary judgment for Defendant Allied Pilots Association on Plaintiff Kathy E. Emery's claims for benefits, statutory penalties, and attorneys' fees, *see* **[DE 69]**, and the Court's Order setting a prejudgment interest rate of 9.5% and awarding Plaintiff $47,058.29 in total interest.

     **FINAL JUDGMENT** is hereby granted in favor of Defendant and against Plaintiff for Plaintiff's claims for benefits, statutory penalties, and attorneys' fees, and in favor of Plaintiff and against Defendant for Plaintiff's claim of prejudgment interest.  The Clerk of Court is directed to **CLOSE** this case and **DENY** any pending motions as **MOOT**.

     **DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 16 day of April, 2013.

                           /s/ Kenneth L. Ryskamp
                           KENNETH L. RYSKAMP
                           UNITED STATES DISTRICT JUDGE

1

# Exhibit 2

LOA 12-01

# American Airlines®

January 1, 2013

Keith Wilson
President
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Ft. Worth, TX  76155-2512

Subject: <u>Settlement Consideration and Bankruptcy Protections</u>

Dear President Wilson:

The Tentative Agreement dated November 16, 2012 reached between American Airlines, Inc. ("Company") and the Allied Pilots Association ("APA") in connection with the Company's Chapter 11 Restructuring was agreed to in furtherance of the Company's effort to restructure its capital structure and operations, and in consideration of the terms of the Tentative Agreement and this Letter of Agreement.  This Letter of Agreement will be binding on any Chapter 11 trustee that may be appointed in the Company's present bankruptcy cases, In re AMR Corporation, et al., Chapter 11 Case No. 11-15463(SHL) (hereinafter "Bankruptcy Cases"), or other entity operating with the equivalent authority of a Chapter 11 trustee.

The Company and APA agree as follows:

**1.  <u>Settlement Consideration.</u>**  In full and complete satisfaction of any and all claims APA has or might arguably have, on behalf of itself or the pilots represented by APA, pursuant to the Railway Labor Act ("RLA") or under or with respect to the abrogated collective bargaining agreement between the Company and APA or the existing pilot terms and conditions of employment ("Green Book"), against the Debtors (or any of them) in the Bankruptcy Cases, and subject to the approval of the Bankruptcy Court, APA will receive under a plan or plans of reorganization of the Debtors equity in the reorganized entity (the "APA Settlement Consideration") equal to 13.5% of such equity issued to the holders of allowed prepetition unsecured claims (including APA) against the Debtors (including any equity issued with respect to other unions) (collectively the "Unsecured Claims").  The APA Settlement Consideration fully, finally, and completely extinguishes any and all claims, interests, causes or demands (including any and all pending grievances, excluding those grievances identified in Exhibit 1) that APA has or might arguably have, on behalf of itself or the pilots represented by APA, pursuant to the RLA and the terms of the abrogated CBA and/or the Green Book, against the Debtors arising prior to the Effective Date of this Letter of Agreement as defined below.  The APA Settlement Consideration will not be diluted by any subsequent events other than: (1) equity consideration given to holders of interests in another entity in the event of a merger or consolidation as provided below; (2) an equity offering approved by the Bankruptcy Court in conjunction with confirmation of a plan of reorganization; (3) equity consideration granted to management in connection with incentive plans approved by the Bankruptcy Court; and (4) any post-emergence equity issuance.

Notwithstanding anything in the preceding paragraph to the contrary, the APA Settlement Consideration will not encompass or extinguish the following claims related to these specific grievances or lawsuits:  American Airlines, Inc. v. Allied Pilots Ass'n, No.  4:12-cv-00083-Y (N.D. Tex); and Canada v. American Airlines, Inc., et al., No. 3:09:0127 (M.D. Tenn.), Case No. 10-6131 (6th Cir.); Furland v. American Airlines, Inc., ARB Case Nos. 09-102, 10-130, ALJ Case No. 2008-AIR-011; American Airlines, Inc. v. Administrative Review Board, Department of Labor, Case No. 11-14419-C (11th Cir.); and pending discipline grievances.

Subject to the foregoing, in the event of a reorganization plan for the Debtors that provides for the consolidation of the Debtors with a third party, the APA Settlement Consideration shall be equal to 13.5% of the total consideration distributed with respect to the Unsecured Claims, and shall be issued contemporaneously with the consideration distributed under the plan with respect to the other Unsecured Claims.

The APA Settlement Consideration will confer upon APA all statutory rights to vote on any plan or plans of reorganization presented by the Company or any other entity.  In the event that the APA Settlement Consideration has not yet been actually issued, it will be estimated for voting purposes as if APA held allowed unsecured claims in an amount that would entitle it to the APA Settlement Consideration.  Neither the APA Settlement Consideration nor any rights under this Letter of Agreement may be assigned or transferred (including the granting of any participation) prior to the effective date of a Bankruptcy Court confirmed Plan of Reorganization, except with the express written consent of the Company exercised in its sole discretion.

**2.  Effective date**.  This Letter of Agreement shall not become effective until the last-occurring of these events (the "Effective Date"):

(1)  The Tentative Agreement is ratified by the pilot membership pursuant to procedures determined by the APA Board of Directors;

(2)  The Tentative Agreement and this Letter of Agreement are approved by a final order of the United States Bankruptcy Court for the Southern District of New York which order has not been stayed.

It is expressly understood and agreed that if the Effective Date does not occur, all of the terms contained in this Letter of Agreement are inapplicable and will be of no force or effect.  Upon the occurrence of the Effective Date, but prior to the approval of any Plan of Reorganization in these cases, this Letter of Agreement shall constitute a binding and enforceable post-petition agreement between APA and the Company.

**3.  Administrative claim for fees and expenses.**  APA shall have an allowed administrative expense claim as of the Effective Date in an amount sufficient to reimburse APA for all reasonable fees and expenses (including attorneys and experts) incurred by APA in the Bankruptcy Cases in connection with the negotiation and/or litigation related to the Tentative Agreement, this Letter of Agreement, and Plan of Reorganization (including APA's opposition to the Company's Motion pursuant to 11 U.S.C. 1113) not to exceed $5 million.  In addition, on the Effective Date, APA shall have an allowed administrative expense claim in the amount of up to $5 million for the reasonable fees and expenses of APA's investment banker (Lazard) incurred by APA in the Bankruptcy Cases in connection with the negotiation and/or litigation related to the Tentative Agreement, this Letter of Agreement, and Plan of Reorganization (including APA's opposition to the Company's Motion pursuant to 11 U.S.C. 1113).  The fees and expenses payable hereunder shall not include fees or expenses incurred in connection with the pursuit of any third party purchaser of the Debtors or a merger partner (including but not limited to US Airways).

**4.  Withholding.**  The APA Settlement Consideration will be subject to applicable governmental withholding and reporting requirements.  Any amounts so withheld will be treated for all purposes as having been paid to and received by the applicable recipient.  In the case of a non-cash payment, the withholding agent may withhold an appropriate portion of the property and sell the withheld property on the recipient's behalf to generate the cash necessary to satisfy and pay the withholding.  To the extent any non-cash payment is withheld, the withholding agent will hold such property in an escrow account until the property is timely sold, at the direction of APA.  The escrow account will permit APA to vote any equity amount.  In the event, or to the extent, that the APA Settlement Consideration has been allocated as of the effective date of a Bankruptcy Court confirmed Plan of Reorganization to the pilots represented by APA (such that it is capable of being distributed to the pilots within a reasonable time), the Company will be the withholding agent (with the cooperation of APA).  To the extent that it has not been so allocated, APA will be the withholding agent (and the Company will assist in the processing of any applicable payroll returns, deposits and the like).

Any withholding obligations will not impact or reduce APA's statutory rights to vote on any plan or plans of reorganization presented by the Company or any other entity as described above in Paragraph 1.

5.  **Indemnification.**  The Company will indemnify and hold harmless APA and its current or former (a) members, (b) officers, (c) directors, (d) committee members, (e) employees, (f) advisors, (g) attorneys, (h) accountants, (i) investment bankers, (j) consultants, (k) agents, (l) actuaries, (m) financial advisors, (n) professionals, (o) agents and (p) other representatives (each an "Indemnitee") from fifty percent of any liability, loss, damages, fines, penalties, taxes, expenses and costs (not including any income or excise taxes or similar amounts imposed by any governmental agency) relating to, concerning or resulting from any and all third party claims, lawsuits or administrative charges of any sort whatsoever, including fifty percent of the reasonable attorney's fees and costs, arising in connection with matters relating to, concerning or connected to the negotiation or establishment of (x) the Tentative Agreement and this Letter of Agreement, (y) any amendment of any benefit plan or program concerning pilots or other participants in such plan made pursuant to or as a result of the Tentative Agreement and this Letter of Agreement, and (z) any other document or agreement forming part of the Tentative Agreement and this Letter of Agreement.  This fifty-percent sharing arrangement will exist until APA's financial exposure reaches $5 million.  Any exposure exceeding $5 million will be the responsibility of the Company.

Such indemnification and hold harmless obligation will not apply to: (1) any claim, lawsuit or administrative charge resulting from the willful or intentional conduct of any Indemnitee; (2) any claim, lawsuit or administrative charge asserting that APA violated its By-Laws or other organizational requirements by entering into the Tentative Agreement and this Letter of Agreement; (3) any claim, lawsuit or administrative charge resulting from any statement made by any Indemnitee that incorrectly describes the Tentative Agreement or Letter of Agreement or the modifications made thereby; (4) any claim, lawsuit or administrative charge related to allocation among American pilots represented by APA of any claim or any proceeds or distribution received in connection with the APA Settlement Consideration; or (5) any claim, lawsuit or administrative charge related to any disposition by APA or pilots represented by APA to third parties of the APA Settlement Consideration or any proceeds or distribution received in connection therewith.

An Indemnitee seeking to be indemnified and held harmless pursuant to this paragraph must provide to the Company written notice within seven business days of the Indemnitee learning of the claim, lawsuit or administrative charge as to which the Indemnitee seeks to be indemnified and held harmless.  The Company will have the right to conduct the defense of such matter with counsel of the Company's choosing and enter into a settlement of such matter.  The Company will give reasonable consideration to the wishes of the Indemnitee in connection with the matters described in the foregoing sentence.

6.  **Exculpation**.  The Company agrees that it will not propose or support any Plan of Reorganization that does not contain an exculpation or release provision for APA and each of its current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives at least as favorable as any exculpation or release provisions provided for the Company's officers, directors, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives.

7.  **Bankruptcy protection.**  From the date of this Letter of Agreement until a date three years from the date of this Letter of Agreement, the Debtors will not file or support any motion ("Motion") pursuant to 11 U.S.C. Sections 1113, 1113(e), or any other relevant provision of the Bankruptcy Code, seeking rejection or modification of, or relief or interim relief from, the Tentative Agreement or this Letter of Agreement and the finalized documents implementing the Tentative Agreement or this Letter of Agreement.  The Debtors will actively oppose any such Motion if filed by another party.

Notwithstanding the foregoing, the Debtors reserve the right to file or support any Motion if there is a material deterioration in the Company's financial condition or financial prospects, whether because of general economic conditions or otherwise.  All requirements and provisions of Section 1113 will also remain applicable to any such Motion.  APA reserves its right to object to such Motion and nothing in this Letter of Agreement shall be construed as an agreement by APA to such modifications or relief.

8.  **Court approval.**  With the full and active support of APA, the Company will file and prosecute a motion for approval and assumption of the Tentative Agreement and this Letter of Agreement under Sections 363 and 1113 of the Bankruptcy Code and any other applicable sections thereto if the condition set forth in Paragraph 2(1) is satisfied.  Both the motion and the proposed order attached thereto (the "363 Order") shall be in form and substance reasonably

acceptable to APA.  Both the Company and APA will use their reasonable best efforts to obtain the support of the Official Committee of Unsecured Creditors and other parties and stakeholders for the Tentative Agreement, including this Letter of Agreement, and to seek entry of the 363 Order.  Immediately upon entering into the Tentative Agreement, APA will file a motion to stay each of its appeals arising from the Bankruptcy Court proceedings, including its appeal of the dismissal of its Adversary Proceeding regarding the application of Section 1113 to amendable collective bargaining agreements, (appeal No. 1:12-cv-04376 (LAK)) (the "Adversary Proceeding Appeal"), its appeal of the Bankruptcy Court's August 15 Section 1113 decision (appeal No. 1:12-cv-07468 (CM)(GWG)) (the "Initial Section 1113 appeal"), the appeal from the Bankruptcy Court's September 5, 2012 Order granting the Company's Renewed Section 1113 motion (appeal No. 1:12-cv-07647 (CM)) (the "Renewed Section 1113 Appeal"), and its appeal from the Bankruptcy Court's decision granting in part the Motion in Limine filed by American in connection with its Renewed Section 1113 Motion (appeal No. 1:12-cv-07648 (CM)) (the "Motion in Limine appeal").  Upon the occurrence of the Effective Date, APA agrees to take all steps necessary to withdraw and dismiss immediately each and every appeal filed by APA related to the Bankruptcy Cases.

   **9.  Damages.**  Other than the APA Settlement Consideration and the claims reserved in Section 1 above, APA shall not have any claims as a result of the Company's requests for relief under Section 1113 of the Bankruptcy Code or the parties' entry into the Tentative Agreement or this Letter of Agreement.


Very truly yours,


/signed/

_____

Laura A. Einspanier

Vice President, Employee Relations



Agreed:


/signed/

_____

Keith Wilson

President

Allied Pilots Association

## Exhibit 1
## Grievances excluded from the settlement

| Grievance No | Date Filed | Grievant |
|---|---|---|
| 06-003 | 01/05/06 | Hunter Presidential |
| 07-009 | 02/12/07 | Hunter Presidential |
| 07-028 | 06/14/07 | Haug, William |
| 07-048 | 08/08/07 | Mock, James |
| 07-066 | 11/05/07 | Murphy, Robert |
| 07-082 | 12/10/07 | Emery, Kathy |
| 08-005 | 02/20/08 | Hill Presidential |
| 08-021 | 04/07/08 | Hass, Mark |
| 08-066 | 07/21/08 | Tierney, Michael |
| 08-102 | 10/08/08 | Smith, Sidney |
| 09-002 | 01/21/09 | Reinford, Philip |
| 09-006 | 03/04/09 | Decker, Richard |
| 09-016 | 03/27/09 | Weiland, Ronald |
| 09-036 | 07/17/09 | Balcom, Robert |
| 10-026 | 04/27/10 | Clark, John J |
| 10-077 | 10/13/10 | Minkin, Ronald |
| 10-087 | 12/21/10 | Smith, Carl |
| 11-019 | 04/12/11 | Bowling, Phillip |
| 11-031 | 05/11/11 | Torres, Felix |
| 11-033 | 05/23/11 | Conlon, Steven |
| 11-054 | 08/18/11 | LGA Domicile |
| 11-065 | 10/24/11 | Gordon, Michael |
| 11-066 | 11/02/11 | Bates Presidential |
| 11-067 | 11/18/11 | Sheehan III, James |
| 11-084 | 11/29/11 | AICA |
| 12-009 | 01/27/12 | Thompson Jr, Glen |

**Exhibit 1**
**Grievances excluded from the settlement**

| | | |
|---|---|---|
| 12-011 | 02/04/12 | Meadows, Lawrence |
| 12-012 | 05/22/12 | DFW Domicile |
| 12-010 | 02/01/12 | Maher, Sylvan |
| 12-016 | 03/09/12 | Thompson, Lawrence |
| 12-023 | 04/09/12 | Salameh, Elias |
| 12-030 | 05/16/12 | Pollenz, Alan |
| 12-034 | 06/12/12 | Piper, William |
| *12-111 | 10/26/12 | Gary, William |
| *12-113 | 10/26/12 | Jackson, Carl |
| *12-114 | 10/26/12 | Bacon, Stephen |
| 10-042 - EXPEDIT | 06/24/11 | Hill Presidential |

*PEH Grievances: the Company reserves the right to challenge as non-disciplinary and not subject to grievance process.

# Exhibit 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                               :
In re                                          :          **Chapter 11 Case No.**
                                               :
**AMR CORPORATION,** *et al.,*                 :          **11-15463 (SHL)**
                                               :
                                 **Debtors.**  :          **(Jointly Administered)**
                                               :
---------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND**
**FED. R. BANKR. P. 9019(a) AUTHORIZING ENTRY INTO COLLECTIVE**
**BARGAINING AGREEMENT AND SETTLEMENT LETTER AND APPROVING**
**CERTAIN COMPROMISES AND SETTLEMENTS IN CONNECTION THEREWITH**
**(ALLIED PILOTS ASSOCIATION)**

Upon the Motion, dated December 7, 2012 (the "**Motion**"),[1] of AMR Corporation

and its related debtors, as debtors and debtors in possession (collectively, the "**Debtors**"),

pursuant to sections 363(b) and 105(a) of title 11, United States Code (the "**Bankruptcy Code**")

and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

authorizing entry into the New CBA and Settlement Letter with  the APA and approving certain

compromises and settlements in connection therewith, and authorizing the Debtors to perform all

their obligations thereunder and to take such actions as may be necessary or desirable in

connection with or in furtherance thereof, all as more fully described in the Motion; and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431 dated

January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion and the

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

Hearing (as defined below) having been provided, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion on December 19, 2012 (the "**Hearing**"); and the Court having also considered (a) Supplement B Pilot Beneficiaries' Objection To The Debtors' Motion For Entry Of Order Authorizing Entry Into Collective Bargaining Agreement And Settlement Letter With Allied Pilots Association (ECF No. 5720), (b) Former TWA Pilots' Objection To The Debtors' Motion For Entry Of Order Authorizing Entry Into Collective Bargaining Agreement With Allied Pilots Association (ECF No. 5722) (the immediately preceding clauses (a) and (b) referred to collectively as the "**Objections**"), and (c) Statement Of The Official Committee Of Unsecured Creditors In Support Of Debtors' Motion For Entry Of Order Pursuant To 11 U.S.C. §§ 363(B) And 105(A) And Fed R. Bankr. P. 9019(A) Authorizing Entry Into Collective Bargaining Agreement And Settlement Letter And Approving Certain Compromises And Settlements In Connection Therewith (Allied Pilots Association) (ECF No. 5724); and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the Objections are overruled; and it is further

ORDERED that the New CBA and Settlement Letter and all of the terms and provisions thereof are hereby approved in their entirety, including, without limitation, the APA Settlement Consideration and Administrative Claim, and the Debtors are authorized to enter into

2

such agreements and perform all their obligations thereunder and to take such actions as may be necessary in connection with or in furtherance thereof; and it is further

ORDERED that within five business days after the occurrence of the Effective Date (as defined in the Settlement Letter), the APA shall take all steps necessary to withdraw and dismiss immediately each and every appeal filed by the APA in connection with the Debtors' chapter 11 cases; and it is further

ORDERED that nothing contained herein or in the New CBA and Settlement Letter shall constitute an assumption of any prepetition agreement nor shall anything herein be deemed to convert a prepetition claim into a postpetition claim or an administrative expense claim; and it is further

ORDERED that if the Debtors seek authorization to reject the New CBA or Settlement Letter subsequent to entry of this Order and after the New CBA or Settlement Letter become effective, nothing in the New CBA, the Settlement Letter or this Order shall alter the order or priority of any claim under the Bankruptcy Code or shall convert any prepetition or unsecured claim into a priority claim, secured claim, post-petition claim, or administrative expense claim; and it is further

ORDERED that any grievances filed by the Supplement B Pilots challenging the Debtors' ability to abrogate the collective bargaining agreement with the APA are moot and are not subject to the grievance and arbitration provisions of the New CBA; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions of this Order shall be immediately effective and enforceable upon its entry; and it is further

3

      ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from the interpretation and/or implementation of this Order.

Dated: New York, New York
       December 19, 2012

**_/s/ Sean H. Lane_**
United States Bankruptcy Judge

4

Exhibit 4

LOA 13-07



February 5, 2013

Keith Wilson
President
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Ft. Worth, TX 76155-2512

RE:  APA's Lump Sum Dispute Resolution Procedure ("Procedure")

Dear President Wilson:

APA has informed the Company that it has devised an internal policy that it will use in determining how it will allocate among the pilots the funds it obtained as an unsecured claim as part of the collective bargaining agreement reached during the course of the proceedings in, In re AMR Corporation, Case No. 11-15463-SHL. The parties hereby agree that any dispute about the distribution of the unsecured claim, including disputes over the APA's methodology for allocating such funds, the factors used to determine the allocation of funds, or regarding the amount allocated to any pilot, shall be subject exclusively to the APA's Lump Sum Dispute Resolution Procedure ("Procedure"). APA has informed the Company that the Procedure provides a process, open to all pilots within the APA-represented craft or class, whereby an individual pilot or a group of pilots may invoke and obtain a final and binding resolution by a qualified neutral Arbitrator. No such dispute shall constitute a grievance or be subject to arbitration or other forms of resolution under the terms of this new collective bargaining agreement.

Sincerely yours,

/signed/

Laura A. Einspanier
Vice President - Employee Relations

Agreed:

/signed/

Keith Wilson
President
Allied Pilots Association

Exhibit 5

# CONSTITUTION AND BYLAWS



HOME OFFICE
14600 Trinity Blvd., Suite 500
Ft. Worth, TX  76155-2512
(817) 302-2272

Ratified and Approved by
Allied Pilots Association Membership
September 16, 2010

Amendment #76
Effective: March 8, 2013

B.      Apprentice and inactive members shall enjoy all the benefits of active membership except the privileges of voting, holding elected office, and participation in Association sponsored programs where specific requirements prohibit such participation. *(10/18/74)*

C.      A member in bad standing shall not have the right to vote, hold office, nor participate in any of the privileges or benefits of active membership, provided, however, that a member's continued participation in an Association-sponsored benefit program shall not be terminated as a result of bad standing membership. *(11/09/2007)*

D.      Voting on matters presented at a domicile meeting shall be restricted to active members in good standing currently occupying a bid status at that domicile. *(02/07/93)*

E.      Members of the Association shall accept and agree to abide by the Constitution and Bylaws of the APA as they are in force or as they may be amended, changed, or modified in accordance with the provisions of this Constitution and Bylaws.

F.      In the event that the Association has discretion to distribute a lump sum payment ("Lump Sum Payment"), which shall be defined by the Board in the Lump Sum Dispute Resolution Procedure, any pilot or group of pilots who wishes to challenge the distribution shall be required to exhaust the Lump Sum Dispute Resolution Procedure. No pilot or group of pilots may take legal action against the Association with respect to any matter that could be addressed in the Lump Sum Dispute Resolution Procedure unless this particular Procedure has been invoked and exhausted by the pilot or group of pilots. *(11/28/12)*

## ARTICLE IV     NATIONAL OFFICERS

### Section 1.    Officers Defined

The National Officers shall be the President, Vice President, and Secretary-Treasurer.

### Section 2.    Eligibility

Only active members in good standing shall be eligible for nomination and election to National office. A National Officer who retires during a term of office shall vacate that office automatically upon retirement. Any National Officer who is ordered to Active Duty service in the United States military in excess of 90 consecutive days or more than 120 days in any twelve month period will be required to resign his/her office and the vacancy filled in accordance with Article IV, Section 7. *(06/12/2004)*

### Section 3.    Salary

The salary of the President, Vice President, and Secretary-Treasurer shall be as determined by the Board of Directors.

# Exhibit 6

3/5/13 12:42

358   APPENDIX A- General Lump Sum Dispute Procedure

359   LUMP SUM DISPUTE RESOLUTION PROCEDURE
360
361
362   1.      Scope of Policy

363

364          This Policy shall be applicable to the allocation of any "Lump Sum Payment,"

365          which shall be defined as any allocation of a bankruptcy claim, stock, stock

366          options, corporate notes or obligations, retroactive payments, contract signing

367          bonuses, profit-sharing payments, or other forms of fixed value received by the

368          pilot group from the Company on a one-time or periodic basis, unless the

369          measurement and allocation of the Lump Sum Payment is pursuant to a

370          Company-wide plan for which the terms that apply to the pilots are the same as

371          the terms that apply to other employees of the Company.  This procedure shall

372          apply to any dispute about the distribution of a Lump Sum Payment, including

373          any dispute over the APA's methodology for allocating such funds, the factors

374          used to determine the allocation of funds, or the amount allocated to any pilot (a

375          "Lump Sum Payment Dispute").

376

377   2.      Statement of Purpose and Preamble

378

379          The purpose of this Lump Sum Dispute Procedure ("Procedure") is to provide an

380          expedited arbitral dispute resolution procedure before a member of the National

381          Academy of Arbitrators to resolve any Lump Sum Payment Dispute.

382

383          The policy rests on a number of premises:

3/5/13 12:42

384

385   a.   Allocation decisions typically arise under circumstances that make it

386        particularly difficult to satisfy all elements of the pilot group.  For example,

387        the circumstances of the allocation may be unique or rare to occur, and

388        allocation decisions may involve distribution of substantial value among the

389        pilots.  In addition, allocation decisions necessarily involve compromises

390        between competing interests within the pilot group.

391

392   b.   APA's policy requires that its Board of Directors consider the purposes or

393        reasons for the Lump Sum Payment and apply relevant factors in light of these

394        purposes or reasons.  This policy serves two purposes: it provides the Board

395        with both a decision-making framework based on principle and sufficient

396        flexibility to differentiate among the very different circumstances that may

397        arise in the future.  Although relevant factors will vary based on the

398        circumstances, they may include, but are not limited to: pilots' past, current,

399        or projected rates of pay; relative seniority and/or longevity; per capita or pro

400        rata distribution or a combination thereof; benefits; and employment status

401        (for example, active, furloughed, discharged, suspended with grievance

402        pending, retired, resigned, death before the payment of the allocation

403        proceeds, or paid or unpaid leave status such as military leave, parental leave,

404        medical leave, disability leave, APA leave, management leave, or leave for

405        other reasons or under other contractual leave provisions).   Membership

406        status within APA is not a relevant factor.

407

3/5/13 12:42

408          c.   With respect to Lump Sum Payments, as to many other issues, the APA Board

409               of Directors is called on to make decisions that affect them individually as

410               well as affecting all of the pilots.  The decision by APA Board Members to

411               support an allocation methodology that is more favorable to them, their

412               demographic or their Domicile is not inappropriate if the Board Member does

413               so by considering the purposes or reasons for the Lump Sum Payment and

414               applying the relevant factors in light thereof.

415

416          d.   This expedited dispute resolution Procedure before an arbitrator who is a

417               member of the National Academy of Arbitrators provides the pilot group with

418               the means to resolve Lump Sum Payment Disputes without the need for

419               expensive, lengthy, and risky litigation, at the end of which there is often no

420               real winner.  This Procedure makes no distinction between pilots who are

421               members of APA and those who are not.

422

423   3.    APA Allocation Decisions

424

425          In making a decision on allocation of a Lump Sum Payment, APA shall consider

426          the purposes or reasons for the Lump Sum Payment and apply relevant factors to

427          seek an equitable outcome in light thereof.

428

429          The pilot group shall be notified of this Lump Sum Dispute Resolution Procedure

430          and the requirement to utilize the procedures for pursuing a Lump Sum Payment

431          Dispute prior to the 30-day time limit contained in paragraph 4.  The notification

Final Equity Distribution Summary Document WV.doc                                    18

3/5/13 12:42

432        and information shall be sent to all affected pilots by first class and/or electronic

433        mail, in a manner consistent with each pilot's chosen mailing preference, and

434        posted at the same date as the mailing on the APA website such that it is available

435        to pilots who are members and non-members of the Association.

436

437    4.     Expedited Dispute Resolution Procedure

438

439        An APA decision to allocate a Lump Sum Payment shall be subject to this

440        expedited Lump Sum Dispute Resolution Procedure.  The timeline for the

441        Procedure will be determined by considering all relevant circumstances, including

442        any contractual provision that requires the Lump Sum Payment to be allocated or

443        distributed by a set date.  In all cases, however, the Procedure must be invoked, as

444        provided by paragraph 5 below, within thirty (30) days from the date that the pilot

445        group is notified of the specific methodology of allocation by a posting on the

446        APA website that is accessible to members and non-members, unless the Board of

447        Directors decides to extend the deadline..

448

449    5.     Invoking the Lump Sum Dispute Resolution Procedure

450

451        In order to invoke the Procedure, a pilot or group of pilots must file a written

452        notice with the APA Secretary Treasurer within the time limit set by paragraph 4.

453        The notice must be in writing and specifically state the precisenature of the Lump

454        Sum Payment Dispute.  The notice shall not exceed ten pages.  The notice may

455        also include a reasonable number of relevant supporting documents.  The

3/5/13 12:42

456    arbitrator will use this notice to assist in organizing an efficient arbitration

457    proceeding. APA reserves the right to reject patently frivolous challenges.

458

459    6.    Question in Lump Sum Dispute Resolution Procedure

460

461    The question before the arbitrator shall be whether to uphold the APA Board of

462    Directors' allocation decisions and, if not, what specific modifications to the

463    decisions are required.  Prior to requiring any changes to APA's distribution

464    methodology, eligibility criteria, or other factor in the APA Board of Director's

465    allocation decision, the arbitrator must find that APA's actions or inactions are

466    either arbitrary, discriminatory, or in bad faith.

467

468    7.    Arbitration Process

469

470    a.    Arbitration proceedings are to be conducted and the award issued on an

471    expedited basis allowing for issuance of a timely arbitration award.

472

473    b.    The process for selection of an arbitrator shall be determined by the APA

474    President or his designee, *provided that* the arbitrator must be a member of the

475    National Academy of Arbitrators, have no conflicts of interest, and be

476    available on a timely basis.

477

478    c.    The Association may appear and participate in the arbitration proceedings.

479

3/5/13 12:42

480   d.   Procedural issues not set forth in this policy shall be determined by the
481        arbitrator, except that, to the extent possible, all disputes shall be part of a
482        single proceeding.   The EDC may confer with the arbitrator about
483        supplemental pre-hearing and hearing procedures to assure informed and
484        efficient participation by anyone who wishes to challenge the allocation
485        decision.
486

487   e.   The arbitrator shall consider but shall not be bound by the allocation decision
488        of the Board of Directors.
489

490   f.   The arbitrator shall issue a written decision and award stating whether the
491        Board of Director's allocation decision is upheld and, if not, what specific
492        modifications are required to be included in a revised method of allocation.
493        The decision will include a statement of reasons for the decision whether or
494        not it upholds the Board of Director's proposed method.
495

496   8.   Distribution to Pilot Group
497

498        Distribution of all or part of a Payment to the pilot group shall be governed by the
499        following:
500

501   a.   There shall be no distribution of a payment to the pilot group prior to forty-
502        five (45) days from the date that the pilot group is notified of the Board of
503        Director's allocation decision.

Final Equity Distribution Summary Document WV.doc                                          21

3/5/13 12:42

504

505     b.  No distribution payment of the primary allocation will occur without the

506         express written authorization of the APA President.

507

508     c.  In the event that the dispute resolution Procedure is invoked, in light of legal

509         risks and other appropriate factors, the arbitrator may direct that some or all of

510         the payment be held in a secure account or trust for an appropriate period

511         pending legal determinations.

512

513  9.  Requirement to Exhaust Dispute Resolution Procedure

514

515     No pilot or group of pilots may take legal action against the Association with

516     respect to any Lump Sum Payment Dispute unless the Procedure has been

517     invoked and exhausted by the pilot or group of pilots.

518

519  10.  Costs and Expenses

520

521     Costs and expenses incurred in the review process and any arbitration proceeding

522     shall be allocated as follows:

523

524     a.  Costs and expenses of the arbitration proceeding (fee and expenses of the

525         arbitrator, hearing room, transcript of the arbitration) shall be borne by the

526         Association.

527

3/5/13 12:42

528          b.   Costs and expenses of pilots invoking the the  Procedure shall be borne by

529                those pilots.

530

Exhibit 7

Challenge #_____
For Office Use Only

APA Equity Distribution Arbitration

**CHALLENGE**

My name is  Kathy E. Emery  and my Employee Number is  354954  ,  and I am submitting this Challenge (the "Challenge").

The category of my Challenge is:  (Check at least one)

| | |
|---|---|
| ☑ Percent Allocation among the Silos | ☐ Calculation Error |
| ☑ Silo Construction or Methodology | ☑ Other |
| ☑ Eligibility Standards | |

**BASIS**

The facts of my challenge are:

1. My status is "TAG" so I am entitled to be treated as an active pilot for the purposes of the distribution.  An active pilot is entitled to full eligibility from all four silos.

2. The effective date of my termination from the company is 10/18/07.  My grievance, No. 07-082 was filed 12/10/07 and is pending.

3. The APA acted in bad faith when they excluded me from the equity distribution.  It is arbitrary and discriminatory to treat me differently than other pilots similarly situated.

These reasons support the facts above and demonstrate that the distribution is arbitrary, discriminatory, or in bad faith.

See Exhibit 1
1. American Airlines PTR History indicating a termination date effective 10/18/07

See Exhibit 2
2. Letter of Agreement, Exhibit 1 (Grievances excluded from the settlement)
Grievance No. 07-082 for Grievant  Emery, Kathy

3. See Attached Summary with Exhibits.

You may also submit supporting documents (up to 10 pages / 5 megabytes). See: My Challenges | Upload a Document.

Note:  You may sign this document electronically by typing your full name below and checking the I Agree box. You may then save this file and upload it to the Equity Dispute website.

By checking this box, I certify that I am the pilot identified above and attest to the accuracy of the information I have entered and uploaded.

☑ I Agree

Signed:  Kathy E. Emery     Date:  5/19/2013

**SUMMARY**

**EQUITY DISTRIBUTION ARBITRATION CHALLENGE OF KATHY E. EMERY**

1.    On September 2, 1992 I was hired as a Commercial Pilot for American Airlines ("AA"). Prior to that date I enjoyed a successful career as a pilot for Pan American World Airways (Pan Am)

2.    On January 13, 2003, after more than ten (10) years of service with the company I was medically disqualified from performing my duties as a pilot for AA following a required medical evaluation performed by the company under the direction Thomas H. Bettes, M.D., (American Airlines Corporate Medical Director.)  No reason was given until July 2003.

3.    Following my medical disqualification by American Airlines Corporate Medical Director, and as a condition of receiving disability benefits.  I was directed to receive treatment from an American Airlines assigned physician, Dr. Enrique M. Suarez.

4.    On or about April 3, 2003, I applied for long term disability (LTD) benefits under American Airlines, Inc. Pilot Retirement Benefit Program, (the "Plan"), I was approved for disability benefits by Dr. Bettes in December 16, 2003.

5.    I remained under the care of the company assigned doctor E.M Suarez, when on January31, 2007, with no attempts by the company to verify my continued disability, my benefits were terminated.  This, despite the company's knowledge that I was taking the prescribed medication (sertraline) a FAA disqualifying  medication per Dr. Suarez recommendation.

6.    Under the terms of the Plan and  the Collective Bargaining Agreement between American Airlines, Inc. and the Airline Pilots in the service of the company, "[a]ny dispute as to the clinical validity of a Pilot Employee's Disability shall be established "by the corporate medical director…through claims procedures agreed to between the Company and the Association."(the "APA").

7.    Under the Plan, [a]ny dispute as to the clinical validity of a Pilot Employee's claim of the existence of a Disability or the continuation of the illness or injury which gave rise to such Disability shall be referred to a clinical source selected under the Agreements [the collective

bargaining agreement between the APA and American], and the findings of such source regarding the nature and extent of such illness or injury shall be final and binding upon the Company, the Association [APA] and the pilot.  The cost of referral of a dispute to the clinical source pursuant to this paragraph, including the cost of all <u>examinations</u> or proceedings in connection therewith, were to be shared equally by the Company and the Association.

8.     This procedure for resolution of a dispute over the clinical validity of my continued disability was ignored by AA.  So on August 2007, I appealed, requesting reinstatement of my LTD benefits with AA's Pension Benefits Administration Committee ("PBAC")  In support of my appeal I submitted updated medical records from my doctor in which it was stated:

> **...I am aware that Federal Aviation Regulations do not permit a pilot to fly while taking anti-depressant medication.  Presently, it is impossible to stabilize Ms. Emery without the daily intake of psychotropic medications this clinical dilemma renders Ms. Emery a disabled pilot.**

Dr. Suarez submitted to American his current Psychological Treatment Summary, for 1/1/07 to 8/26/07, which communicated his opinion that:

> **...in her current condition, Ms. Emery is disabled from functioning in her job as a pilot...However, it is quite possible that with continued treatment, which includes discontinuation of her current medications, after she is stabilized, she can be restored to functionality with respect to her employment...**

9.     On October 22, 2007 my disability appeal was arbitrarily and capriciously denied.  The appeal memorandum and the appeal denial letter outrageously asserted that a pilot's taking of a FAA-disqualify medication is irrelevant to a claim for disability benefits under the Plan.

> **While the specialist physician's observations regarding the Pilot's taking FAA-disqualifying medications are interesting, those comments and concepts are distinctly different and are irrelevant to a claim for benefits under the Plan... [because] the certification relates to licensure, not disability.**

10.    In rendering its decision, the PBAC purported to rely on evaluations made by Western Medical Evaluators ("WME"),   WME was not a properly selected or compensated clinical source under the Plan, and the conclusions contained in the WME report are inconsistent with, the medical information in the claim file, submitted by my assigned American Airlines doctor.  Moreover, no representative of WME ever examined me.

11.     Perhaps the most troubling, however, is Americans dealings with the outside medical reviewer, Western Medical Evaluators, Inc. ("WME"), upon whose report it allegedly based the decision to deny my appeal.  More specifically, WME submitted two identical reports with the <u>exception</u> of a change in conclusion as to my disability;  that is from a finding of **disabled** to **not disabled**.  That change was the result of an *ex parte* telephone conversation AA had with a WME employee in relation to having the reviewing physician clarify his report.

12.     On September 28, 2007, Ashlee Dickerson (WME's IME Coordinator) provided WME's report to AA via facsimile (the original report)

13.     WME's original report concluded:

**In summary therefore, if the administration of Sertraline prevents the pilot from performing her duties she is considered disabled from January 31, 2007 forward.**

14.     Following receipt of WME's original report, On October 11, 2007, AA's Deborah Jameson, the individual responsible for handling my appeal telephoned Ms. Dickerson. Ms. Jameson instructed "that there is a distinction between being "not fit for duty" (because of taking an FAA disqualifying medication) and being disabled".  Ms Dickerson was told to "explain to the specialist- we're not asking him to opine on fitness for duty- only on the disability issue- the pilots taking this medication doesn't necessarily mean she meets the definition of disability under the plan."

15.     Six days later, on October 17, 2007, Ms Dickerson provided a second report to AA via facsimile (WME's "changed report").

16.     WME's changed report concluded:

**In summary therefore, from all the information available there is no evidence that the pilot is disabled from performing her job duties from January 31, 2007 forward.**

17.     Except for the change in opinion on disability, WME's physicians' signatures (Drs. Greener and Grant) on the changed report are exact (cut-and-paste) replicas of the signatures on the original report.

18.     Following receipt of WME's changed report, Ms Jameson telephoned Ms. Dickerson on October 18, 2007 and again raised the issue of "fitness for duty" versus "disability"

Ms. Jameson "asked to have Dr. Greener 'clarify'

19.     On October 22, 2007, Ms Jameson received an electronic version of the changed report via email from Ms. Dickerson, who stated, "Dr. Greener agreed with the change and I have attached the amended report."

20.     Ms. Jameson then prepared an appeal memorandum with the "recommendation" to "deny" the appeal and a letter to me denying the appeal, both of which were dated October 22, 2010.  The appeal memorandum and the denial letter included verbatim WME's **changed** report."

21.     On October 22, 2007, my appeal was denied by Charlotte Teklitz.  Ms. Teklitz was responsible for deciding appeals.

22.     The appeal memorandum and the appeal denial letter were the only documents Ms. Jameson provided Ms. Teklitz to decide the appeal.   **WME's original report favoring Disability was not provided to Ms. Teklitz.**

23.     Following my receipt of the denial of my appeal from the PBAC, I received a letter from my supervisor Captain Thomas Hynes, Miami Chief Pilot and Director of Flight notifying me that I needed to make arrangements to return to work or be terminated.

24.     A hearing was scheduled with a Miami Chief Pilot, Brian Fields where I advised Captain Fields of my intention to immediately return to work.   Following Dr. Bettes decision,( that there was no evidence that I continued to be disabled or in need of treatment) and the WME decision confirming same,  there was only one obstacle to my returning to work.

25.     Pursuant to company policy, a pilot returning from medical disability must first obtain medical clearance from AA Medical before returning to work.   At the meeting with Captain Fields, it was agreed that since the company no longer considered me disabled, I would at the same time get my FAA First Class Medical from Dr. Bettes.

26.     Subsequently, I was scheduled for a FAA medical examination with Dr.Bettes. Notably he is the same doctor who medically disqualified me and the same doctor who determined that there was no evidence that I continued to be disabled.

27.    The result of that medical evaluation, I was denied medical clearance to return to work and Dr. Bettes declined to issue me a First Class Medical. .In fact Dr. Bettes did not even conduct a First Class Medical Exam as directed by the Miami Chief Pilot.   Dr. Bettes based his decision on the medical records before him, which were the very same records he purportedly reviewed when he terminated my disability benefits.

28.    Dr. Bettes seemed unaware of the fact that he had already issued a determination of no evidence of a disability.

29.    I have recently learned there is a company e-mail between the then Miami Chief Pilots Captain Thomas Hynes and Captain Brian Fields, where Brian Fields who conducted my initial hearing after learning that Dr. Bettes did not medically clear me, opined that I should be placed on Paid Withhold Status or on Disability Status.

30.    I am told that around that time, the APA had a contentious feud with one of the Miami Chief Pilots, Thomas Hynes (the water bottle incident).  The APA never followed up with the Miami Flight Office and insisted that all further proceedings would be conducted in Dallas.

31.    With no resolution , I filed a lawsuit in against American Airlines in or around December 2008, in the Florida Southern District to enforce my rights under ERISA, Case No. 08-22590.

32.    Around this time I had a second hearing with American Airlines Director of Flight Captain Mark,Hetterman.  His decision was to refer the matter back to American Airlines Pension Benefit Committee.  Captain Hetterman's notice was sent to Deborah Jameson at the PBAC and it appears that no action was taken.

33.    In the course of discovery in my lawsuit, I learned that AA tracked its "savings" resulting from the termination of disability claims like mine.  Many of the calculated savings were from WME denials.

34.    I also learned that WME (on whose reports AA relied to terminate my benefits) and its principles were indicted by the State of Texas in August, 2010,[1] for securing execution of documents by deception in connection with workers compensation claims during the precise time frame in 2007 and 2008 that they were performing services for AA.

35.     In a civil case filed in the State of Florida WME was accused of Fraud and Theft by Deception, including Mail and Wire Fraud.   WME engaged in a "double dipping" scheme wherein it sold its receivables to a factor company, Capital Funding Solutions, Inc. and then turned around and "cut and pasted" its own name back on invoices that Capital Funding had already bought from WME, and which were required to be invoiced in the name of Capital Funding.  This is the same method used to change my disability report from "disabled" to "not disabled".  WME and its principals also have been accused in affidavits filed in litigation pending in this case of sending out forged or fraudulent reports on doctors' behalf.

36.     WME submitted "reports" to AA about me containing signatures from two doctors, Drs. Greener and Drs. Grant.   After noticing what appeared to be "cut and paste" signatures of both doctors on the second changed report, I contacted the Drs.  I was not able to speak to Dr. Greener, but his office assistant claimed they had no records or information about me.

37.     I spoke personally to Dr. Grant who stated that she had worked for WME at some time but that she had no records in her possession concerning me, and stated that the copy of the Western Medical Evaluators, Inc. letterhead containing both her and Dr. Greener's signature in which it appeared that they both practiced from the same location was not of her doing.

38.     Dr. Grant practices in Texas and Dr. Greener in Miami.  The signatures of the doctors were obviously "cut and paste" signatures.  Her office had an outside firm conduct a records research for any records they might have bearing my name and concluded there were none.

---

[1] *State of Texas v. Howard Thomas Douglas,* Travis County, TX No. DIDC10900204 (securing execution of a document by deception-3d degree felony); *State of Texas v. Barbara Ann Douglas,* Travis County, TX, No. D1DC10900205 (securing execution of a document by deception-2d degree felony); *State of Texas v. Western Medical Evaluators, Travis County,* TX, No. DIDC10900206 (securing execution of a document by deception-2d and 3d degree felonies).

[2] *Capital Funding Solutions, Inc.v. Western Medical Evaluators,* United States District Court for the Southern District of Florida, No 08-61106-civ-Seitz/O'Sullivan.  Affidavits by former employees have Been filed in that case by Leighanne Griffin, stating that in or about June 2008 she was told by the owner, Barbara Douglas, to send out doctors' reports even if the doctor had not approved the report, and that she was told by other employees that Barbara Douglas would complete doctors' reports if she did not want to wait for the doctor to respond.

39.     Regarding the changed report, there is no evidence that AA even asked Dr. Grant to clarify the decision of "disabled" and there is no evidence that she did so, even if she had signed the first report.  Dr. Grant who is an FAA approved Aviation  Medical Examiner could not have signed the second report.

40.     I did not learn about WME until after the PBAC's administrative claim process and discovery in my case had been completed.

41.     Before my ERISA case could be fully adjudicated, AA filed for bankruptcy, and my lawsuit was subject to an automatic stay.  Since my disability status has not been restored, and I was denied the opportunity to return to work, and my grievance was still pending, my status as of January 1, 2013 was *Terminated Awaiting Grievance* ("TAG").  Further evidence of my TAG status is the PTR report that I only recently received from American Airlines indicating that I had been terminated effective 10/18/07 **Exhibit 1** and the fact that I have a pending grievance. **Exhibit 2.**

42.     It is arbitrary and discriminatory for the APA to treat me differently than other pilots similarly situated.  I am aware of a pilot Robert Murphy, employee number 16584 whose circumstances are indistinguishable from mine.  He is scheduled to receive the full equity distribution (the same as any active employee).  Mr. Murphy, went out on disability in 2002.  Because of the nature of his disability, there was a time limit on how long he could receive disability benefits, which was 18 months.  After his disability benefits ended he was not medically cleared to return to work, despite the fact, like me, he wanted to go back to work.  Mr. Murphy then took an extended leave of absence, but still cannot get medical clearance to return to work, nor can he get an FAA medical certificate.  According to the APA Member Detail information, he has been removed from the seniority list.  He is no longer active, but because he is considered terminated awaiting grievance, he is considered to be active for purposes of the distribution.  Mr. Murphy's Grievance No. 07-066 is listed directly above my name on the list of grievances excluded from the settlement.   See Exhibit 2 attached.  To put it succinctly, he is disabled; no longer receiving disability benefits; has been out more than 5 years; and removed from the seniority list.  However, unlike me, the APA has categorized Mr. Murphy as *Terminated Awaiting Grievance* "TAG" and has been notified by the APA that he will receive a 100% equity share.

43.    During this extended period of time, I also had a claim for APA Disability Benefits under the APA Long Term Disability Plan.  Not unlike American, the APA failed to pay all of my disability benefits under the plan and failed to administer my claim within the time prescribed by law.  So in 2011 after a protracted claim process lasting nearly eight (8) years, I filed suit against the Allied Pilots Association to enforce my rights under ERISA.

44.    Currently I am being denied access to the public side of the APA Equity Distribution Web-site.

45.    Further evidence that the APA has acted in bad faith with respect to the Equity Distribution is the fact that other pilots like myself, on the protected grievance list, who that meet the published criteria for equity distribution, were not notified of the distribution or the fact that they had been excluded.   The failure of the APA to properly notify all pilots, in particular those that have been excluded, is strong evidence of bad faith and discriminatory practices.

46.    In terms of my status for purposes of exclusion from the APA Equity Distribution, I have never been formally informed.  When the APA excluded me and other pilots from the equity distribution and refused to explain why, they acted in bad faith.  Pilots who have been told that they will be receiving the equity distribution funds have been told the reason for entitlement and the estimated amount of money they will receive.

47.    Like other pilots who have filed challenges to the distribution methodology, I agree that it is arbitrary and discriminatory for the APA to adopt a distribution methodology that draws a large distinction among pilots on disability who receive their benefit from the A Plan and those who receive their benefits from the long term disability plan without clearly articulating the reasons.

48.    Furthermore, as articulated by Lawrence Meadows, employee 332713 in his challenge **APA's Equity Payout Amounts for Disabled Pilots Are Discriminatory** pg.4
As a labor organization, the APA is a covered entity under the Americans with Disabilities Act (ADA). Moreover, as a disabled employee/union member I have certain rights and protections under ADA.  More specifically, the ADA entitles me as *"a covered entity's employee with a*

*disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employee without disabilities."* However, APA is discriminating against its disabled pilot members, by arbitrarily giving them substantially lower equity payout amounts than similarly situated pilot members without disabilities ...Moreover, the resultant gross disparity in equity payouts between pilots with disabilities versus pilots without disabilities is inherently unjust, and is the result of APA's flawed and arbitrary distribution methodology. I could not agree more.

49.     The APA's distribution methodology of awarding a furloughed pilot who never turned a wheel at AA a 100% equity distribution while a disabled pilots such as myself, with  years of service will receive a 0% equity distribution is grossly unfair and discriminatory.  This in particular when some, if not all of those disabled pilots, excluded by the APA, fell victim to the company's disability cost savings program and the corrupt practices of Western Medical Evaluators in rendering decisions on pilot's disability cases.  It is noteworthy that the APA was instrumental in selecting WME.   The APA is aware, that I and other pilots have gone six or more years without receiving any disability benefits or being allowed to return to work, (while the company continues to claim no disability). Now the APA seeks to add insult to injury and further discriminate against its disabled pilots.

50.     Not only is the APA treating its disabled pilots unfairly, it is discriminating against its older pilots who have had stagnant careers for years, and have no way to recoup their losses by creating a distribution process that monetarily favors younger pilots.

## CONCLUSION

The APA has acted in an arbitrary, discriminatory, and bad faith manner by deliberately excluding me from the Equity Distribution.  More specifically the APA has failed to follow the BOD approved methodology, when they denied me a full share amount from all four Silos, despite eligibility for such based on my special status of *Terminated Awaiting Grievance* "TAG". Furthermore, APA's discriminatory methodology had failed to provide disabled pilots, an equal amount of distributed benefits enjoyed by other similarly situated pilots without disabilities.   Thus, the APA has failed in its legal responsibilities to fairly represent all pilots who are subject to the provisions of the CBA.

Therefore, For the reasons stated above, I object to the decision by the APA to exclude me from the equity distribution on the basis that it is discriminatory, arbitrary and unfair.


Kathy E. Emery
Employee No. 354954
(305) 758-8310

Separation PTR History                                                                                Page 1 of 1

From: Hansen, Scott <Scott.Hansen@aa.com>
To: a.l.combs <a.l.combs@aol.com>
Subject: Separation PTR History
Date: Wed, Apr 24, 2013 4:31 pm



> **IMPORTANT: This Employee History site was designed to provide historical employee information accrued through December 31, 1998 only. For information beginning January 1, 1999, please use SHARP.**

| New Employee Emp Nbr | Name | Social Sec Nbr | Status | Location Company |
|---|---|---|---|---|
| 354954 | EMERY, KATHY E | | Separation | MIA    AA |

| R X | EffDate | TC | S | R | PT | NC | Co | CG | Sta/Bra | JbCd | ET | Lvl | PayRate | HrRate | StdHrs | ComSen | OccSen | ClaSen | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 10/18/2007 | 84 | 4 | M | 4 | 00 | AA | | 0691/7211 | 7011 | N | | 0.00 | 0.00 | 0.00 | 09/01/1992 | 10/18/1992 | 04/04/1997 | 09/ |

NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer.



Letter of Agreement
Page 7 of 7

## Exhibit 1
## Grievances excluded from the settlement

| Grievance No | Date Filed | Grievant |
|---|---|---|
| 06-003 | 01/05/06 | Hunter Presidential |
| 07-009 | 02/12/07 | Hunter Presidential |
| 07-028 | 06/14/07 | Haug, William |
| 07-048 | 08/08/07 | Mock, James |
| 07-066 | 11/05/07 | Murphy, Robert |
| 07-082 | 12/10/07 | Emery, Kathy |
| 08-005 | 02/20/08 | Hill Presidential |
| 08-021 | 04/07/08 | Hass, Mark |
| 08-066 | 07/21/08 | Tierney, Michael |
| 08-102 | 10/08/08 | Smith, Sidney |
| 09-002 | 01/21/09 | Reinford, Philip |
| 09-006 | 03/04/09 | Decker, Richard |
| 09-016 | 03/27/09 | Weiland, Ronald |
| 09-036 | 07/17/09 | Balcom, Robert |
| 10-026 | 04/27/10 | Clark, John J |
| 10-077 | 10/13/10 | Minkin, Ronald |
| 10-087 | 12/21/10 | Smith, Carl |
| 11-019 | 04/12/11 | Bowling, Phillip |
| 11-031 | 05/11/11 | Torres, Felix |
| 11-033 | 05/23/11 | Conlon, Steven |
| 11-054 | 08/18/11 | LGA Domicile |
| 11-065 | 10/24/11 | Gordon, Michael |
| 11-066 | 11/02/11 | Bates Presidential |
| 11-067 | 11/18/11 | Sheehan III, James |
| 11-084 | 11/29/11 | AICA |
| 12-009 | 01/27/12 | Thompson Jr, Glen |
| 12-011 | 02/04/12 | Meadows, Lawrence |
| 12-012 | 05/22/12 | DFW Domicile |
| 12-010 | 02/01/12 | Maher, Sylvan |
| 12-016 | 03/09/12 | Thompson, Lawrence |
| 12-023 | 04/09/12 | Salameh, Elias |
| 12-030 | 05/16/12 | Pollenz, Alan |
| 12-034 | 06/12/12 | Piper, William |
| *12-111 | 10/26/12 | Gary, William |
| *12-113 | 10/26/12 | Jackson, Carl |
| *12-114 | 10/26/12 | Bacon, Stephen |
| 10-042 - EXPEDIT | 06/24/11 | Hill Presidential |

*PEH Grievances: the Company reserves the right to challenge as non-disciplinary and not subject to grievance process.

Exhibit 8

**ALLIED PILOTS ASSOCIATION EQUITY DISTRIBUTION ARBITRATION**

| | |
|---|---|
| **In the Matter of** | |
| **DISTRIBUTION OF EQUITY BY ALLIED PILOTS ASSOCIATION** | **DECISION AND AWARD** |

## Arbitrator:   Stephen B. Goldberg

### HEARING APPEARANCES – ALLIED PILOTS ASSOCIATION:

Edgar N. James, Attorney (James & Hoffman, P.C.)
Daniel Rosenthal, Attorney (James & Hoffman, P.C.)
Jeff Vockrodt, Attorney (James & Hoffman, P.C.)

Mark R. Myers, Attorney, Allied Pilots Association

### HEARING APPEARANCES – CHALLENGERS:

**Counsel:**

John O'B. Clark, Jr., Attorney for CA David Williams, FO Thomas Duncan, *et al.*
Gavin MacKenzie, Representative for FO Gregory Cordes
Stanley Silverstone, Attorney for CA Larry Scerba, *et al.*
Scott Singer, Attorney for CA Ann Singer
Ronald Surkin, Attorney for FO Wallace Preitz

**Challengers:**

| | | |
|---|---|---|
| CA Keith Bounds | FO Richard Elder | FO Wallace Preitz |
| CA Markus Bras | FO Kathy Emery | FO Eric Sapp |
| FO James Callaway | CA Steven Fulmer | CA Larry Scerba |
| FO Gregory Cordes | CA Stephen Greene | CA Sammy Lynn Sevier |
| CA Stephen Cox | FO Lloyd Hamlin | FO Leland Shanle |
| FO Stephen Davidson | FO Mark Hass | CA Ann Singer |
| FO James Dodson | CA Harold Hoffman | FO Brian Smith |
| FO Glen Dominy | FO Melanie Jarvi | CA Roy Wall |
| CA Martin Dravis | FO Lawrence Meadows | FO Ken Wuttke |
| | FO Momcilo Mihailovic | |

## **TABLE OF CONTENTS**

I.   STATEMENT OF FACTS ..................................................................................................1

   A.   American Airlines Bankruptcy Proceedings..........................................................1

   B.   The APA Equity Distribution Plan .........................................................................2

        1.   Inverse Seniority Silo..................................................................................3

        2.   Per Capita Silo ............................................................................................3

        3.   Years of Service Silo ..................................................................................3

        4.   Pension Silo .................................................................................................4

        5.   Allocation of the Equity Interest Among the Silos.....................................4

        6.   Equity Distribution Eligibility Criteria ......................................................5

   C.   The General Lump Sum Dispute Resolution Procedure and the APA Equity
        Arbitration Procedure...............................................................................................6

II.  STANDARD OF REVIEW .............................................................................................7

   A.   Purpose and Origins of Duty of Fair Representation...............................................7

   B.   Highly Deferential Tripartite Standard ....................................................................8

        1.   Arbitrary Union Action................................................................................8

        2.   Discriminatory Union Action ......................................................................8

        3.   Bad Faith Union Action...............................................................................9

   C.   Prior Cases Addressing Pilot Unions' Distribution Plans.......................................9

        1.   *Bondurant v. Air Line Pilots Association, International* ............................9

        2.   *Mansfield v. Air Line Pilots Association*..................................................10

III.    DISCUSSION ...................................................................................................11

    A.    Silo Allocation Challenges ..................................................................11

        1.    The Union should not have allocated equity among silos; every pilot should be given an equal share ..................................................11

        2.    The percentage allocation of equity to the various silos was arbitrary ......13

            a.    Freezing the A Plan caused the most harm to the pilots; the Pension Silo should have been weighted more heavily ..........13

                *i.    The allocation to the Pension Silo should have been based on actual damages to the pilots* ..............................13

                *ii.    Regardless of whether the allocation to the Pension Silo was drawn from Company cost savings calculations, it should have been weighted more heavily* ...........................14

                *iii.    The allocation of equity to the Pension Silo was discriminatory to junior pilots* ...........................................14

                *iv.    Other challenges to the Pension Silo allocation* ...............15

            b.    The Years of Service (YOS) Silo should be eliminated or weighted less heavily ....................................................16

            c.    The Inverse Seniority Silo is weighted too heavily ......................17

        3.    The silo structure discriminates against senior pilots ...............................19

        4.    The silo structure fails to account for the special harm to Supplement B pilots ............................................................................................20

    B.    Silo Methodology Challenges .............................................................21

        1.    Invalid methodology in the Inverse Seniority Silo ...................................21

            a.    APA's proposed distribution methodology: a 1:2 ratio ................22

            b.    FO Brian Smith's proposed distribution methodologies: a 0:1 or 1:5 ratio ....................................................................24

            c.    Proposed 1:1 ratio .......................................................................26

d.      Conclusion ..................................................................................26

2.      Invalid methodology in the Pension Silo ....................................................28

a.      The Pension Silo's methodology is arbitrary because APA could have used more precise methods to calculate pension damages..........................................................................................28

b.      The Pension Silo arbitrarily failed to give length of service credit to pilots who were furloughed after 2001 ...........................29

c.      The Pension Silo should have excluded pilots not vested in the A Plan at the time it was frozen ................................................31

d.      The Pension Silo arbitrarily or discriminatorily favors certain categories of pilots based on age or seniority ...............................31

e.      The discount rate used to calculate the net present value of pilots' losses was too conservative.............................................32

f.      The distributions for LTD Category 2 and Category 3 pilots from the Pension Silo are too low because (1) LTD Category 2/3 pilots do not receive the increased 401(k) contributions received by active pilots, and (2) unlike active pilots, they will be unable to recover their A Plan losses by working under the increased pay rates of the 2013 CBA................................................33

3.      Invalid methodology in the Per Capita Silo................................................34

4.      Invalid methodology in the Years of Service (YOS) Silo ........................34

a.      Inclusion of different harms in the Years of Service Silo and measuring those harms by years of service............................34

b.      Allocations from the Years of Service Silo should be prorated for those pilots who will reach mandatory retirement during the 2013 CBA ...............................................................................36

5.      Silo structure unfairly prorates the Inverse Seniority and Per Capita Silos ...............................................................................37

C.    Challenges to APA's Treatment of the Effect of Prior Service at Another Airline ...............................................................................38

1.      Challenges by former TWA pilots ............................................................38

a.      Background ............................................................................38

b.      The EDC use of Occupational Date in the Years of
        Service Silo ..........................................................................38

c.      Harm from the abrogation of Supplement CC, the closing of
        the St. Louis base, and the decision of the LOA 12-05
        Arbitration Panel ................................................................40

2.      Challenges by former Reno Air pilots ........................................44

3.      Challenges by former American Eagle pilots .............................45

        a.      Former American Eagle pilots did not receive the years
                of credited service in the A Plan to which they are entitled
                pursuant to the April 9, 2010, award of Arbitrator George
                Nicolau ..........................................................................45

        b.      Former Eagle pilots have been discriminated against
                compared to former TWA pilots in the calculation of their
                dates of service for purposes of determining their allocations
                under the Years of Service and Pension Silos ..............................46

        c.      AA pilots who were forced to remain on furlough because
                Eagle pilots were allowed to flow through to American should
                receive pension credit for that furlough time ................................47

D.      Challenges to Eligibility Criteria ..........................................................48

1.      Challenges related to pilots on furlough ...................................48

        a.      The distribution unfairly penalizes furloughed pilots who
                exercise their contractual right to defer recall................................48

        b.      The distribution unfairly penalizes furloughed pilots who
                have deferred recall and are currently employed by
                US Airways ..........................................................................53

        c.      The distribution irrationally assumes that furloughed pilots
                who return will not ultimately get credit for their time on
                furlough..........................................................................54

2.      Challenges related to pilots on Long Term Disability (LTD)....................55

        a.      It was arbitrary for APA to treat some LTD pilots as if they
                would not return to active duty ......................................................55

        b.      LTD Category 2 and Category 3 pilots should be eligible for recovery from the Years of Service Silo ................................56

        c.      Pilots in LTD Category 2, whose disability benefits began between February 1, 2004, and December 31, 2007, should be eligible for the same four silos as LTD Category 1 pilots whose disability benefits began on January 1, 2008 ...............................57

   3.      Pilots not receiving LTD benefits and not on the Seniority List .............58

        a.      FO Lawrence Meadows ....................................................59

        b.      FO Kathy Emery and FO Wallace Preitz.......................................61

            i.       *FO Kathy Emery: summary of the evidence* .....................61

            ii.      *FO Wallace Preitz: summary of the evidence*...................62

            iii.    *Did APA act arbitrarily in declining to treat FO Emery and FO Preitz similarly to TAG pilots – assuming for Equity Fund purposes that their grievances and/or ERISA suits would result in a change of status that would make them eligible for Equity Fund participation?*................................63

   4.      CA Ann Singer -- currently receiving LTD benefits and not on the seniority list........................................................................64

   5.      Retired pilots ...............................................................65

   6.      Management pilots...........................................................66

 E.    Challenges to APA's Administration of the Equity Distribution Process ............66

 F.    Challenges Alleging Data and Calculation Errors .................................67

IV.   AWARD ..................................................................................67

V.   ARBITRATOR'S RETENTION OF JURISDICTION......................................68

<u>DECISION</u>

I.   **STATEMENT OF FACTS**

    A.    **American Airlines Bankruptcy Proceedings**

        AMR Corp., the parent company of American Airlines (collectively, "American," "AA," or "the Company"), filed for Chapter 11 bankruptcy on November 29, 2011.  *See In AMR Corp.,* Case No. 11-15463 (Bankr. S.D.N.Y. 2011).  In the bankruptcy proceedings, American sought to reduce its labor costs by proposing modifications to its collective bargaining agreements ("CBA," "labor contract," "contract" or "collective bargaining agreement") with the Allied Pilots Association ("APA" or the "Union") and other unions.  *See id.*, dkt. nos. 2034 and 2041.  American ultimately filed a motion to abrogate APA's then-existing 2003 CBA pursuant to 11 U.S.C. § 1113.  That motion was granted by the bankruptcy court on September 5, 2012.  *Id.*, dkt. no. 4293.

        During the course of the bankruptcy litigation, American and APA undertook negotiations for a new CBA.  The new agreement was ratified by APA on December 7, 2012, submitted to and approved by the bankruptcy court on December 19, 2012, and became the effective CBA between American and APA as of January 1, 2013 (the "2013 CBA").  The 2013 CBA included substantial concessions from the 2003 CBA including, for example:

- a freeze of the defined benefit pension plan (known as the "A Plan");
- elimination of the option for pilots to obtain a "lump sum" payment from the A Plan;
- changes to scheduling rules;
- authorization for American to engage in greater outsourcing of flying;
- loss or reduction of certain pay premiums (e.g., night pay, international pay); and
- loss or reduction of certain benefits (e.g., active medical, retiree medical).

        In exchange for these concessions, the 2013 CBA and an attendant Memorandum of Understanding between American, APA, US Airways, and the US Airways Pilots Union (the "MOU"), that was entered into in contemplation of the planned merger between American and US Airways, also included certain changes that were favorable to the pilots in comparison to the 2003 CBA.  Those changes included a general increase in hourly wages and increased contributions from American to the pilots' defined contribution retirement plan ("B Plan").

        In negotiating the 2013 CBA, APA agreed with American and American's other unsecured creditors that APA would receive 13.5% of the total equity of the post-bankruptcy American that would be distributed to American's unsecured creditors in the bankruptcy.   The equity is to be distributed from American to APA in the form of publicly-traded stock.  In return for this equity interest, APA agreed to release such bankruptcy claims as it might have arising out of the abrogation of the 2003 CBA.

        In seeking to maximize the amount of equity that it would receive in its negotiations with American, APA initially relied on its estimate of the financial harm to pilots resulting from the

1

concessions in the 2013 CBA.  Andrew Yearley of Lazard Frères & Co. LLC, who was APA's financial advisor and representative in these negotiations, testified, however, that estimates of harm to the pilots were not the controlling factor in the negotiations.[1]  Rather, the key factor was the equity interests received by pilot unions in other airline bankruptcy cases—namely, the Northwest (11%), United (10%) and Delta (15%) bankruptcies.  Thus, while the specific harm suffered by APA as a result of the 2003 CBA abrogation was a consideration in the equity interest negotiations, it was not outcome determinative regarding the percentage of APA's equity interest.

## B.     The APA Equity Distribution Plan

When it became likely that APA would receive a significant percentage of the unsecured creditors' equity, APA formed a special committee to analyze and provide options for the distribution of the equity to pilots represented by APA.  The Equity Distribution Committee ("EDC") was formed on October 5, 2012.  The EDC members were CA Michael Mellerski, CA Mark Stephens, FO Michael MacMurdy, CA Doug Pinion, and FO David Quinlan.[2]

From October 2012 to March 2013, the EDC worked to develop an equity distribution plan.  Its conclusions were presented to the APA Board of Directors and a final Equity Distribution Plan was adopted by the APA Board of Directors on April 3, 2013. The "Overarching Principles" of the Distribution Plan were stated to be:

1.    The Distribution shall be based on contractual damages forward-looking from the effective date of the Collective Bargaining Agreement (CBA), Jan. 1, 2013;
2.    The damages shall be assessed relative to the Green Book[3] prior to the abrogation of the CBA under Section 1113; and,
3.    The methodology and eligibility criteria shall recognize that the total value of the equity stake is insufficient to make the pilot group whole with regard to those contractual damages.[4]

---

[1] Mr. Yearley's Declaration (¶ 16-18) states, in relevant part:

[T]here are several reasons why these valuation analyses were not the controlling factor in the negotiation over the Equity Stake. First . . . APA's calculation was based on estimates and assumptions that were highly uncertain and subjective. If actually disputed before the Bankruptcy Court, any one of those assumptions (and the estimates resulting from them) could have been subject to significant litigation risk.

Second, it was my understanding based on advice of counsel, that the question of whether APA, as a matter of law, was entitled to a claim as a result of modifications to its collective bargaining agreement under Section 1113 of the Bankruptcy Code involved significant litigation risk.

Finally, and perhaps most importantly, the negotiation was significantly guided by precedent financial outcomes realized by other pilot unions in network carrier bankruptcies such as United Airlines, Northwest Airlines and Delta Airlines. Not only were American and its advisors focused on these precedents but the Creditors' Committee was also sensitive to these prior benchmarks because, as a fiduciary to all unsecured creditors, any recovery agreed with APA would result in less recovery to other unsecured creditors.

[2] EDC members range in seniority from number 311 to number 6764 on the AA seniority list, and their age range is 49-59.

[3] (Footnote added).  The Green Book is the 2003 CBA.

[4] Equity Distribution: APA Board of Directors-Approved Eligibility and Allocation at 2.

According to APA, the guiding principles of the Equity Distribution Committee also recognized that specific harm to pilots is highly uncertain, and that neither the Company nor APA could hold back any significant portion of the equity stake for later distribution.[5] APA also asserted that it has an institutional interest in limiting the disparity between the payouts received by pilots while still acknowledging that some pilots were likely to be more harmed by changes in the 2003 CBA than others.[6]  Finally, APA noted that "the importance of many contract changes cannot be fully assessed on a purely quantitative basis."[7]

With these principles in mind, the EDC developed a distribution plan based on four "silos," each of which, according to APA, was intended to account for different financial harms caused by the concessions in the 2013 CBA.  The four distribution silos are: (1) Inverse Seniority, (2) Per Capita, (3) Years of Service, and (4) Pension.  The purpose and general methodology of each silo is stated by APA to be:

1.   Inverse Seniority Silo

The Inverse Seniority Silo was intended to mitigate financial harm from contractual changes that disproportionately affected junior pilots.  Such changes, according to the testimony of EDC members, include increased work hours and outsourcing of flying, both of which delay junior pilots from advancing into more lucrative flying positions.  Because, according to the EDC, even senior pilots may be harmed by these changes, albeit to a lesser degree, the methodology adopted for this silo distributes to the most junior pilot twice as much equity as that received by the most senior pilot, with each pilot in between those two extremes receiving a distribution on a linear scale.  This silo was prorated for pilots who will reach mandatory retirement (at age 65) before the end of the 2013 CBA's six-year term because the financial harm accounted for in this silo affects only active pilots.[8]

2.   Per Capita Silo

The Per Capita Silo was intended to mitigate financial harm from contractual changes that tend to affect all pilots equally or for which it was impossible to predict which categories of pilots would be affected.  Such changes include reduced medical benefits for active pilots and changes in pilots' work schedules.  In this silo, the EDC's methodology called for each pilot to receive an equal share of the equity distribution.  The Per Capita Silo is also prorated for pilots who will reach mandatory retirement before the end of the 2013 CBA's six-year term.

3.   Years of Service Silo

The Years of Service Silo was intended to mitigate financial harm related to seniority, pay rate, and proximity to retirement, including the loss of subsidized medical insurance for

---

[5] APA Statement of Position at 4-6.
[6] APA Statement of Position at 13; Declaration of EDC Member Mark Stephens ¶ 73.
[7] APA Statement of Position at 13.
[8] This means, for example, that a pilot forced to retire after the third year of the six-year 2013 CBA will receive a 50% fractional share of what would otherwise be his or her Inverse Seniority Silo distribution.

retirees, elimination of the lump sum pension plan option, loss of profit sharing, changes to the international pay premium, and changes to vacation.  Each of these harms, according to APA, is related to a pilot's years of service, defined as the difference between the pilot's Occupational Date and the effective date of the 2013 CBA.[9]  In order to avoid unnecessary complexity, APA chose to create a single silo based upon years of service, rather than separate silos based on seniority, pay rate, and proximity to retirement.  Each pilot's equity distribution from this silo is proportional to his or her years of service.  The silo is not prorated because at least some of the financial harm that it is intended to mitigate occurs after retirement.

    4.    Pension Silo

    The Pension Silo was intended to mitigate the financial harm resulting from the "freeze" of the pilots' defined benefit pension plan (the A Plan).  As a result of the freeze, retiring pilots will receive only the benefit they would have been entitled to receive as of the freeze date (November 1, 2012). The loss caused by the freeze of the A Plan is mitigated in part by the 2013 CBA, which provides that American will increase its contributions to the defined contribution plan (the B Plan) from 11% to 14%, and eventually to 16%.

    The EDC adopted a methodology for the Pension Silo that attempts to do the following: (i) estimate the value of the pension a pilot would have received from the A Plan if it had not been frozen, and (ii) subtract from that non-frozen A Plan value (a) the value of the frozen A Plan the pilot will receive from American and (b) the value of the pilot's increased contributions from American to the pilot's B Plan.  The Pension Silo was not prorated.

    5.    Allocation of the Equity Interest Among the Silos

    In determining the appropriate allocation of the equity interest among the four silos, the EDC relied to some extent on American's analysis of projected cost savings to it over the six-year term of the 2013 CBA, an analysis that had been developed by American for the negotiations concerning the 2013 contract.  The EDC used American's estimates of cost savings to it of each of the concessions in the 2013 contract as a rough proxy for the harm to pilots occasioned by each of those concessions, assigning the estimated cost savings/harm to pilots to one of the four silos.

    The EDC used American's cost savings estimates rather than attempting to calculate actual harm to pilots resulting from the 2013 CBA concessions because of the difficulty it encountered in attempting to determine the harm that pilots would sustain under the concessions in the 2013 CBA.  According to APA (Statement of Position at 30):

        . . . [F]or the most part, these harms have not yet occurred (and had not occurred at all when the Committee started its work on the equity distribution scheme). These harms are incredibly difficult to predict, with projections varying based on assumptions about future business

_____

[9] "Occupational Date" is the approximate date a pilot actually begins to perform work for American, with certain exceptions discussed below.  As a matter of course, American assigns a pilot's Occupational Date as 47 days after the pilot is hired by American, which accounts for the average training time required before a pilot begins working.

4

decisions of American, trends in the airline industry, pilot behavior, and many other factors. While the Equity Distribution Committee carefully considered all available data, [it declined] to make the equity distribution scheme dependent solely on a series of guesses about the future effects of dozens of different concessions in the 2013 CBA. . . .

The EDC, however, modified American's estimates in two important respects. It considered pension costs over a twelve year period, the average remaining career of AA pilots, rather than using American's six-year estimate. It also included an estimate of savings from changes in the Scope clause of the CBA, to which American had assigned no value.

Based upon this analysis, the EDC assigned $1.08 billion, which amounted to 32.6% of the equity interest, to the Pension Silo, $1.127 billion (34%) to the Inverse Seniority Silo, $551 million (16.6 %) to the Per Capita Silo, and $555 million (16.8 %) to the Years of Service Silo. The EDC was concerned, however, that these figures presented an impression that its calculations of the harm to the pilots attributable to each of these silos were precise, which it knew not to be the case. Accordingly, it decided to round the percentage allocations to each of the four silos as follows: 30% to the Pension Silo, 30% to the Inverse Seniority Silo, 20% to the Years of Service Silo and 20% to the Per Capita Silo. In doing so, the EDC was also guided by its interest in minimizing the disparity between the amount of the equity allocations to the pilots in order to avoid the hard feelings and internal union conflict that would follow an equity distribution in which some pilots received amounts vastly in excess of those received by other pilots.[10]  The EDC's calculations showed that rounding the percentages to 30-30-20-20 succeeded in reducing disparities, and, the EDC concluded, was not substantially inconsistent with its admittedly imprecise estimates of harm drawn from American's cost-savings estimates. Accordingly the EDC recommended the 30-30-20-20 silo division to the APA Board of Directors.

The Board of Directors, in turn, accepted the EDC's proposed allocation among silos. It did so, according to APA:

> . . . because it was roughly in accord with the imprecise cost-savings data and the Board's sense of the relative importance of the silos, while minimizing the variance in payouts. Alternative allocations, especially those that placed greater weight on the Pension Silo, would have disrupted this balance and increased the variance in the payouts.[11]

6.    Equity Distribution Eligibility Criteria

The basic eligibility principle established by the EDC was that all pilots who were active on January 1, 2013, would be eligible to receive a share of the equity from all four silos.  Any

---

[10] EDC Chairman Michael Mellerski testified that the EDC "didn't think $300,000 disparities was in the best interest of the union.  So that was one factor in our recommendation on the silo allocations." Tr. 411:8-11.
[11] APA Post-Hearing Brief at 4-5 (internal citations omitted).

pilot who became active between January 1, 2013, and August 1, 2013, would also be eligible to receive a share from all four silos, provided the pilot were to sign an enforcement letter and accompanying promissory note agreeing to remain an active pilot at American for at least twelve months.  The purpose of this requirement, according to APA, was to deter pilots from briefly returning to American solely to claim a share of the equity distribution.

The EDC also established eligibility rules for special categories of pilots.  To the extent there were challenges to those rules or their application, they are discussed below.

### C.    The General Lump Sum Dispute Resolution Procedure and the APA Equity Arbitration Procedure

The Equity Distribution Plan includes a General Lump Sum Dispute Resolution Procedure, applicable to:

> . . . any dispute about the distribution of a Lump Sum Payment, including any dispute over APA's methodology for allocating such funds, the factors used to determine the allocation of funds, or the amount allocated to any pilot. . . .[12]

Pursuant to the General Lump Sum Dispute Resolution Procedure, the question before the Arbitrator, in the event of challenges to the APA Board of Directors Allocation decisions, is:

> . . . whether to uphold the APA Board of Directors' allocation decisions and, if not, what specific modifications to the decisions are required.  Prior to requiring any changes to APA's distribution methodology, eligibility criteria, or other factor in the APA Board of Directors' allocation decision, the arbitrator must find that APA's actions or inactions are either arbitrary, discriminatory, or in bad faith.

The Procedure further provided:

> The arbitrator shall issue a written decision and award stating whether the Board of Directors' allocation decision is upheld and, if not, what specific modifications are required to be included in a revised method of allocation. The decision will include a statement of reasons for the decision whether or not it upholds the Board of Directors' proposed method.

Pursuant to the General Lump Sum Dispute Resolution Procedure, Professor Stephen B. Goldberg was selected as Arbitrator and a detailed APA Equity Arbitration Procedure ("Arbitration Procedure") was established.  A pilot who wished to contest the amount of the

---

[12] Equity Distribution: APA Board of Directors-Approved Eligibility and Allocation at Appendix A.

equity allocation that he/she had received was required to submit a challenge to that allocation no later than May 20, 2013.[13]

The Arbitration Procedure provided for limited discovery in the form of document requests, and permitted pilots to request that witnesses appear and provide testimony at the scheduled hearing on the merits of all challenges. Pursuant to the Arbitration Procedure, the Arbitrator conducted a procedural hearing on June 13-14, 2013, to resolve discovery disputes, motions to dismiss, and issues relating to the consolidation of challenges.

Subsequent to the procedural hearing, a hearing on the merits (the "Merits Hearing") was held on July 16-20, 2013. Thereafter, Supplemental Hearings were held on August 14, 2013 (to hear additional evidence and argument related to the challenges of former TWA pilots to their Equity Fund allocations and challenges of certain former American Eagle pilots related to data and calculation errors) and September 11, 2013 (to hear additional evidence and argument related to challenges to the distribution of funds from the Inverse Seniority Silo). All challengers were notified of their right to present evidence and argument at these hearings and to submit written evidence and argument to the Arbitrator.

During the pendency of the Arbitration Procedure, APA maintained a website accessible to all pilots, both APA members and non-members, on which the following documents were posted: (i) general equity distribution documents, including the Equity Distribution Plan, the 2003 CBA, and the 2013 CBA; (ii) all Orders of the Arbitrator; (iii) APA's motions, notices and responses to motions; (iv) the challenging pilots' challenges, motions, requests and responses to motions; (v) APA's Statement of Position and supporting declarations and exhibits; and (vi) hearing exhibits and transcripts. All documents posted on the APA website, as well as all testimony and documents received into evidence at the Merits Hearing and the Supplemental Hearings, constitute the record in this matter.

## II.    STANDARD OF REVIEW

The question before the Arbitrator, in reviewing the methodology and allocation decisions made by the EDC and adopted by the APA Board of Directors is, as set out in the General Lump Sum Dispute Resolution Procedure, whether those decisions were arbitrary, discriminatory, or in bad faith. Inasmuch as these standards of review are identical to those that have been developed by the courts in determining whether a union has violated its duty of fair representation, I shall be substantially guided by court decisions and doctrine interpreting and applying the duty of fair representation.

### A.    Purpose and Origins of Duty of Fair Representation

The duty of fair representation ("DFR") was first enunciated by the Supreme Court in *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 202-03 (1944), and applies to unions covered by both the Railway Labor Act (*id.*) and the National Labor Relations Act. *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 76 (1991) (*O'Neill I*).

---

[13] Each pilot was able to determine the amount of his/her Equity Fund allocation from the APA DataVerification and Payout Website as of April 29, 2013.

## B.      Highly Deferential Tripartite Standard

The United States Supreme Court has likened the DFR to "the duty owed by other fiduciaries to their beneficiaries." *O'Neill I*, 499 U.S. at 74.  Courts have devised a three-part test to determine whether challenged conduct runs afoul of the DFR:  "[A] union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Id.* at 67 (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)).  In making this determination, courts engage in a "tripartite" inquiry, examining each element separately.  *Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1083 (7th Cir. 1994).

This inquiry is "highly deferential."  *See O'Neill I*, 499 U.S. at 78 (citing "the wide latitude that negotiators need for the effective performance of their bargaining responsibilities"); *see also United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 374 (1990) ("The doctrine of fair representation is an important check on the arbitrary exercise of union power, but it is a purposefully limited check, for a 'wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents.'") (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953)); *Landry v. The Cooper/T. Smith Stevedoring Co., Inc.*, 880 F.2d 846, 852 (5th Cir. 1989) ("A union does not breach its duty of fair representation . . . through simple negligence or a mistake in judgment.").

### 1.      Arbitrary Union Action

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill I*, 499 U.S. at 67 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)); *see also Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998) ("A union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation."). As the Supreme Court also stated in *Marquez*, "[t]his wide range of reasonableness gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Id.* at 45-46 (internal quotations omitted).

### 2.      Discriminatory Union Action

Courts have held that a union's conduct is discriminatory within the meaning of the DFR only if such conduct is "invidious," *O'Neill I*, 499 U.S. at 81, or "intentional, severe, and unrelated to legitimate union objectives." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (quoting *Amalgamated Ass'n of Street, Elec. Ry & Motor Coach Employees of Am. v. Lockridge,* 403 U.S. 274, 301 (1971)).

Thus, "[t]he fact that a union adopts a position which favors one group of employees over another does not amount to a breach of the duty of fair representation." *Turner v. Air Transport Dispatchers' Ass'n*, 468 F.2d 297, 300 (5th Cir. 1972).  In particular, as long as distinctions between employees are "relevant," such distinctions do not run afoul of the DFR.  *Steele*, 323 U.S. at 203 (contrasting permissible distinctions based on seniority, skill, and function with impermissible distinctions based on race).  As the Supreme Court has explained,

> Inevitably differences arise in the manner and degree to which the terms of any
> negotiated agreement affect individual employees and classes of employees. The
> mere existence of such differences does not make them invalid. The complete
> satisfaction of all who are represented is hardly to be expected. A wide range of
> reasonableness must be allowed a statutory bargaining representative in serving
> the unit it represents, subject always to complete good faith and honesty of
> purpose in the exercise of its discretion.

*Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953); *see also Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 712 (2d Cir. 2010) ("[T]here is no requirement that unions treat their members identically as long as their actions are related to legitimate union objectives"); *Ryan v. New York Newspaper Printing Pressmen's Union No. 2,* 590 F.2d 451, 457 (2d Cir. 1979) ("The Union was trying to make the best out of a bad situation, and it was almost inevitable that the Union's drawing of a line would hurt someone.").

3.      Bad Faith Union Action

"A union acts in bad faith when it acts with an improper intent, purpose, or motive . . . encompass[ing] fraud, dishonesty, and other intentionally misleading conduct."  *Merritt*, 613 F.3d at 619 (internal quotations omitted); *see also O'Neill v. Air Line Pilots Ass'n, Int'l*, 939 F.3d 1199, 1203 (5th Cir. 1991) (*O'Neill II*) (requiring a union's misstatements to be "sufficiently egregious or so intentionally misleading to be invidious and therefore meet the demanding standard of a bad faith breach of [the] DFR") (internal quotations omitted).

**C.      Prior Cases Addressing Pilot Unions' Distribution Plans**

Several courts have considered challenges to pilot unions' equity distribution plans in the wake of airline bankruptcies.

1.      *Bondurant v. Air Line Pilots Association, International*

*Bondurant* arose in the wake of the 2005 bankruptcy of Northwest Airlines.  There, former pilots challenged a distribution scheme that used the effective date of the Bankruptcy Restructuring Agreement as a strict cutoff for determining eligibility for full claim shares. *Bondurant v. Air Line Pilots Ass'n, Int'l*, 679 F.3d 386, 391 (6th Cir. 2012).  Specifically, the union presumed that any pilot who was actively employed on the effective date of the Bankruptcy Restructuring Agreement would remain employed throughout the duration of the agreement. If a pilot had retired or otherwise left Northwest Airlines prior to the effective date of the Bankruptcy Restructuring Agreement, that pilot would receive a share of the claim based upon the actual number of months worked during the 85-month concessionary period.  *Id*.  Pilots who had participated in the Pilot Early Retirement Program all retired after the cutoff date. In addition, older pilots who retired after the cutoff date or who continued flying as "Second Officers" past the age of 60 received special benefits under the challenged distribution scheme. *Id*.

9

Plaintiffs—regular retirees who reached the retirement age of 60 and left the airline before the effective date of the Restructuring Agreement—claimed that the cutoff date for determining full claim eligibility was arbitrary and discriminatory and therefore ran afoul of the duty of fair representation.  *Id*. at 392.  In particular, plaintiffs argued that the distribution scheme was arbitrary insofar as it granted full claim eligibility to pilots who were employed on the cutoff date but left well before the termination of the agreement. *Id.* The *Bondurant* court rejected this contention, reasoning that the challenged distribution scheme simply amounted to an "imperfect compromise," because the union was attempting to compensate the pilots fairly, but at the same time, distribute shares as quickly as possible so as to protect the value of the claim.  *Id*. at 392-93 ("Without endorsing the union's approach as the best possible method for allocating the claim, we are also satisfied that the union tried to distribute the shares 'quickly and fairly' and that its selection of the cutoff date was by no means 'wholly irrational.'").

The *Bondurant* plaintiffs also argued that the distribution plan at issue was discriminatory.  While the court acknowledged that some pilots fared better than others under the challenged scheme, it noted that "there is no requirement that unions treat their members identically as long as their actions are related to legitimate union objectives." 679 F.3d at 393 (quoting *Vaughn v. Air Line Pilots Ass'n Int'l*, 604 F.3d 703, 712 (6th Cir. 2010)).  The court further reasoned that "[u]nions represent diverse interests and sometimes have to make decisions that affect certain members more harshly than others" and that "[t]his proposition is especially true in the context of employer bankruptcy, which can present unique challenges for a bargaining representative." *Id.*

The court also found no evidence of unlawful age discrimination:

> The mere fact that the plaintiffs, who were older than the early retirees, did not similarly benefit from the union's distribution scheme is insufficient to create an inference that the union intended to discriminate against them because of their age.  Moreover, the union also awarded full claim shares to a number of pilots (those who secured Second Officer positions) who were older than the plaintiffs--an aspect of the distribution scheme that considerably weakens any link between the cutoff date and discriminatory age animus.[14]

2.      *Mansfield v. Air Line Pilots Association*

In *Mansfield v. Air Line Pilots Association International*, No. 1:06-cv-06869, 2009 WL 2386281 (N.D. Ill. July 29, 2009), senior pilots employed or formerly employed by United Airlines challenged a union's allocation method after United filed for bankruptcy.  The union's Master Executive Council (MEC), charged with developing a distribution plan for the convertible notes that United issued to its pilots, considered a number of alternatives before adopting a final distribution plan.  Under the plan that was ultimately adopted (the "GAP 2" plan), the allocations were based on each pilot's lost accrued benefits and future lost benefits. Under an alternative plan that was ultimately rejected (the "GAP 1" plan), allocations would

---

[14] *Id.* (internal citation omitted).

have been based only upon accrued benefits. *Id*. at *3. More senior pilots fared worse under the plan that was ultimately adopted than they would have fared under the rejected plan. *Id*. at *6. The plaintiff pilots presented evidence in the form of testimony from one member of the MEC and emails among MEC members indicating that, despite statements to the contrary, the MEC had decided early on to reject the GAP 1 plan. The plaintiffs also submitted evidence demonstrating that 13 of the 15 members of the MEC fared better under GAP 2 than GAP 1.

The court held that the fact that the adopted allocation method "favored one group of pilots over another [was] not by itself indicative of a breach of the duty of fair representation," but nevertheless declined to grant summary judgment in favor of defendants. *Id*. at *5-6. Specifically, the court held that a jury could find from the plaintiffs' evidence that the union had "engaged in an elaborate show of soliciting expert advice and pilot opinion," and was telling pilots that it was considering GAP 1, when in fact it had already rendered a decision as to which allocation method to adopt. *Id*. at *6.[15]

## III.   DISCUSSION

### A.   Silo Allocation Challenges

1.   <u>The Union should not have allocated equity among silos; every pilot should be given an equal share</u>.

Several pilots filed challenges asserting that allocation of the equity among silos prior to awarding each pilot's share was arbitrary, and that an equal distribution of equity among all pilots would have been fairer, simpler, less divisive, and more transparent. APA, however, offered a legitimate basis for its use of the silo structure, stating:

> The APA adopted a silo system because it allowed the union to account for a variety of harms associated with the concessions in the 2013 CBA, without necessitating an impossible inquiry into the specific financial impact of each and every concession. Indeed the term "silo" was adopted from the Delta ALPA MEC and the Northwest ALPA MEC, both of which constructed what they called silo systems for distribution of the money they received as a result of their carriers' bankruptcies. *See Gilliland v. Air Line Pilots Ass'n Int'l*, 741 F. Supp. 2d 1334 (N.D. Ga. 2009); *Bondurant v. Air Line Pilots Ass'n*, 679 F.3d 386 (6th Cir. 2012).[16]

According to Equity Distribution Committee member Mark Stephens:

> Q. [Mr. Rosenthal] . . . What is a silo, and why did you decide to use that approach?

---

[15] *Gilliland v. Air Line Pilots Ass'n, Int'l*, No. 1:07-cv-3082-TCB (N.D. Ga. Oct. 15, 2009), involved a challenge to a pilot union's distribution of funds acquired following the Delta Air Lines bankruptcy, but was dismissed as time-barred. Hence, the court did not consider the validity of the challenge to the union's distribution plan.
[16] APA Statement of Position at 7-8.

A.   . . .We weren't really reinventing the wheel here.  The previous unions had done it.  What it allowed us to do was take disparate damages that came from different sources, group them together, and deal with them collectively without the need or the ability to calculate individual damages. . . . [I]t gave us max flexibility to deal with the fact that there were disproportionate harms that affected different demographics of pilots . . . .

So we basically hopped onto the bandwagon of what the previous unions had decided to do because we thought that it would be effective.  In fact, as we went through the process, it did turn out to be an effective way to look at it . . . .[17]

Another challenger argument for distributing equity equally without regard to the harm suffered by different pilot groups as a result of the concessions in the 2013 contract was that in light of the pay increases, the majority of pilots will make more money during the term of the 2013 contract than they would have under the 2003 contract. Hence, no pilots were actually harmed by the concessions in the 2013 contract.  Accordingly, APA need not concern itself with redressing nonexistent harm, but should distribute the equity equally.

The short answer to this contention is that regardless of the amount of the pay increase, distinct pilot demographic groups sustained more or less harm as a result of the contract concessions.  While for some demographic groups the amount of the pay increase might have been enough to make up for the harm resulting from the concessions, that may not have been true for other pilot groups.  Hence, an equal distribution of the equity, while simple and transparent, would have created its own fairness issues, no less and perhaps more significant than those of which the challengers complain here.

Finally, despite its primary focus on mitigating the different types of harm sustained by different pilot groups, APA was not insensitive to the interest underlying the demand for equal distribution – that disparities in the amounts received by pilots would be regarded as unfair and would produce dissension in the pilot ranks.  To the contrary, the testimony showed that both the EDC and the APA Board of Directors considered, when debating the amount to be allocated to each silo, the APA concern about reducing the distributional disparity among pilots.[18]

The fact that APA chose not to make the elimination of disparities its central goal in distributing the equity among pilots, but rather chose to give primacy to remedying differing degrees of harm to different pilot groups and lesser, but nonetheless genuine attention to reducing inequality, was consistent with the "Overarching Principles" of the Equity Distribution Plan (*see* pp. 2-3, *supra*) and does not render its equity distribution method arbitrary, discriminatory, or in bad faith.[19]

---

[17] Tr. 80:4-81:5.

[18] *See* testimony of EDC Chairman Mellerski, quoted at page 5, n.10.

[19] Some pilots asserted that they were told by APA representatives, prior to the ratification vote on the 2013 contract, that each pilot would receive the same amount in the equity distribution.  Wholly without regard to the

2.      The percentage allocation of equity to the various silos was arbitrary

      a.      Freezing the A Plan caused the most harm to pilots; the Pension Silo should have been weighted more heavily.

            i.      *The allocation to the Pension Silo should have been based on actual damages to the pilots.*

As previously noted, the amount of the APA allocation to the Pension Silo - $1.08 billion - was primarily based upon the Company's estimate of the cost savings to it of the freeze of the A Plan. The amount of the Pension Silo allocation was also predicated, albeit to a lesser extent, on the APA interest in minimizing disparities in payouts to the pilots.

APA's Pension Silo allocation was, however, unique in two respects. First, although the Company's cost savings estimates were calculated over the 6-year term of the 2013 CBA (as was true of all Company cost savings estimates), APA used a 12-year period – the average time to mandatory age 65 retirement for the eligible pilot population – in estimating the harm resulting from the freeze of the A Plan.[20] Second, APA reduced that estimate by the increased amounts that the Company was to contribute to the pilots' defined contribution plan (the B Plan) during the contract term.

A number of pilots, many of whom were represented by FO Brian Smith and/or CA Martin Dravis, argued that the amount assigned to the Pension Silo was too low and should be substantially increased. The crux of this argument was that the Union acted arbitrarily in using the Company's estimate of cost savings from the pension freeze to determine the allocation to the Pension Silo when it had access to data showing the actual pension loss to each pilot, as well as total pension loss to the entire pilot body. Towers Watson and Milliman, two consulting firms engaged by the Union, had estimated actual pension loss to the pilots to be approximately $1.5 billion over the course of their careers – the appropriate damage measurement period according to FO Smith and CA Dravis. It is at least this sum that should have been allocated to the Pension Silo, according to challengers, rather than the $1.08 billion assigned by APA.[21]

There is no doubt that APA could have used the Smith-Dravis approach of determining actual pension fund losses for all pilots and calculating the amount of the allocation to the Pension Silo based on those calculations. The question is not, however, whether APA could – or should – have used the Smith-Dravis approach, but whether its failure to do so was so far beyond the bounds of reasonableness as to constitute a breach of the duty of fair representation. FO Smith and CA Dravis say "yes" – that for the Pension Silo APA had access to actual damages,

---

validity of such assertions, on which I express no opinion, they fall outside the Lump Sum Distribution Procedure, which is limited to disputes about the allocation of the equity, and does not apply to APA conduct that preceded that allocation. *See* Lump Sum Dispute Resolution Procedure, quoted at p. 6, *supra*.

[20] To calculate this figure, APA simply doubled AA's 6-year cost savings estimate.

[21] I say "at least" this sum because FO Smith and CA Dravis estimate total pilot pension losses at $2.6 billion. That estimation, however, is predicated on the wholly unwarranted assumption that APA would have received all the wage increases ultimately provided for in the 2013 CBA and the MOU even without having conceded the A Plan pension freeze.

and it was wholly unreasonable, even irrational, for APA not to use actual damages in determining the amount of the allocation to the Pension Silo.

I do not agree.  APA had developed a method of determining silo allocations that it used for all silos – relying primarily on Company estimates of cost savings – in determining the estimated harm to pilots resulting from those concessions.  It was not required, under penalty of being found to have breached its duty of fair representation, to vary from that approach in calculating the amount of the allocation to the Pension Silo solely because for that silo – and no other silo – it was possible to calculate actual damages.[22]

> ii.    *Regardless of whether the allocation to the Pension Silo was drawn from Company cost savings calculations, it should have been weighted more heavily.*

The first Smith-Dravis argument on this aspect of their challenge is that the allocation to the Pension Silo should be dramatically increased because wage increases under the 2013 CBA and the MOU were sufficient to compensate for the financial harm of all contractual concessions other than the A Plan freeze and the reductions in medical benefits.  Hence, the Equity Fund should be used almost entirely to compensate for the A Plan freeze and, to a lesser extent, for reductions in medical benefits.  FO Smith and CA Dravis would allocate 89% of the Equity Fund to the Pension Silo, with the remainder going to compensate pilots for the reduction in active and retiree medical benefits.

The argument that wage increases were sufficient to compensate for all contractual concessions other than the pension freeze and reductions in medical benefits, and that the amount of the Equity Fund allocated to the Pension Silo should be dramatically increased – from 30% to nearly 90% – is predicated on the assumption that none of the wage increases in the 2013 CBA and the MOU were attributable to the APA's concessionary acceptance of the freezing of the A Plan.  That assumption is wholly unwarranted.  The Company's estimate of its cost savings resulting from the freezing of the A Plan was approximately $550 million over the 6-year contract term. There is no reason to suppose that cost savings of this magnitude were of no significance to the Company in agreeing to substantial wage increases.  To the contrary, a substantial portion of those wage increases is attributable to the pension freeze.

> iii.   *The allocation of equity to the Pension Silo was discriminatory to junior pilots.*

Some challengers assert that the effect of APA allocating equity share to the Pension Silo on the basis of the Company's estimated cost savings from the harm sought to be mitigated by that silo - the same approach it had used in allocating equity share to the other silos - was to favor older pilots at the expense of younger pilots.  That may well be, but it does not, absent evidence that the Union's decision was wholly outside the bounds of reasonableness, which has not been shown here, render the Union's actions a breach of its duty of fair representation.[23]

---

[22] Indeed, had it been possible to calculate actual damages for the other silos, the amount of those damages may have equaled, or even exceeded, the damages attributable to the Pension Silo.

[23] *See Bondurant*, cited and discussed at pp. 9-10.

Nor may challengers succeed by arguing that the asserted negative effect on younger pilots constituted forbidden discrimination.  Union conduct that has a negative effect on one group of employees compared to another does not constitute the type of discrimination that violates the duty of fair representation unless it is "intentional, severe, and unrelated to legitimate union objectives" (*Merritt*, *supra*, p. 8).  In addition to its legitimate interest in using the same approach in allocating equity shares to all silos,[24] the APA Board of Directors discovered, in trying to decide on silo allocation, that increasing the amount of the allocation to the Pension Silo – certainly in the amounts sought by FO Smith and CA Dravis – would significantly increase the disparity in equity distributions among the pilots.  Reducing such disparity is a legitimate union interest, and thus provides further support for the conclusion that the APA decision to use the same allocation method for the Pension Silo that is used for determining the allocation for all other silos did not violate its duty of fair representation.

*iv.*    *Other challenges to the Pension Silo allocation.*

CA Peter Oborski also claims that the Pension Silo is underweighted.  According to CA Oborski, APA documents show estimated cost-savings to the Company approximating $122 million per year from freezing the A Plan, representing 39% of the Company's total annual savings of $315 million per year.  However, the figures on which CA Oborski relies consist of mere "placeholders," for final estimates.  There is no support in the record for CA Oborski's claim that the freeze of the A Plan resulted in $122 million annual savings to the Company, and his challenge is therefore rejected.

CA Larry Scerba, on behalf of himself and numerous other pilots, claims that the Pension Silo was underweighted at 30% because pension claims constituted 36% of the Proof of Claim that APA filed in American's bankruptcy proceedings.  Although the proportion of the pension claims is lower in the equity distribution (30%) than in APA's bankruptcy claim (36%), the measuring stick was not the same in both proceedings.  The harm measured in the equity distribution is based on cost savings to American, whereas APA's claim in the bankruptcy was predicated on financial harm to pilots.

A different challenge to the weighting of the Pension Silo was filed by FO Andrew Weingram.   As FO Weingram notes, subsequent to the ratification of the 2013 CBA, APA negotiated a Memorandum of Understanding (the MOU) with American, US Airways and US Airways Pilots Association.  The MOU provided that in the event American and US Airways were to  merge, there would be certain modifications to the 2013 CBA, most significantly for present purposes certain wage increases and increases in American's contribution to the pilots' defined contribution pension plan (the B Plan).  APA took those increases into account in calculating the amount of the pension losses sustained by the pilots, and FO Weingram challenges its decision to do so.  He states that the calculation of loss "must be done off of the actual contract that awarded the equity" and that "speculative or future enhancements" to be brought about by the MOU should not form part of the calculation.  By including those

---

[24] *See* discussion in Section I.B.5.

15

"speculative enhancements", FO Weingram concludes, APA has underweighted the amount of the pension loss in the Pension Silo.[25]

APA's counter-argument is that the merger was almost certain to take effect at the time the EDC decided to consider the MOU modifications in calculating pilot losses. The Boards of Directors of both American and US Airways had approved the merger and no step remained but approval by American's creditors and the bankruptcy court as part of American's bankruptcy plan of organization.

I cannot sustain FO Weingram's challenge. While he is correct in pointing out that the increased contributions to the defined contribution pension plan were not definite at the time the EDC decided to consider them in calculating the pilots' pension plan losses, the likelihood that they would take place was sufficiently great that I cannot find that APA acted arbitrarily in taking account of them. To be sure, what APA had not considered in March 2013, at the time it finalized the Equity Distribution Plan, was the possibility that the United States Department of Justice might bring suit to block the American – US Airways merger. Nonetheless, the fact that it has done so does not lead me to sustain FO Weingram's challenge. First, there is no telling at this time what the outcome of that litigation will be. Second and more fundamentally, it is my role to determine whether the decisions of the EDC and the APA Board of Directors were arbitrary, discriminatory, or in bad faith at the time they were made, not with the benefit of subsequent developments which were not and could not reasonably have been known by the EDC and the APA Board of Directors at that time. *See Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (*O'Neill I*) ( "[A] union's actions are arbitrary only if, in light of the factual and legal landscape *at the time of the union's actions*, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational.") (emphasis supplied, internal citation omitted).

        b.      The Years of Service (YOS) Silo should be eliminated or weighted less heavily.

The APA allocated 20% of the equity distribution, or $555 million, to the YOS Silo. This silo was designed to compensate pilots for the loss of the lump sum option in the frozen A Plan, elimination of the Company contribution to retiree medical insurance premiums, and "Compensation Concessions," including loss of profit-sharing, changes to the international premium and training pay, and a reduction in vacation days.

Some challengers, including FO Smith and CA Dravis, would eliminate or reduce significantly the allocation to the YOS Silo. They assert that, apart from the loss of the Company contribution to retiree medical insurance, pilots sustained no harm warranting financial compensation under the YOS Silo. Initially, they claim that the loss of the lump sum option for pensions is not a compensable loss because the actuarial values of an annuity's current and future values are equivalent. Further, they assert that the "Compensation Concessions" sought to be compensated under the YOS Silo have been fully offset by the 2013 CBA and MOU wage increases, hence that pilots do not suffer any harm from those concessions.

---

[25] FO Weingram's challenge also alleged that consideration of the MOU impacted inappropriately on the Years of Service Silo, but the theory of his argument on that score was unclear.

It is undoubtedly true that from certain perspectives, a lump sum option has no greater financial value than does the annuity on which the lump sum option is based.  However, that is not to say that the pilot who loses the lump sum option has not been harmed. There is any number of reasons why a pilot might prefer a lump sum to an annuity.  He may, for example, believe that he will do better financially by investing the amount of the lump sum than he would by accepting the annuity; alternatively, he may fear that if he accepts the annuity, he will be unable to pass it onto his heirs without sacrificing a significant portion of the annuity payments during his lifetime.   Admittedly, the loss of the freedom to choose one option over another is not quantifiable, but APA was nonetheless entitled to treat it as harm to the pilots.[26]

I also reject the argument that the remaining harms which APA sought to mitigate in the YOS Silo had been fully offset by the wage increases in the 2013 CBA and the MOU.  As pointed out previously, the wage increases were not negotiated in exchange for particular contractual concessions, but rather were part of an overall bargain by which the Company received workrule, compensation, and benefits concessions, and the Union received wage increases and increased contributions to the B Plan. Hence, the value of the wage increases is appropriately spread among all silos, and cannot be used to offset the contractual concessions that APA sought to mitigate in the YOS Silo.

> c.     The Inverse Seniority Silo is weighted too heavily.

The Inverse Seniority Silo was intended to mitigate financial harm from contractual changes that affected all pilots, but more particularly junior pilots.  In this category the EDC placed increased work hours and changes in the contractual Scope clause, which allowed the Company to contract out flying previously restricted to American pilots.  Both of these changes disproportionately harmed junior pilots because they reduced the amount of flying by AA pilots (Scope) and required AA pilots to work more days and longer hours, thus reducing the need for manpower, in either event delaying junior pilots from advancing into more lucrative flying positions.

The appropriate amount to allocate to this silo was particularly difficult to determine. Generally, after determining the type of harms to pilots that should be grouped together for silo purposes, APA decided the amount to allocate to each silo primarily on the basis of the Company's estimate of its cost savings from the contractual changes generating the harm that silo was intended to mitigate. It treated those cost savings as a rough estimate of the amount of harm to the affected pilots (modified by the interest in avoiding excessive disparity in payouts). It did so, as previously noted (Statement of Facts, pp. 4-5), both because of the great difficulty in estimating damages and because Company cost savings data were available and had been studied by APA in both the bankruptcy proceedings and the negotiations for the 2013 CBA.

The Company, however, consistent with its long-term practice, attributed no cost savings to the Scope concessions. This presented the Union with the choice of either treating the Scope

---

[26] Some pilots assert that loss of the lump sum option was treated in the Pension Silo, hence it ought not be included in the YOS Silo.  The Pension Silo, however, considered only the financial harm flowing from the A Plan freeze. The loss of choice resulting from the absence of the lump sum option was not treated in the Pension Silo.

concessions as having no harmful effect on the pilots or of attempting to measure that harm itself.   According to APA's Post-Hearing Brief (at 6-7):[27]

> . . . [T]he APA recognized that the valuation of Scope concessions is extremely uncertain because it depends largely on the Company's future business decisions.  Although American has never acknowledged the cost-savings impact of Scope concessions, the APA has long maintained that Scope flexibility has tremendous value, not just in increased Company revenue but both in savings to the Company and potential harm to pilots.  APA Director of Industry Analysis Allison Clark generated a variety of valuations for Scope concessions and concluded that the Scope figure used by the [EDC, $766 million,] was aggressive but reasonable.

Several challengers contend that the weighting of the Inverse Seniority Silo was arbitrary or made in bad faith, primarily because it does not correspond to actual damages in Scope concessions.  For example, CA Larry Scerba (joined by others) challenged the 30% weighting of this silo as inflated because it exceeds the 14% that APA attributed to Scope concessions in the Proof of Claim it submitted in the bankruptcy proceedings. The amount of Scope damages asserted by APA in its bankruptcy claim ($759 million) was, however, almost identical to the EDC valuation of $766 million in the equity distribution.  To be sure, as CA Scerba notes, the proportion of the Scope claim to the total bankruptcy claim was lower than the proportion of the harm to pilots flowing from Scope changes as valued in the equity distribution proceeding, but in the bankruptcy proceedings the APA claim was predicated entirely on financial harm to pilots, whereas in the equity distribution the allocations were primarily predicated on cost savings to the Company, even for Scope valuation, as to which the Company put forward no cost savings estimate.

FO Brian Smith and CA Martin Dravis raised here the same objections that they had in contesting other silo allocations – that APA acted arbitrarily in taking into account the interest in reducing disparities and that the wage increases more than made up for all the contractual concessions, other than the pension freeze and the reduction in retiree medical benefits.  I have previously responded to those arguments, and will say no more here than that in my judgment those arguments have no more force as applied to the amount of the allocation to the Inverse Seniority Silo than they do as applied to the Pension Silo previously discussed.

CA Markus Bras and FO Eric Dean contended that 30% was a "huge" allocation for this silo because the Scope concessions are worth less than the freeze of the A Plan. The Inverse Seniority Silo, however, also accounts for the cost savings to the Company resulting from increased work hours, which was substantial. Indeed, the projected cost savings resulting from the freeze of the A Plan was $1.08 billion (net of increases to the B Plan), and projected cost savings for Scope and work rule changes, which combined to comprise the Inverse Seniority Silo, was $1.127 billion.[28]

---

[27] (internal citations omitted).

[28] CA Steven Salmirs asserts that the Inverse Seniority Silo should be eliminated because it is impossible to predict a pilot's career progression.  The contract changes addressed by this silo will, however, have a negative effect on

The challenges to the weighting of the Inverse Seniority Silo are denied.

3.      The silo structure discriminates against senior pilots

On November 1, 1983, APA and American entered into an agreement ("Supplement B") that provided, so far as relevant here, that pilots hired after that date would receive less pay and benefits than pilots hired previously.  This separate pay and benefit schedule was gradually phased out, ending in August 2001, but the disfavored pilots (known as the "B Scale pilots") who were harmed by Supplement B – all of whom have considerable seniority - claim that they should be compensated for that harm by an allocation from the Equity Fund.

APA raised two defenses to these challenges.  Initially, it argued (APA Statement of Position at 28):

> It would  have been impossible for the APA to consider all past harms incurred by American Airlines pilots.  Measuring ten years of  harm, going back to  the 2003 CBA, would have been an extraordinarily difficult task. Moreover, if the APA had decided to consider past harm, there would be no logical stopping point.  For example, prior to the 2003 CBA, many pilots were furloughed after the terrorist attacks of September 11, 2001. . . . Was APA required to consider . . . these harms in the equity distribution?

APA also argued that the equity stake was received by it in exchange for its agreeing in the 2013 CBA to work practices and conditions that were inferior to those in the 2003 CBA; hence, it was reasonable for it to reserve the equity stake to compensate those pilots who would work under those less favorable working conditions of the 2013 contract.  To be sure, as previously noted, the ultimate amount of the APA equity stake was predicated in large part on the size of the equity stakes received by other airline unions, but the principle of the equity stake—that it was a form of compensation for the concessions made by APA in the 2013 contract—was not altered by these negotiations.

Inasmuch as the equity stake was based upon future harm to the pilots, it was neither arbitrary, discriminatory, nor in bad faith for APA to conclude that the equity stake should be used only to compensate for such harm, not for harm occurring before the effective date of the 2013 CBA.  *See Bondurant*, 679 F.3d at 392-93.

Another argument raised by the senior pilots is that, without regard to any particular harm sustained by them as a result of the 2013 CBA, their long service as AA pilots is entitled to recognition and they did not receive adequate recognition in the Equity Fund distribution. The argument is understandable, but the core  principle in the equity distribution was that allocations from the Equity Fund would be predicated on the estimated harm sustained by pilots

---

career progression (and income) for many pilots, and it was rational for APA to create a silo to compensate pilots for those harms even though it could only estimate the amount of those harms.

as a result of the concessions in the 2013 CBA.  Indeed, applying that principle, seniority – years of service as a pilot for American Airlines – was explicitly recognized and compensated in the YOS Silo.  I have approved the forward-looking principle of recovery as well within the Union's allowable range of discretion, and its application to the senior pilots was equally so.

Three First Officers contend that the Pension Silo model discriminates against older FOs because, unlike the A Plan formula, it calculates pilots' assumed A Plan payout on the basis of the projected final average pay (FAP) of the pilots with seniority numbers closest to theirs, not on the basis of their actual final average pay.  The Pension Silo model thus takes no account of the possibility that these FOs may achieve CA status and pay during their last five years of employment, a development that would substantially increase their pensions.

The challengers' description of the difference between the A Plan formula and the Pension Silo formula for estimating harms from freezing the A Plan is accurate.  The EDC, however, was unable to use the A Plan formula because under the A Plan, which pays out a pension at the time a pilot retires, AA could wait until retirement and then determine the pension amount based upon the individual pilot's FAP.  The EDC could not do that.  It had to estimate what a pilot's likely FAP would be at the time it developed its allocation formula for Pension Silo distributions, and concluded that the best means of doing that was to estimate an individual pilot's FAP based on the projected pay for pilots with similar seniority numbers at the date of the individual pilot's retirement. Admittedly, that approach does not take account of the possibility that the challengers will achieve FAPs much greater than other pilots with similar seniority numbers, but EDC was unaware of any means of taking into account that possibility in a manner that would be fair to all pilots.  Nor do the challengers suggest any practical and fair means of doing so.  Under the circumstances, the Pension Silo model as applied to older FOs was neither arbitrary, discriminatory, nor in bad faith.[29]

4.      The silo structure fails to account for the special harm to Supplement B pilots

Supplement B, which, as noted above, established separate wage scales for pilots hired before and after its effective date of November 1, 1983, also contained a promise by American that it would "take no action, at any time, by way of notice, negotiations or otherwise, to diminish the pay or the retirement benefit programs in effect on [November 1, 1983]."

Although the separate pay and benefit scale for pilots hired after November 1, 1983, was ultimately phased out, that portion of Supplement B which protected the pay and retirement benefits of pre-November 1983 pilots remained in effect until the 2012 bankruptcy proceedings when American, with the approval of the Bankruptcy Court, abrogated both the labor contract and Supplement B.  The pilots covered by Supplement B protested American's action, both by motions to the Bankruptcy Court and by objecting to the Court's extinction of contractual grievances which they had filed against American.  These protests were to no avail; the Court

---

[29] CA Peter H. Remington argues that the Equity Plan discriminates against senior pilots because they will have less time to realize the benefits of the pay increases that were granted in partial exchange for the concessions addressed in the Equity Plan.  While this may be true, the Equity Plan is designed solely to cover damages incurred during the term of the 2013 CBA.  Within that 6-year period, junior pilots will not have more time to realize any such benefits.

denied their motions and held that their grievances were not subject to the grievance and arbitration provisions of the new contract.

Here, the Supplement B pilots complain that APA breached its duty of fair representation by not creating a special category of damages that would recognize the greater harm sustained by them than by other pilots as a result of the freeze of the defined benefit retirement plan (the A Plan) and the elimination of the lump sum retirement option.  The core of their complaint is   that other pilots' retirement benefits were protected solely by the labor contract, but their retirement benefits were protected *both* by the labor contract *and* by American's Supplement B promise that it would take no action to diminish their pay or retirement benefits.  The abrogation of the latter promise, they argue, created unique and greater harm over and above the harm sustained by those pilots who lost only the labor contract promise.  The Supplement B pilots contend they are entitled to special compensation from the Equity Fund for this "greater" harm.

I reject that argument.  The Supplement B pilots sustained no greater loss from the freeze of the A Plan and the termination of the lump sum retirement option than did other pilots.  Nor is there any evidence in the record of this proceeding of animus, prejudice or hostility to these pilots. Hence it was neither arbitrary, discriminatory, nor in bad faith for APA to treat their claims for compensation the same as the claims of other pilots.[30]

### B.   Silo Methodology Challenges

1.   Invalid Methodology in the Inverse Seniority Silo

According to APA, the Inverse Seniority Silo is designed to mitigate harms resulting from work rule and Scope changes.   These changes include an increase in the maximum number of hours pilots are allowed to fly per month and changes to the Scope clause that permit an increase in permissible outsourcing of flying that had been reserved to AA pilots.

Each of these changes, APA concluded, was likely to reduce the size of the pilot workforce, thereby making it more difficult for junior pilots to advance to more lucrative positions, causing a career stagnation effect.  Although these adverse effects tend to harm junior pilots more than senior pilots, APA concluded that even senior pilots could be harmed by these changes.  For example, according to APA, increased outsourcing is likely to eliminate trips and perhaps routes, forcing even senior pilots onto less desirable trips.  Work rule changes may

---

[30] The Supplement B pilots also assert that APA breached its duty of fair representation by failing to defend Supplement B with sufficient vigor in the bankruptcy proceedings.  Whatever the merit of this assertion—a matter on which I express no opinion—the Equity Fund is not available to redress all harm sustained by APA pilots, but only that harm flowing from the less favorable terms of the 2013 contract compared to the 2003 contract. To be sure, the 2013 contract does not contain Supplement B and the 2003 contract did, but whether APA could have prevented the abrogation of Supplement B is not a matter properly before the Arbitrator in these proceedings, in which his jurisdiction is limited to resolving disputes over APA's methodology for allocating funds and the amount allocated to each pilot. The question of whether APA has breached its duty of fair representation to the Supplement B pilots by failing to defend Supplement B sufficiently is, however, pending in the U.S. District Court for the Southern District of New York (Case No. 13-03694), in which the Supplement B pilots have filed suit against APA, alleging that APA breached its duty of fair representation towards them in the Section 1113 negotiations and litigation.

eliminate some trips and routes on all equipment types, limiting the pool of trip options for captains on even the largest aircraft, *i.e.*, the most senior pilots.  Furthermore, the new work rules may limit senior pilots' ability to maximize their pay.  Even pilots who have substantial system seniority may be junior within a highly sought after bid status, such as 777 CA, and thus may be vulnerable to the harmful effects of greater pilot productivity and increased outsourcing.

a.    APA's proposed distribution methodology: a 1:2 ratio.

In an effort to mitigate these harms, APA structured the Inverse Seniority Silo so that all eligible pilots would be allocated some portion of the silo, with junior pilots receiving a greater allocation.  Pursuant to APA's proposed methodology, the most junior pilot would receive twice as much payout as the most senior pilot, with a linear distribution between these two pilots for all other pilots, depending on their seniority.[31]  APA asserts that it is impossible to calculate pilots' damages flowing from work rule changes and Scope concessions with any sort of precision.[32]  It chose a 1:2 distribution ratio because it is approximately the same ratio as the pay of a narrowbody FO, typically the most junior pilot, compared to the pay of a widebody CA, typically the most senior pilot.  In choosing this ratio, APA also relied on the example of the pilots' unions involved in the Delta and Northwestern bankruptcies, both of which used a seniority silo with a 1:2 ratio between the payout for the most senior pilots to the most junior pilots, albeit with the senior pilots at the higher end of the scale.

FO Brian Smith and other challengers contend that while proportionate payouts are permissible, the 1:2 payout ratio is arbitrary because it does not attempt to calculate and reflect the anticipated harms pilots will suffer from the concessions addressed by this silo.  The issue, therefore, is whether calculating the harm to the most senior pilot as 50% of the harm to the most junior pilot was rational, or so far beyond the wide range of reasonableness as to be irrational.

As I stated in an August 26, 2013, Notice and Order, my preliminary finding was that APA had not presented a rational basis for its conclusion that a 1:2 ratio was an appropriate formula for distributions from the Inverse Seniority Silo.  I explained:

---

[31] The Inverse Seniority Silo is prorated for pilots who will reach the mandatory retirement age of 65 during the 6-year term of the 2013 CBA.

[32] According to CA Mark Stephens: "We . . . realized very early in the process that as we looked at these particular damages and this silo that we didn't have that same kind of precision to that, in order to do that.  We determined it was essentially an impossible feat to try to get down to what the harm was going to be to a particular individual." September 11, 2013 Hearing Tr. 13:18-14:3; *see id.*, 130:22-131:9 (CA Mellerski: "[W]e looked at various, you know, what I'll call y intercept and various slopes of the line as to which one was the most correct. Or which one gave us the greatest ability to address all of the issues that we had placed in that particular category. And as we've talked about here after addressing all of them we decided that the 1 to 2 ratio from senior to junior was as good a fit as we could come up with."); *id.*, 37:15-19 ("We looked at zero y axis solutions and we decided just as I told you that they understate damages or potential damages to the senior pilot. I believe they don't make sense."); *id.*, at 33:18-34:3 ("[W]e looked at trying to get, trying to say, okay, how does it impact this particular group, or how does it impact that group. But simply because of the indefiniteness both in productivity and scope we couldn't come up with something that we could say is a better formula."); *id.*, 105:12-17 (CA Mellerski also testified that EDC considered a 1:1 payout for this silo and determined it was not the "best fit").

22

According to APA, the 2:1 scale[33] was appropriate for two reasons: (1) the most junior pilots (NB FOs) have pay rates that are approximately half of those of the most senior pilots (WB CAs); and (2) two other pilot unions that distributed money related to their carriers' bankruptcies used a 2:1 scale for seniority-based silo distributions, albeit with senior pilots at the higher end of the scale.

As for the first of these reasons, APA offers no explanation, and I am aware of none, why a 2:1 pay differential in favor of senior pilots should lead to junior pilots receiving twice as much under a distribution plan that is aimed at providing redress in proportion to harm where there is no basis for concluding that the relevant harms correspond to this pay ratio.

APA also defends the 2:1 ratio on the ground that unions at Delta and Northwest each used a 2:1 ratio in one of their silos.  Unlike here, however, those 2:1 ratios favored senior pilots and the harms included substantial pay cuts as well as pension cuts.  It is not difficult to hypothesize why senior pilots, whose pay rates are twice those of junior pilots, should receive post-bankruptcy payouts twice those of junior pilots – either because they were disproportionately harmed, e.g. by pay cuts and pension cuts, or because all pilots were equally impacted, say by work rule changes, but the dollar impact of those changes was greater on senior pilots because their pay rate was greater. None of that, however, explains why it is appropriate or even rational to distribute a silo designed to mitigate the harm of work rule and Scope changes, which concededly harm junior pilots more than senior pilots, on a 2:1 ratio.

If there is a legitimate basis for distributing the Inverse Seniority Silo on a 2:1 basis, it must be the assumption that, while precise measures are unavailable, junior pilots are harmed approximately twice as much as senior pilots by the contractual changes intended to be mitigated by the Inverse Seniority Silo.   While that assumption may be valid, APA has provided neither analysis nor evidence to support it. . . .[34]

The August 26 Notice and Order directed that a Supplemental Hearing be held on September 11, at which APA and challengers would have the opportunity to introduce additional evidence and argument concerning the proper ratio to be applied when distributing sums from the Inverse Seniority Silo.  At the September 11 hearing, APA introduced additional evidence to

---

[33] (Footnote added.)  The 2:1 scale or ratio referred to in the August 26 Notice and Order is the same as the 1:2 ratio referred to in this Decision.  No matter how expressed, the APA formula is intended to provide the most junior pilot with a payout double that provided to the most senior pilot.

[34] Notice and Order, at Attachment A, p. 3.

show that senior pilots are harmed by the concessions addressed by the Inverse Seniority Silo.[35] APA did not, however, submit evidence to quantify the relationship between the amount of harm to senior pilots and the harm to junior pilots.  Instead, APA repeated its original assertion that 1:2 is a rational payout ratio because there is no way to calculate the damages addressed by this silo with accuracy, and the ratio between the pay of the most junior and most senior pilot (which historically has been 1:2) is a reasonable proxy for these harms.[36]

APA also asserts that the 1:2 ratio is preferable to a formula that would provide still greater payments to junior pilots because it serves the Union's institutional interest in minimizing  disparities in payouts so as to reduce conflict among pilots: "[A]s is particularly pertinent here, while senior and junior members of a bargaining unit will always have perfectly rational bases on which to argue for a larger share of a given benefit, it is entirely rational for the dispenser of that benefit -- the union -- to seek and find ways in which to mediate between the groups and therefore reduce those inherent conflicts."[37]

<b>b.     FO Brian Smith's proposed distribution methodologies: a 0:1 or 1:5 ratio.</b>

FO Brian Smith, who also appeared and presented evidence at the September 11 hearing, agrees that APA should look at pay loss as a model for Inverse Seniority Silo allocations, but contends that the pay slope should begin at zero because the most senior pilots are unlikely to suffer from the work rule and Scope changes addressed by this silo.  According to Smith, the changes in the 2013 CBA allow senior pilots to fly more hours in the same amount of days, to make more money, and to bid on more efficient and favorable trips.  Smith also argues that the new Individual Monthly Maximum enhances senior pilots' pay opportunities.

It is junior pilots, FO Smith asserts, who will bear the brunt of the harm from work rule and Scope changes. For example, Smith cites American's expressed intent to retire Group III aircraft, replacing them with some Group IV aircraft and many more Group II aircraft.  As a result of this change, Smith contends that some Group III pilots will be able to bid up to Group IV jobs, but many more Group III pilots will be bumped down into Group II jobs.  He also relies on American's proposed outsourcing of 76 seat jets to commuter carriers, a change that, if implemented, would result in the elimination of jobs primarily for junior pilots.

Moving from the general principle that junior pilots will be harmed substantially more than senior pilots by Scope and work rule changes, Smith attempts to quantify the harm to pilots in each bid status flowing from the career stagnation that these changes will produce.  The means by which FO Smith measures the financial harm of career stagnation is to calculate the amount

---

[35] According to APA, for example, senior pilots may be unable to maximize their pay through the loss of the ability to bid lines that conflict with their training.

[36] APA Post Hearing Brief on Formula In Inverse Seniority Silo at 2; *see* September 11, 2013 Hearing Tr. 42:9-43:5 (CA Stephens explaining the justification for using pay scale as a proxy for harm in this silo); *id.*, 92:6-17 (CA Mellerski: "And what is that ratio?  If you look at the pay that pilots get it's a little steep at the very top end, and the very top end I mean in the top 100-150 people.  And then it's almost an exact 2 to 1 slope down until you get to people who are essentially new hires.  That's the way we've been paid and that line, that curve has been consistent for many, many years, at least as long as the pay structure has been in place which has been the same thing since 1963.").

[37] APA Post Hearing Brief on Formula In Inverse Seniority Silo at 6.

24

that pilots in each bid status would lose by being unable to move up to the next higher bid status. Smith assumes that, under the preferential bidding system to take effect during the 2013 CBA, lineholders in all seniority ranges will have the opportunity to earn 90 hours of pay per month, 15% of pilots will be on reserve, reserve pilots will fly 81 hours per month (10% less than lineholders), the highest bid status will be Group IV CA Lineholders and the lowest bid status will be Group II FO Reserve.[38]  Because the highest bid status is Group IV CA Lineholders, Smith calculated the career stagnation for each bid status, in part, as the difference in pay between pilots in that bid status and the corresponding pay of Group IV CA Lineholders.  This necessarily results in Group IV CA Lineholders being attributed $0 career stagnation.  Using 2013 CBA rates, the career stagnation losses for pilots in each bid status would be as follows:[39]

| Pilot Bid Status | Hours Pay Per Month | Pay Based on Current 2013 Pay Rates | Immediate Career Stagnation: % Immediate Cost of Not Moving Up to Next Bid Status | Career Stagnation in Proportion to Highest Bid Status, Group IV CA Lineholder |
|---|---|---|---|---|
| Group II FO Reserve | 81 | $110,800 | 11% | 108% |
| Group II FO Lineholder | 90 | $123,100 | 0 | 87% |
| Group III FO Reserve | 81 | $119,600 | 11% | 92% |
| Group III FO Lineholder | 90 | $132,800 | 6% | 73% |
| Group IV FO Reserve | 81 | $140,900 | 11% | 63% |
| Group IV FO Lineholder | 90 | $156,600 | 4% | 47% |
| Group II CA Reserve | 81 | $163,300 | 11% | 41% |
| Group II CA Lineholder | 90 | $181,400 | 0 | 27% |
| Group III CA Reserve | 81 | $175,900 | 31% | 31% |
| Group III CA Lineholder | 90 | $195,500 | 18% | 18% |
| Group IV CA Reserve | 81 | $207,000 | 11% | 11% |
| Group IV CA Lineholder | 90 | $230,000 | | 0% |

There are a number of problems with FO Smith's analysis.  Initially, it purports to measure career stagnation on the basis of two criteria: (1) the cost of delay in moving from one bid status to the next higher bid status; and (2) the cost of delay in moving from each bid status to that of Group IV CA Lineholder.[40]  The first of these measures is entirely sound, but does not support Smith's proposed 0:1 distribution formula, pursuant to which junior pilots would receive substantially greater sums than would senior pilots.  Smith's table shows that Group II FO Reserves, typically the most junior pilots, whose annual estimated pay is $110,800, would sustain a loss of $12,300 for each year in which they were delayed in moving up to Group II FO Lineholder, whose annual estimated pay is $123,100.  Smith's table also shows, however, that Group IV CA Reserves, typically possessing high seniority numbers, whose annual estimated pay is $207,000, would sustain a $23,000 loss for each year in which they were delayed in moving up to Group IV CA Lineholder.  Yet, under Smith's 0:1 formula, the junior Group II FO, who has been less financially harmed by the delay than has the senior Group IV CA Reserve, would receive a far greater payout than would the Group IV CA Reserve.

---

[38] In selecting the range of bid statuses, FO Smith used the bid statuses that American has used to date.

[39] This chart has been created from the data and calculations set forth in Smith's Summary Brief to Supplemental Hearing On the Inverse Seniority Silo.

[40] The latter is expressed in percentage terms in Smith's chart, but those percentages translate into financial loss.

The only basis in Smith's chart for awarding substantially greater payouts to the most junior pilots – Group II FOs – is that career stagnation will cause the progression to Group IV CA Lineholder to be much slower for the most junior pilots than it will be for more senior pilots – such as Group II CA Lineholders or Group IV FO Reserves.  Not only would the same be true even without the career stagnation effects of work rule and Scope changes, but measuring the effect of those changes on the most junior pilots over the 6-year term of the 2013 CBA by their increased delay in becoming a Group IV CA Lineholder is wholly unrealistic since the most junior pilots have no realistic possibility of becoming a Group IV CA Lineholder during the term of the 2013 CBA under any circumstances.[41]

Also problematic in the Smith analysis is his assumption that the most senior pilot will suffer no harm whatsoever from work rule and Scope changes and that other senior pilots will suffer negligible, if any, harm from these changes.  While it may be true that the most senior pilot would suffer no such harm, it is difficult to accept that the junior Group IV CA Lineholders would suffer no harm.  Though their system-wide seniority is great, these pilots would be vulnerable to the harmful effects of greater pilot productivity and increased outsourcing because they are the junior most pilots within their bid status.

In the alternative, FO Smith proposes a 1:5 ratio based on the assumption that a Group IV CA Lineholder will be harmed by the concessions addressed by this silo in the amount of 5% of his or her 2013 salary.  While this ratio may reach what appears to be a reasonable result, I reject it because no data has been presented to show that the Group IV CA Lineholder will suffer this specific amount of harm.

      c.     Proposed 1:1 ratio

CA Ann Singer, FO Kathy Emery, and CA Steven Fulmer also appeared at the September 11 hearing. They contend that the funds in the Inverse Seniority Silo should be distributed equally among all eligible pilots. In the alternative, FO Emery asserts that this silo should be distributed on a 2:1 or 1.5:1 ratio in favor of senior pilots.  Alternatively, she proposed different ratios for senior, midrange, and junior pilots, also favoring senior pilots.  These ratios are, however, inconsistent with the evidence that junior pilots will suffer a disproportionate amount of the harm addressed by the Inverse Seniority Silo.  Accordingly, I reject these ratios.[42]

      d.     Conclusion

I stated in the August 26 Notice and Order of Hearing that APA's justifications for its proposed 1:2 distribution ratio - that the most junior pilots (Group II FOs) have pay rates that are approximately half of those of the most senior pilots (Group IV CAs)  and that two other pilot unions that distributed money related to their carriers' bankruptcies used a 1:2 scale for seniority-

---

[41] While Smith states that the effect of stagnation on junior pilots will ripple for decades throughout their careers because of the time value of money, the Equity Distribution is limited to harm suffered during the 6-year term of the 2013 CBA.

[42] FO Kenneth G. Wuttke argued that the Inverse Seniority Silo should be eliminated, and its portion of the distribution moved to the Pension Silo.  I address this argument in Section III.A.2.c.

based silo distributions, albeit with senior pilots at the higher end of the scale – were so unpersuasive as to lack rationality.[43]   I further stated:

> If there is a legitimate basis for distributing the Inverse Seniority Silo on a 2:1 basis, it must be the assumption that, while precise measures are unavailable, junior pilots are harmed approximately twice as much as senior pilots by the contractual changes to be mitigated by the Inverse Seniority Silo.   While that assumption may be valid, APA has provided neither analysis nor evidence to support it.

APA has not, subsequent to the August 26 Order, presented evidence to support its assertion that junior pilots are harmed approximately twice as much as are senior pilots by the contractual changes sought to be mitigated by the Inverse Seniority Silo.  On the other hand, precisely the same observation can be made of FO Smith's position that junior pilots are harmed substantially more than APA suggests, and that Inverse Seniority Silo funds should be distributed on a 0:1 ratio, with the most junior pilot receiving considerably more and the most senior pilot considerably less than under the 1:2 ratio.[44]   FO Smith attempts to support his position on the basis of empirical data, but is not successful in doing so.

Ultimately, I accept APA's argument that it is impossible to calculate the damages flowing from work rule changes and Scope concessions with any sort of precision. Not only is it difficult to predict the effect of changed work rules on pilots in different bid and seniority statuses, but it is equally difficult to predict what use the Company will make of its increased Scope clause freedom to outsource flying, and the effect that will have on pilots in different bid and seniority statuses.

Under these circumstances, I cannot conclude, despite the unpersuasive nature of the APA justifications for the 1:2 ratio, that the 1:2 ratio itself is arbitrary.  It was chosen by the experienced pilots who made up the EDC after their efforts to find a data-based distribution formula had failed.[45]  As EDC Chairman Mellerski testified, the 1:2 ratio reflected the view of a majority of the EDC, based upon their experience, that a 1:2 distribution in favor of junior pilots

---

[43] The Group II FOs were referred to in the August 26 Order as "NB FOs" (Narrow Body FOs); the Group IV CAs were referred to as "WB CAs" (Wide Body CAs).

[44] Under the 1:2 APA formula, assuming a $1 billion total equity distribution, $300 million of which would be allocated to the Inverse Seniority Silo, and 8,678 pilots eligible for this silo, the most senior pilot would receive approximately $23,000 from the Inverse Seniority Silo and the most junior pilot would receive approximately $46,000, a difference of $23,000.  Assuming the same factors under the 0:1 formula, the most senior pilot would receive nothing and the most junior pilot would receive approximately $69,000.  These disparities would, of course, exist only at the extremes; all other pilots would receive payments somewhere between these extremes. (The estimated payouts in this footnote do not take account of the effect of prorating.)

[45] CA Stephens testified that EDC considered the same factors and analysis that FO Smith considered before it determined that 1:2 was the best fit.  September 11, 2013 Hearing Tr. 40:21-41:2; 78:20-79:4; 204:19 – 205:3 (CA Stephens: "I appreciate First Officer Smith's efforts, I mean, and I really can relate to them, because we spent months doing, you know, a similar analysis, trying to figure out how to do this. So I know the type of thought and the type of effort that goes into it.").

was as close as they could come to estimating the harm to junior pilots compared to those more senior flowing from work rule and Scope changes.[46]

Furthermore, the 1:2 ratio is unquestionably more consistent with the APA interest in minimizing disparity than is FO Smith's approach, which would result in a payoff disparity of approximately $69,000 between the most junior and the most senior pilot, compared with the approximately $23,000 disparity under the APA 1:2 ratio.  If there were data that supported a $69,000 payout disparity on the basis of greater harm in the amount of $69,000 to the most junior pilot, I might well approve a formula resulting in that disparity on the ground that it would be warranted by the core Equity Distribution Plan principle of basing recovery on harm.  In considering allocation formulas for the Inverse Seniority Silo, however, under which determinations of harm cannot be made with any degree of precision, I am unwilling to strike down the APA 1:2 formula and approve a formula that would lead to the substantial disparities of the 0:1 formula on the basis of no more than FO Smith's estimations of harm, however well-intentioned those estimates may be.

The challenges to the APA formula for the distribution of funds allocated to the Inverse Seniority Silo are denied.

    2.    <u>Invalid methodology in the Pension Silo</u>

        a.    The Pension Silo's methodology is arbitrary because APA could have used more precise methods to calculate pension damages.

The Pension Silo was intended to address the significant financial loss caused to pilots as a result of American freezing the A Plan, which prevented pilots from continuing to accrue credit towards their plan benefit.  While the actual calculations used to determine this loss were complex, the basic concept is not.

Each pilot's payout from the Pension Silo is based on the pension loss suffered by a generic pilot who shares his or her demographics, rather than an estimate of his or her actual damages.  APA first calculated the pension payout at the mandatory retirement age of 65 that a generic pilot whose seniority was approximately the same as that of the pilot in question would have received at retirement if the A Plan had not been frozen.  It did this, in part, by calculating the Final Average Pay ("FAP") for each seniority number.  This calculation took into account future pay raises and increases in payments to the defined contribution pension plan (B Plan) that were provided in the 2013 CBA and the MOU.  From this estimated payout, APA subtracted the amount the pilot was estimated to receive from the frozen A Plan.  The result, subject to various technical modifications not relevant here, and reduced to present value, was the pilot's estimated loss as a result of the A Plan freeze.  Each pilot's payout under the Pension Silo was distributed in proportion to all Pension Silo payouts for the total amount of

---

[46] "[W]e looked at various, you know, what I'll call y intercept and various slopes of the line as to which one was the most correct. Or which one gave us the greatest ability to address all of the issues that we had placed in that particular category. And as we've talked about here after addressing all of them we decided that the 1 to 2 ratio from senior to junior was as good a fit we could come up with." *See* September 11, 2013 Hearing Tr. 130:22-131:9.

money allocated to the Pension Silo. APA explained that it did not attempt to determine each pilot's actual loss for a number of reasons (APA  Statement of Position at 38-39):

> The model generally does not attempt to account for the individual circumstances of pilots . . . . This is consistent with the APA's overall approach of declining to take on the impossible task of predicting the specific harms to be incurred by specific pilots. . . . The goal of the Pension Silo is to predict the size of the benefit that pilots would have received under the A Plan if the A Plan had not been frozen. That benefit would have been determined based on pilots' earnings during their last five years of work at American. But of the many factors that could influence a pilot's future earnings, only seniority can be predicted with any reasonable level of confidence.  Other factors are based largely on pilot preferences and behavior, e.g. whether a pilot will choose to upgrade to a more lucrative aircraft or seat, even if it means flying out of a different base or sacrificing quality of life.

Some challengers argued that APA should have determined A Plan losses for each individual pilot rather than determining those losses based on a generic pilot model.  Given the complexities and uncertainties APA has articulated regarding projecting precise results for each individual pilot, it is difficult to find that the APA approach is irrational. The amount a pilot will earn in his last five years of employment is dependent on factors within the pilot's choice that cannot be known by APA (such as whether and when to upgrade to a certain aircraft or seat, and whether to retire before the mandatory retirement age).  Thus, it is impossible for APA to predict any pilot's actual FAP with any confidence.[47]

The challenges to APA's use of damages based on expected harm to a generic pilot are therefore rejected.[48]

b.    The Pension Silo arbitrarily failed to give length of service credit to pilots who were furloughed after 2001.

The APA model for calculating A Plan losses multiplies length of credited service ("Credited Service") by FAP.  With limited exceptions for pilots who joined American by

---

[47] Courts have not required distribution plans to be predicated on actual damages when such damages are extraordinarily difficult to determine, as they are here.  *See, e.g., Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615, 629 (6th Cir. 2007) (quoting *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 855, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)) (finding that a plan need not adopt an approach of distribution in proportion to the harms suffered by class members because "equity in such a simple sense" may be "unattainable in complex cases"); *In re Agent Orange Prod. Liab. Litig.,* 611 F. Supp. 1396, 1402-3, 9-10 (E.D.N.Y. 1985) (holding that damages were "far too speculative to serve as the primary basis for a distribution plan").

[48] The challenge of FO Al J. Austgen is based on facts specific to him. He asserts that the "calculation of [his] loss of pension should have been done based on what [he] would have received had [his] shares not been divided in half due to divorce."  Because these facts, in the absence of further explanation not provided by FO Austgen,  provide no support for applying a different formula to calculate his distribution from the Pension Silo, I reject this challenge.

merger, the model defines Credited Service as a pilot's years of service as an American pilot, minus one year.

FO Brian Smith, as well as several other pilots, contends that the Pension Silo arbitrarily denies length of service credit for time spent on furlough after 2001, thus unfairly reducing the Pension Silo allocations of pilots furloughed since 2001. The CBA in effect at that time of the furloughs did not, however, provide pilots with the right to accrue credited service while on furlough. Nor did these pilots have such a right under the A Plan itself. FO Smith relies, in support of his contention, on the fact that in 2001. APA successfully negotiated with American to provide credited service for furlough time to all pilots who had been on furlough before 2001 He argues that this negotiation success in 2001 for pilots furloughed prior to that date makes it likely that APA will be similarly successful in future negotiations with respect to pilots furloughed after 2001. Accordingly, he asserts that pilots furloughed after 2001 should be given credit for their furlough time or, at least, for a portion of that time.

APA, in response, points out that its success in 2001 marked the first time in decades that it had persuaded the Company to award credited service time to pilots who had been on furlough. APA also points out two factual differences between furloughs before and after 2001 that are not insignificant. First, the number of pilots who have been furloughed since 2001 is far greater than the number of pre-2001 furloughees. Second, the post-2001 furloughees have been on furlough longer than the pre-2001 furloughees. According to CA Mark Stephens, a member of the EDC:

> [T]he other important factor between those is the 600 furloughed pilots that were in the '90s, they were furloughed for two to three years. And the almost 3,000 pilots that have been furloughed [since then], some of them have been furloughed for . . . almost 12 years.[49]

Because crediting furlough time for post-2001 furloughed pilots would substantially increase their pensions, APA concludes that it is unlikely that the Company would be willing to credit time spent on furlough post-2001 as Credited Service time. Thus, APA could not reasonably expect to succeed in those negotiations.

APA's arguments are persuasive. It did not act arbitrarily, discriminatorily, or in bad faith in declining to award credited service for time spent on furlough after 2001 on the basis of the highly speculative assumption that it could have persuaded American to do so.[50]

---

[49] Tr. 1313:2-7.

[50] FO Smith also argues that post-2001 furloughees should receive at least 5 years credited service time because American Eagle pilots who had been improperly denied the right to flow up to American were awarded 5 years of credited service time by Arbitrator George Nicolau. That argument is without merit. In the first place, the Nicolau Award did not grow out of a furlough, but was a remedy for a violation of Supplement W; the request for credited service time here is not based on a CBA violation. Second, Arbitrator Nicolau did not award any years of credited service to the American Eagle pilots. Rather, he held that the time between when they should have flowed up to American and the time they actually flowed up should be credited solely for complying with the 5-year vesting requirements of the A Plan. *See* Section III.C.3.a. of this Decision (pp. 45-46) at which this issue is discussed.

      c.      The Pension Silo should have excluded pilots not vested in the A Plan at the time it was frozen.

FO James Dodson argues that pilots who were not vested in the A Plan at the time it was frozen cannot incur damages as a result of the freeze, hence those pilots should not have been included in the Pension Silo.

APA acted rationally in including unvested pilots in the Pension Silo distribution. Inasmuch as only five years of service is needed for a pilot's A Plan rights to vest, all pilots on active duty on January 1, 2013, the eligibility date for Equity Fund participation, will become vested prior to the December 31, 2018, expiration of the 2013 CBA. Accordingly, such pilots will sustain harm from the freeze of the A Plan during the relevant period for determining damages under the Equity Distribution Plan.

      d.      The Pension Silo arbitrarily or discriminatorily favors certain categories of pilots based on age or seniority.

In order to deal with these challenges, it is necessary to go into more detail concerning the APA treatment of the harm sustained by pilots as a result of the A Plan freeze. Initially, for purposes of determining the amount of the allocation to the Pension Silo, APA, as set out on pp. 4-5, used the Company's estimate of the savings to it of the A Plan freeze over the 6-year term of the 2013 CBA. Because, however, the average time to age 65 retirement for eligible pilots was 12 years, APA doubled the amount of the Company's 6-year cost savings calculation (net of the increased Company contribution to the B Plan) in determining the amount it would allocate to the Pension Silo.

In determining allocations to individual pilots under the Pension Silo, however, APA calculated the loss that a pilot would suffer as a result of the A Plan freeze as the amount a generic pilot, who shared the actual pilot's demographic characteristics, would sustain if he or she continued in the Company's employ until the mandatory retirement age of 65.

Some challengers argue that because the amount of damages a pilot will receive under the Pension Silo accounts for harms beyond the 6-year term of the 2013 CBA, the Pension Silo awards to pilots arbitrarily favor younger pilots who have more years to retirement than do older pilots. These challenges fail to recognize, however, that although the 2013 CBA has only a 6-year term, the harm resulting from the A Plan freeze extends far beyond those six years, encompassing, for pension purposes, all years until that pilot's retirement. The challengers' approach of cutting off the accumulation of damages after six years would assign the same damages to a pilot scheduled to retire in 2040, whose anticipated pension has been dramatically cut by the freeze, as to a pilot scheduled to retire in 2019, whose pension loss due to the freeze is far less.

The result sought by these challengers would eliminate the effect of age – more precisely of years to retirement – from the Pension Silo calculation, but in doing so would transgress a fundamental principle of the Equity Distribution Plan – that each pilot's recovery should be proportional to the harm that pilot sustained as a result of the concessions in the 2013 CBA.

Finally, contrary to the challengers' contention, it is not forbidden age discrimination to provide greater compensation to pilots who sustained greater harm, even if the latter tend to be younger. *See Bondurant,* cited and discussed at pp. 9-10.

Other challengers assert that the Pension Silo's priority on seniority penalizes older workers who do not have seniority commensurate with their age. These challenges incorrectly assert that it is the Pension Silo that prioritizes seniority. In fact, the Pension Silo model does no more than follow the A Plan formula for determining pension payouts, which is, in essence, to multiply final average pay by credited service (seniority). The Pension Silo model must follow the A Plan formula in order to calculate the difference between what a pilot would have received if the A Plan had not been frozen and the amount the pilot will receive as a result of the freeze (albeit with final average pay based upon a generic pilot). What this challenge really seeks is for APA to reduce the impact of seniority in the Pension Silo formula to benefit older pilots whose seniority is not commensurate with their age. Were APA to do so, however, it would be using the Equity Fund to aid one group of pilots at the expense of others for the purpose of permitting the former group to receive a Pension Silo allocation greater than that to which it otherwise would be entitled. Such a result would contradict the basic Equity Fund principle of allocating damages as a function of the harm sustained by the concessions in the 2013 CBA. APA cannot be faulted for declining to allocate Equity Fund resources in the manner sought by the challengers.

> e. The discount rate used to calculate the net present value of pilots' losses was too conservative.

The final step in the complex formula for calculating each pilot's payout from the Pension Silo was to reduce his or her estimated loss to present value in consideration of the fact that the pilot will receive the money earlier than he or she would have absent the freeze. The discount for present value depends on the length of time until each pilot reaches the assumed retirement age of 65, as well as an estimated rate of return on the money from the pension.

EDC member Michael MacMurdy testified concerning the means by which the EDC determined the present value for each pilot's payout. First, it looked at data from Morningstar, Inc., a leading investment research firm, to determine a reasonable asset allocation for pilots prior to retirement. Based on this data, EDC determined a 70% equity / 30% fixed-income asset allocation mix to be reasonable. EDC then asked its consultant, Towers Watson, which had long conducted actuarial work related to pilots' benefits for American, to provide an estimated rate of return for such a portfolio. Towers Watson informed the EDC that the estimated projected rate of return was 6.02%, and subtracted an estimated average expense ratio of 0.51% to arrive at 5.51%. The EDC used this 5.51% rate to discount what would have been the pension's value at a pilot's retirement to present value. The EDC had used the same assumptions, calculations, and rate in the Pension Silo to calculate the return for the expected B Plan contributions for each pilot pre-retirement.

CA Martin Dravis claims that the 5.51% discount rate to calculate the net present value of pilots' pensions was too low (similarly, he claims the same rate used to calculate the return for the expected B Plan contributions is also too low). He asserts that both should be 6.86% based on

the historical rate of return since its inception in 1999 of the moderate mixed portfolio which is available to pilots in the B Plan.  The APA's artificially low discount rate (and for the rate of return for the expected B Plan contributions), CA Dravis argues, overcompensates younger pilots because the net present value of that anticipated pension loss many years in the future will be overstated (and the net present value of the expected B Plan contributions will be understated) in comparison to that of older (more senior) pilots who will have fewer years to benefit from an overstated discount rate (and understated rate of return).

EDC's determination of reasonable portfolio allocations based on data generated by a leading investment research firm, and its reliance on an estimated discount rate and rate of return provided by its pension and investment consultants cannot be characterized as arbitrary, discriminatory or in bad faith. Accordingly, I reject the challenge to EDC's use of a 5.51% discount rate and rate of return.

> f.   The distributions for LTD Category 2 and Category 3 pilots from the Pension Silo are too low because (1) LTD Category 2/3 pilots do not receive the increased 401(k) contributions received by active pilots, and (2) unlike active pilots, they will be unable to recover their A Plan losses by working under the increased pay rates of the 2013 CBA.

Several LTD Category 2 and Category 3 pilots contend that their distributions from the Pension Silo are too low because, unlike active pilots, they do not receive 401(k) contributions.[51] Their concern is that even though Category 2 and Category 3 pilots do not participate in the 401(k) plan, they are being treated like active pilots, whose 401(k) contributions from the Company are used to offset their A Plan losses in calculating the amount due to them under the Pension Silo. In fact, however, the Equity Distribution Plan does not subtract from the Pension Silo payments of LTD Category 2 and Category 3 pilots the 401(k) contributions they are not receiving.[52]

LTD Category 2 and Category 3 pilots also contend that they suffer more harm from the A Plan freeze than active pilots because they will be unable to recover their A Plan losses over time through the increased compensation rates negotiated in exchange for the 2013 CBA concessions.  Assuming that pilots working under the 2013 CBA will gain more from increased compensation than they will lose from the work rule and benefit concessions that APA made to obtain that increased compensation, the amount of that gain is impossible to calculate.  Thus, APA did not act arbitrarily in declining to provide additional Pension Silo payouts to LTD Category 2 and Category 3 pilots who would not work under the 2013 CBA.

---

[51] In Section III.D.2, *infra*, I define LTD Category 2 and Category 3 pilots as LTD pilots who went on disability before January 1, 2008.

[52] Tr. 1158:6-12. At least one challenger asked APA to add LTD pilots to the 401(k) plan.  As discussed during the Merits Hearing, this request does not involve a challenge to the Equity Distribution.  It is thus beyond my jurisdiction.

3.      Invalid methodology in the Per Capita Silo

The only challenge to the methodology in the Per Capita Silo was filed by FO Kenneth Wuttke, who argued that the equal distribution of equity for the harms encompassed by this silo, primarily scheduling changes impacting the pilots' quality of life, was unfair to junior pilots because such pilots typically suffer more from work schedule changes than do more senior pilots.  APA does not dispute that scheduling changes may have a disproportionate impact on junior pilots, making it more difficult for them to claim favorable trips and advance to more lucrative positions, but points out that the disproportionate effects on junior pilots are mitigated by the Inverse Seniority Silo, which was designed for this purpose.  APA also points out that some of the contractual concessions dealt with by the Per Capita Silo, particularly the increased cost of active medical insurance, has an equal impact on all seniority groups.

I cannot find, under all the circumstances, that APA acted arbitrarily in not taking seniority into account in the Per Capita Silo, particularly because it did so in the Inverse Seniority Silo.

4.      Invalid methodology in the Years of Service (YOS) Silo

        a.      Inclusion of different harms in the Years of Service Silo and measuring those harms by years of service.

APA designed the YOS Silo to mitigate financial harm arising from various concessions in the 2013 CBA, including: (i) the loss of the lump sum option in the frozen A Plan; (ii) elimination of the Company contribution to retiree medical insurance; (iii) changes to benefits related to compensation, such as profit-sharing, the international premium, and pay for military leave; (iv) 35-day cap for vacation days; and (v) modified training opportunities.  As APA acknowledges, the impact of some of these concessions depends on a pilot's age (loss of subsidized retiree medical insurance and the lump sum pension option); the impact of others depends on a pilot's pay rate (changes to profit-sharing, military leave and training opportunities); and still others depend on a pilot's seniority (limited international premium and 35-day vacation cap).

Despite the variance in the source of these harms, APA combined them in a single silo, allocating each eligible pilot's share as a function of the number of years he or she worked for American.  It did so on the ground that each of the key factors in determining the impact of the concessions treated in this silo – age, pay rate, and seniority – is highly correlated with a pilot's years of service.  It stated (APA Statement of Position at 36):

> The APA reasonably determined that the impact of many contractual concessions is closely linked to pay, age, or various measures of length of tenure at American.  Rather than create separate silos for each of these factors, the APA recognized that all were correlated with years of service, *i.e.*, years since a pilot's Occupational Seniority Date.  The APA therefore chose to create a single Years of Service Silo.

34

In choosing this approach, the APA gave significant weight to two of its guiding principles: the value of simplicity and the impossibility of creating any exact measure of damages.  In light of these principles, it was reasonable for the APA to create a silo that employed a straightforward methodology that generally, though imperfectly, correlated to a variety of contractual harms . . . .

Combining varied harms in a single silo necessarily makes the distribution imperfect. The compensation-related harms and age-related harms are measured by years of service rather than according to the most relevant benchmark, *i.e.*, compensation or age.  Nonetheless, the decision to combine them was rational because the Union did so to further the legitimate Union interest in avoiding unnecessary complexity.[53] The primary question, therefore, becomes whether it was arbitrary for APA to use years of service as the yardstick by which to measure pilots' individual distributions from this silo.

Several pilots contended that it was improper to use years of service as the yardstick for this silo because some of the concessions in the YOS Silo, such as the loss of subsidized retiree medical benefits, stem from factors other than years of service.  Others argued that years of service is improper because the compensation-type losses at issue in this silo are shared equally by all eligible pilots on a percentage basis (rather than linked to seniority), depending on the pilot's pay rate and bid status.  Still others claimed that junior pilots suffer more harm from the compensation-related concessions.

APA responded, "[y]ears of service is directly linked to seniority and is correlated to age (and therefore proximity to retirement), pay rate, and accredited service for vacation purposes."[54] Moreover, APA asserted that the absolute impact of the compensation concessions in this silo would be greatest on senior pilots because their pay was greatest under the 2003 CBA.

Like age, pay rate and bid status generally increase with seniority, so senior pilots would – as APA suggests – have a larger share of the damages that are correlated to these factors.  The distribution is designed to compensate pilots for losses covered by the 2013 CBA, which expires after six years; junior pilots do not suffer a larger percentage of harm arising from the compensation concessions simply because they will retire later.

FO Eric Kowalski argued that the YOS Silo inaccurately allocates significantly more to a senior pilot who does not fly internationally than to a junior pilot who does, even though the senior pilot is not harmed by the loss of international premiums.  He also contended that loss of night and international pay is unrelated to years of service, and instead hinges on bid status. These arguments show the imperfections of using years of service, but do nothing to show that it was an unreasonable measuring tool.

Understandably, some pilots are dissatisfied with this silo.  Indeed, APA recognizes its flaws.  But imperfection does not rise to the level of arbitrariness, discrimination or bad faith.

---

[53] APA Post-Hearing Brief at 30.
[54] APA Statement of Position at 11.

APA designed the YOS Silo to accomplish legitimate objectives that were clearly set forth in the Equity Distribution Plan.  Such a decision was not so far outside a wide range of reasonableness as to be irrational.  *See Vaughn v. Air Line Pilots Ass'n Intern.*, 604 F.3d 703, 709 (2d Cir. 2010).  Although the use of years of service is imperfect, an alternative yardstick for all concessions in the YOS Silo might produce comparable imperfections.  Further, dividing the YOS Silo into several sub-silos based on different yardsticks would increase the complexity of the distribution scheme, without any guarantee of a corresponding benefit.  Because each pilot's years of service are reasonably correlated to the harm he or she will suffer from each of the concessions in the YOS Silo, it was not arbitrary for APA to rely on years of service.

As evidence of discrimination, the challengers cite the fact that the YOS Silo favors senior pilots and imperfectly allocates damages.  The law is clear that a union's actions are not discriminatory simply because they are unfavorable to some pilots.  *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 202-03 (1944); *Bondurant v. Air Line Pilots Ass'n Int'l*, 679 F.3d 386, 393 (6th Cir. 2012); *see Turner v. Air Transport Dispatchers' Ass'n*, 468 F.2d 297, 300 (5th Cir. 1972) ("The fact that a union adopts a position which favors one group of employees over another does not amount to a breach of the duty of fair representation.").  Although the YOS Silo favors senior pilots, the Inverse Seniority Silo favors junior pilots.  When examined as a whole, the Equity Distribution Plan does not favor either group.

FO Brian Smith proposed that the YOS Silo should be renamed the "Age 65/Retiree Medical Silo," limited to the loss of subsidized retiree medical care, and allocated according to age on the ground that the other concessions in this silo have been mitigated due to wage increases.  This argument has been responded to elsewhere (p. 14), and that response will not be repeated here.

> b.  Allocations from the Years of Service Silo should be prorated for those pilots who will reach mandatory retirement during the 2013 CBA.

APA chose not to prorate the YOS Silo because many of the concessions allocated to it (*e.g.*, loss of the lump sum option and subsidized retiree medical benefits) occur post-retirement.  Because, however, other concessions in the YOS Silo do not affect pilots post-retirement, senior pilots who retire before the 2013 CBA expires will receive some compensation for damages they will not incur, thus reducing the pool of money available for junior pilots. As a result, some junior pilots have challenged the APA decision to not prorate the YOS Silo as arbitrary and discriminatory. As explained above, however, it is not discriminatory for a union to make a decision that favors one group over another unless there is evidence – lacking in this case – that the Union's decision was based upon invidious considerations.  *See, e.g.*, *Bondurant*, 679 F.3d at 393 (accepting union's allocation even though it gave an unearned benefit to certain pilots).  Evidence of Company cost savings, from which estimates of pilot harm were primarily drawn, showed that the cost savings attributable to cuts in retiree medical insurance accounted for nearly half of the cost savings in the YOS Silo.  Furthermore, even those pilots who must retire during the term of the 2013 CBA will suffer some degree of harm from the concessions that affect active employees.  Under these circumstances, it was not arbitrary or discriminatory for APA not to prorate the YOS Silo.

5.      Silo structure unfairly prorates the Inverse Seniority and Per Capita Silos

As described above, APA chose to prorate the award from two silos—Inverse Seniority and Per Capita—for pilots who would reach the mandatory retirement age of 65 before the end of the 2013 CBA's six-year term.  The EDC stated that this decision was made because the financial harm associated with those two silos accrued only to active pilots.

Several pilots have filed challenges to this proration decision.  The arguments by these pilots fall into two categories: (i) the proration decision is discriminatory because it unfairly reduces the award to older pilots; and (ii) the proration decision is arbitrary and/or discriminatory because it reduces the award to pilots facing *mandatory* retirement but does nothing to reduce the award to pilots who *voluntarily* retire during the 2013 CBA.  These pilots have also noted that none of the EDC members will be affected by proration.

As to the challengers' first argument, APA responds that there is a legitimate basis for reducing the award to "older" pilots (*i.e.*, those who must retire during the contract term) in the Inverse Seniority and Per Capita Silos.  Pilots who must retire during the term of the 2013 CBA, APA points out, will suffer less from the harm mitigated by those silos because that harm (*e.g.*, increased work hours and reduced medical benefits for active pilots) falls on active pilots and those pilots who must retire during the contract term will be active for fewer years than those pilots who will work during the entire contract term.  Hence, prorating their recovery as a function of the time they will work under the 2013 CBA is entirely reasonable.

With respect to the challengers' second argument, APA explains that the differential treatment between pilots facing mandatory versus voluntary retirement is based on the unpredictability of the latter.  APA argues that it cannot reduce the initial distribution to pilots who may voluntarily retire during the term of the 2013 CBA because, in almost all cases, it does not know who those pilots will be.  Mandatory retirement, in contrast, is certain to occur during the term of the 2013 CBA for pilots aged 59 or older as of January 1, 2013.

Nor would it serve pilot interests for APA to seek to recover a portion of the initial equity distribution from those pilots who voluntarily retire during the term of the 2013 CBA.  APA asserts that voluntary retirements are beneficial to the pilot group as a whole because they create opportunities for advancement for the remaining pilots.  APA thus has an interest in not discouraging voluntary retirements by requiring pilots who voluntarily retire during the 2013 CBA to return some portion of their equity award.

I conclude, in light of these arguments, that the APA decision to prorate distributions from the Per Capita and Inverse Seniority Silos for those pilots who would be required to retire during the term of the 2013 CBA, but not for those who voluntarily retire, served legitimate Union interests, and was neither arbitrary, discriminatory, nor in bad faith.[55]

---

[55] This conclusion is not affected by the challengers' observation that no member of the EDC will suffer as a result of proration.  The fact that the EDC decision on this issue was consistent with the personal interests of its members does not render that decision a breach of the duty of fair representation in the absence of evidence that EDC members acted for the purpose of furthering their personal interests rather than the interests of all pilots represented

C.   **Challenges to APA's Treatment of the Effect of Prior Service at Another Airline**

1.   Challenges by former TWA pilots

a.   Background

In April 2001, American acquired the assets of Trans World Airlines, Inc. ("TWA"), and hired 2,337 former TWA pilots.  Those pilots were initially assigned to TWA LLC, a wholly-owned subsidiary of American.  They were subsequently integrated into the American workforce and, by virtue of Supplement CC, an agreement between American and APA, were assigned places on the AA-APA system seniority list.[56]  The 1,095 most senior former TWA pilots were "feathered" into the existing seniority list on a 1:8.1762556 ratio, beginning at AA seniority number 2596, a pilot who had an American date of hire of October 8, 1985.  The 1,242 remaining former TWA pilots were "stapled" to the end of the seniority list immediately below the last AA pilot hired before the April 10, 2001, purchase by American of the TWA assets.  For the 1,095 pilots feathered into the list on a ratio basis, American and APA assigned each TWA pilot an Occupational Date between the American pilot immediately above and below him.  For the 1,242 stapled TWA pilots, American and APA assigned them all the same Occupational Date—June 10, 2001—as the last American pilot hired before April 10, 2001.  Other dates that American had assigned to the former TWA pilots, as to all other pilots, were Classification Date (for pay purposes), Company Date (for vacation accrual), and Date of Hire (for pension accrual).  For former TWA pilots, these dates corresponded with their initial hire at TWA, not the date on which they arrived at American.  As a result of the American-APA seniority integration formula, the seniority dates assigned to the former TWA pilots were considerably later than were their TWA dates of hire.

b.   The EDC use of Occupational Date in the Years of Service Silo

When the former TWA pilots started work at American, they were assigned an Occupational Date based on their placement on the APA system seniority list, and that was the date used by the EDC to determine their years of service in calculating their allocations from the Years of Service Silo. The EDC also used the Occupational Date in calculating years of service for other pilots.

Several former TWA pilots argue that the EDC's decision to use Occupational Date for them in the Years of Service Silo was arbitrary because, in their case, that date has no relation to the financial harms the Years of Service Silo seeks to remedy.  The Occupational Date for them,

---

by APA.  There is not a scintilla of such evidence in this case.  *Cf. Mansfield v. Air Line Pilots Association International*, No. 1:06-cv-06869, 2009 WL 2386281 (N.D. Ill. July 29, 2009), cited and discussed at pp. 10-11, *supra*.

[56] Supplement CC, which also established St. Louis as a protected base for the former TWA pilots, providing protective fences and preferred bidding rights for them at that base, was abrogated by American in the 2012 bankruptcy, but the seniority list was not disturbed.  The effect of the Supplement CC abrogation and the projected closing of the St. Louis base upon the Equity Fund allocations to the former TWA pilots is discussed subsequently at pp. 40-44.

they assert, does not correspond to their age, pay, or length of tenure at American.   Rather, their Occupational Date was "manufactured" after they had been assigned places on the system seniority list through the feathering and stapling process.   They assert that any of the other relevant dates assigned to them by the Company would have been a more satisfactory measure of the harms sustained by them as a result of the contractual concessions treated by the YOS Silo, since each of those dates corresponds to their TWA date of hire. The best date, they state, would have been Date of Hire.

APA does not dispute that Date of Hire, Classification Date or Company Date could have been used to measure years of service for former TWA pilots in the YOS Silo.  It argues, however, that had it used any of those dates across the two silos in which awards are a function of seniority—YOS and Inverse Seniority—former TWA pilots would have fared less well because doing so would have decreased their payout from the Inverse Seniority Silo by a greater amount than it increased their payout from the YOS Silo.  For, contrary to the YOS Silo methodology, pursuant to which more senior pilots receive a higher allocation, the Inverse Seniority Silo methodology provides greater awards to more junior pilots.  And, since the Inverse Seniority Silo contains 30% of the assets in the Equity Fund, while the Years of Service Silo contains 20% of those assets, it stands to reason, APA asserts, that the former TWA pilots benefited as a result of the EDC decision to use Occupational Date, rather than any other date, as a measure of seniority in both the YOS and Inverse Seniority Silos.[57]  Finally, APA points out that 85% of former TWA pilots received total awards from the YOS, Inverse Seniority, and Per Capita Silos that were in excess of $80,000, while 88% of "legacy" American pilots received such awards from those three silos. This, APA asserts, clearly shows that there has been no discrimination against former TWA pilots.[58]

The former TWA pilots argue that APA's contention that they profited by the APA decision to use Occupational Date in both the YOS Silo and the Inverse Seniority Silo is unsupported because the EDC made no effort to determine what the impact would have been if it had used a more compensation-related date in its YOS calculations.   They assert that there is no evidence to support the EDC's determination that its use of Occupational Date in the Years of Service Silo was balanced out by its use of Occupational Date in the Inverse Seniority Silo.

This argument is not persuasive. Albeit not mathematically tested, the EDC calculation that the former TWA pilots were not harmed, but helped, by the use of Occupational Date in both the YOS and Inverse Seniority Silos is entirely reasonable. The former TWA pilots

---

[57] Actually, APA used a pilot's seniority date, not his Occupational Date, as the measure of seniority in the Inverse Seniority Silo.  Inasmuch, however, as Occupational Date is drawn from seniority date, the two are closely related.  To simplify the analysis, the date used by APA in the Inverse Seniority Silo will be referred to as the Occupational Date.

[58] APA also notes that in the Pension Silo former TWA pilots benefit from the EDC decision to use the past pay of former TWA pilots, rather than the past pay of all pilots with similar seniority numbers, to project future pay for former TWA pilots.  That treatment, based on the St. Louis flying advantages provided to former TWA pilots by Supplement CC, provided greater Pension Silo payouts to the former TWA pilots than they would have had if they had been treated like legacy AA pilots with similar seniority numbers.   APA further notes that TWA pilots, because of their comparatively low system seniority, benefited from the Inverse Seniority Silo, which rewards junior pilots more than senior pilots.

comprise approximately 10% of the total American pilot work force. It does not require mathematical testing to accept the proposition that 10% of 30% (the former TWA pilots' share of the proportion of the Equity Fund allotted to the Inverse Seniority Silo) is greater than 10% of 20% (their proportion of the Equity Fund allotted to the YOS Silo).  Nor, despite their suggestion that the EDC calculation may not stand up to more rigorous analysis, do the former TWA pilots put forward any analysis that would undercut the EDC calculations.

Finally, while the former TWA pilots contest the APA assertion that they are better off with the use of Occupational Date in both the YOS and Inverse Seniority Silos, and prefer that, in light of their special circumstances, Date of Hire be used in the YOS Silo, they do not propose that their seniority also be determined by Date of Hire in the Inverse Seniority Silo.  Instead, in the YOS Silo they want Date of Hire, which would maximize their seniority, and in the Inverse Seniority Silo, they want their "manufactured" seniority date, which would minimize their seniority, thus maximizing their payout from both silos.  They put forward no justification for such special treatment, and I am aware of none.

In sum, because of the special circumstances under which seniority dates had been assigned to the former TWA pilots, the EDC was required to determine whether their Occupational Date was an appropriate measure for determining their years of service for the YOS Silo, as it had been for all other pilots.  In doing so the EDC determined that to use any of the other potentially relevant measures of seniority—Date of Hire, Classification Date, or Company Date—that would serve to increase the former TWA pilots' seniority and allocations from the YOS Silo would reduce their allocations from the Inverse Seniority Silo by a greater amount than the potential gain in the YOS Silo.  Hence, the EDC decided to use Occupational Date to determine years of service in the YOS Silo for former TWA pilots, as it had done for all other pilots.  I conclude that in doing so, APA acted neither arbitrarily, discriminatorily, nor in bad faith.

            c.        Harm from the abrogation of Supplement CC, the closing of the St. Louis base, and the decision of the LOA 12-05 Arbitration Panel.

Supplement CC to the 2003 CBA guaranteed that 346 CA seats in American's St. Louis base ("STL") would be held by former TWA pilots and provided former TWA pilots with preference for FO seats in STL. Supplement CC also established a protected "bubble" for former TWA pilots in STL.  Within that bubble, despite the comparatively low system-wide seniority former TWA pilots had as a result of the Supplement CC seniority integration formula, they bid only among themselves for STL flying, with the result that the more senior among them had their choice in monthly bidding for lines of flying, days off, vacations, and other seniority-based preferences.

When Supplement CC was abrogated in September 2012, along with the remainder of the 2003 CBA, and American announced its plan to close STL as a pilot base, American and APA entered into a Letter of Agreement ("LOA 12-05"), which provided in relevant part:

This letter confirms our agreement concerning the termination of Supplement CC, the planned closure of the STL base, interest arbitration related to that action, and the schedule of any other base closures.

Supplement CC established seniority placement on the Pilots' System Seniority List for TWA pilots, as defined under Section I.D of Supplement CC, and certain preferential flying rights to specific aircraft based at STL associated with those seniority placements. The Company and APA agree that the TWA Pilots' existing seniority placements on the Pilots' System Seniority List are final and shall continue pursuant to Section 13 of the CBA notwithstanding the termination of Supplement CC and any preferential flying rights associated with those seniority placements. The Company and APA agree that a dispute resolution procedure is necessary to determine what alternative contractual rights should be provided to TWA Pilots as a result of the loss of flying opportunities due to termination of Supplement CC and the closing of the STL base.

The Company will have the right, in its sole discretion, to decide whether to close the existing STL pilot base, and such closure and consequences thereof shall not constitute a breach of the CBA. In preparation for closure of the STL pilot base, the Company and APA will engage in final and binding interest arbitration pursuant to Section 7 of the RLA to establish certain terms of the CBA as a substitute for the loss of Supplement CC preferential flying opportunities in order to resolve all issues related to the impact on TWA Pilots of termination of Supplement CC. The interest arbitration will commence within 30 days of the effective date of this agreement and the hearing shall be completed and a final award issued within 90 days of commencement. Within 30 days of issuance of the final award, the Company and APA shall submit to the Panel contract language implementing the award and the Panel shall within 15 days thereafter issue final approval of such contract language. The Company shall defer closure of the STL base until issuance of a final award and the Company shall have the contractual and legal right to close the STL base upon issuance of and compliance with the award, from which there shall be no reconsideration motions considered and notwithstanding any legal challenges to the award.[59]

---

[59] (Footnote added.) While the timetable set out in LOA 12-05 contemplated a final award on or about May 1, 2013, and final contractual language on or about May 15, 2013, the final award was issued on July 22, 2013, and final contract language was approved by the Arbitration Panel on September 12, 2013.

The interest arbitration panel shall consist of three neutral arbitrators who are members of the National Academy of Arbitrators with Richard Bloch as the principal neutral if he is available and will to serve.  The arbitrators shall decide what non-economic conditions should be provided to TWA Pilots as a result of the loss of flying opportunities due to the termination of Supplement CC and the closing of the STL base, provided that training costs associated with the closure of the base shall be considered non-economic.  In no event shall the arbitrators have authority to modify the Pilots' System Seniority List, require the establishment or continuation of any flight operation at any location, or impose material costs beyond training costs on the Company, and any preferential flying rights under the award shall not modify or be deemed a modification of the TWA Pilots' seniority placements on the Pilots' System Seniority List.

The estimated cost savings to American of closing STL as a pilot base was $83 million over the term of the 2013 CBA. These savings resulted partly from system efficiencies due to American's freedom to begin and end flights so as to maximize profits, rather than being constrained to utilize pilots based in STL for certain flights in order to comply with the Supplement CC guarantees.  Cost savings to American would also be achieved by not being required to deadhead STL pilots to other locations to begin trips not originating in STL, as well as from not having to pay hotel bills for deadheaded STL pilots.

The EDC decided that the $83 million in estimated cost savings to American resulting from the closing of STL and the abrogation of Supplement CC should not be placed in a separate silo to be distributed solely among former TWA pilots. Instead, the $83 million was placed in the Per Capita Silo, where it would be shared by all pilots. Initially, the EDC decided that the $83 million in cost savings to American, because it resulted from system efficiencies and the elimination of deadheading costs, did not impose concomitant harm to the former TWA pilots. Furthermore, the EDC believed that any harms to former TWA pilots that were not mitigated by an Equity Fund allocation would be dealt with by LOA 12-05, which provided for:

> . . . final and binding interest arbitration . . . to establish certain terms of the CBA as a substitute for the loss of Supplement CC preferential flying opportunities in order to resolve all issues related to the impact on TWA Pilots of termination of Supplement CC.  (Emphasis added.)

The former TWA pilots, for their part, argue that whatever the general principles of the Equity Distribution Plan may have been, they constitute a unique group that sustained clearly identifiable harm resulting from the closing of the STL base, the abrogation of Supplement CC, and the decision of the LOA 12-05 Arbitration Panel.  They introduced evidence showing that as a result of the LOA 12-05 arbitration award, which requires them, when they are transferred from STL to other bases, to use their comparatively low system seniority when bidding against American pilots at those bases, most of whom have greater system seniority than they do, most

of them will not have sufficient seniority to hold a line at those bases.  Instead they will be forced to fly as reserves.  They also introduced evidence showing that lineholders' income is significantly greater than that of reserves, with the result that the loss in income to them will be approximately $37 million over the term of the 2013 CBA.   To this loss the TWA pilots added the loss in their quality of life resulting from their inability to choose, as they had at STL, their schedules, days off, and vacations.  The monetary value of this loss they estimated at $18.8 million.[60] They also added the increased costs to those STL pilots who live within commuting distance of STL of having to commute the greater distance to the new bases to which they would be assigned upon the closure of STL, a cost they estimated at $12 million.  In total, they claimed $95.6 million in losses as a result of the STL base closing, the abrogation of Supplement CC, and the LOA 12-07 arbitration decision.

APA's initial response to the damage claims of the former TWA pilots is that they are both highly speculative and overstated.  According to APA, the claimed commuting losses are predicated on a flawed analysis of the number of pilots who live within commuting distance of STL. Furthermore, the claimed commuting losses take no account of the likelihood that some STL pilots will move to their new bases to avoid commuting costs, a likelihood made greater by American's agreement to pay moving costs for pilots who are transferred out of STL.  APA also attacks the alleged quality of life losses being predicated on the assumption that being unable to take a summer vacation with the pilot's family renders that vacation essentially worthless. APA introduced evidence that 60% of all pilots system-wide cash in as much vacation as they can, suggesting that for most pilots, the time when they would otherwise take their vacation is of little importance.  Finally, APA asserted that the claimed financial losses due to the former TWA pilots being forced onto reserve ignored the effects of preferential bidding, soon to be implemented, and the limitation in the 2013 CBA on the maximum number of hours that can be flown by lineholders, both of which APA asserts will markedly reduce the number of reserves and shrink the income gap between lineholders and reserves.

More fundamentally, APA argues that the former TWA pilots seek to have the Arbitrator overturn an EDC allocation decision made in March 2013 on the basis of facts that were not, and could not have been known to the EDC at that time – more precisely the Decision and Award of the LOA 12-05 Arbitration Panel, which was not issued until July 2013 and not reduced to contract language until September 2013.  Were the Arbitrator to do as the former TWA pilots request, APA asserts, he would exceed his jurisdiction, which is limited to reviewing allocation decisions *at the time they are made*, not months afterward on the basis of newly-acquired evidence.[61]

The former TWA pilots do not contest the APA assertion regarding the scope of the Arbitrator's jurisdiction, but instead assert that even viewed as of March 2013, the EDC acted arbitrarily in assuming that the LOA 12-05 arbitration was capable of and would determine the

---

[60] The TWA pilots valued the loss in their quality of life by assuming that being unable to choose summer vacations with their families rendered those vacations essentially worthless because the dates on which they may be able to take vacation time (generally winter months) will be times when their children and families are generally not available to travel.  Hence, they treated the dollar value of those vacations as a loss.

[61] *See Air Line Pilots Ass'n, Intern. v. O'Neill*, 499 U.S. 65, 67 (1991) (holding that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational") (internal citation omitted).

harms sustained by the former TWA pilots and provide an appropriate remedy for those harms. They state:

> It is impossible to see how a rational labor organization could honestly believe that the arbitration process it devised—with the *limitations* it imposed—could fully replicate the protections the prior agreement gave to a minority so as to avoid the need to compensate that loss through the Equity Distribution available to redress concessions it made.[62]

This assertion is without merit. The former TWA pilots argued to the LOA 12-05 Arbitration Panel that the Panel had the authority to – and should –  provide fences for the former TWA pilots at the bases to which they were transferred, with bidding behind the TWA fence limited to former TWA pilots, thus recreating at several bases the protected bubble that had existed at STL. Had the LOA 12-05 Arbitration Panel accepted this argument, the former TWA pilots would have bid for lines only among themselves, thus avoiding their automatic relegation to reserve status, and would also have bid among themselves on quality of life issues (flying schedules, days off, vacations) just as they had at STL. Inasmuch as the former TWA pilots argued for this outcome in the LOA 12-05 arbitration, it was hardly arbitrary or irrational for the EDC to believe that they might attain it, hence that the LOA 12-05 arbitration could have redressed any harm resulting from the closing of STL and the abrogation of Supplement CC.

In sum, I reject the former TWA pilots' argument that the EDC should have known that substantial harm to the TWA pilots was inevitable as a result of the LOA 12-05 arbitration and that the EDC acted arbitrarily in not providing a separate silo to compensate former TWA pilots for the harm they allegedly sustained as a result of the closing of the STL base, the abrogation of Supplement CC, and the foreseeable inability of the LOA 12-05 arbitration to remedy those harms.[63]

2.     Challenges by former Reno Air pilots

Former Reno Air pilots, who also joined American as the result of a merger with their former employer, and who also received Occupational Dates that did not correspond to their dates of hire at Reno Air, complain of that treatment on the same grounds as did the former TWA pilots.  Those arguments have been rejected as to the former TWA pilots and are similarly rejected here.

---

[62] Supplemental Post-Hearing Brief at 4-5 (internal footnote omitted). (Emphasis in original.)
[63] As a result of this holding I need not and do not express an opinion on the competing arguments of APA and the former TWA pilots regarding the amount, if any, of the harm sustained by the latter as a result of the STL base closing, the abrogation of Supplement CC, and the Decision and Award of the LOA 12-05 Arbitration Panel.

     3.     <u>Challenges by former American Eagle pilots</u>

     a.     Former American Eagle pilots did not receive the years of credited service in the A Plan to which they are entitled pursuant to the April 9, 2010, award of Arbitrator George Nicolau.

Pursuant to an agreement dated May 5, 1997, between American Airlines, American Eagle (hereafter "Eagle"), APA, and the Airline Pilots Association ("ALPA"), which was memorialized as Supplement W to the 1997 American/APA CBA, and which has since expired, Eagle pilots obtained certain rights to flow up to American when there were openings, and American pilots obtained certain rights to flow down to Eagle when there were layoffs at American.[64]

Supplement W was a source of many disputes in the following years, some of which were decided by Arbitrator George Nicolau.  In an award dated April 9, 2010 (hereafter the "Nicolau Award"), Arbitrator Nicolau held that several Eagle pilots had been improperly denied the right to flow up to American between June 6, 2007 and March 18, 2009.  As a remedy, Arbitrator Nicolau ordered American to offer those pilots the opportunity to flow up to American beginning in June 2010.  Arbitrator Nicolau further held that:

> Once that Eagle CJ Captain transfers to American, he shall receive length of service for pay purposes retroactive to the date he would have transferred during the June 6, 2007-March 18, 2009 period.  Prospectively, that Eagle CJ Captain who transfers will also receive the greater vacation and sick bank credit he would have earned if had been at American on the date he should have transferred.  Those Eagle CJ Captains within the group of 244 who transfer will also become participants in American's A Plan on the day they become American employees.  However, as was done when TWA pilots became American employees, the one year waiting period shall be waived and the period between the time they should have transferred and the time they actually transferred shall be credited, but solely for vesting purposes.[65]

The EDC, in determining former Eagle pilots' credited service in the A Plan, did not give them credit for the period between the time they should have been transferred to American and the date on which they were actually transferred, interpreting the Nicolau Award as ordering that they be given credit for that time solely for vesting purposes.[66]

---

[64] ALPA is the collective bargaining representative of the Eagle pilots.

[65] (Footnote added.)  Some former Eagle pilots asserted that they had not received the benefit of the waiver of the one-year waiting period for commencing credited pension service to which they were entitled under the Nicolau Award.  APA confirmed the merit of this claim with American and all former Eagle pilots have now had the one-year waiting period waived.

[66] An AA pilot was required to have been employed by American for 5 years before his A Plan rights became vested.

Several former Eagle pilots challenge the EDC decision, arguing that the EDC erred in its interpretation of the Nicolau Award, and that they were entitled to A Plan credit for the period between the date on which they should have been transferred to American and the date on which they were actually transferred, interpreting the Nicolau Award as ordering that they be given A Plan credit for that period.

The challengers' argument is without merit. Arbitrator Nicolau was (and is) an able and experienced arbitrator who has had extensive experience arbitrating disputes in the airline industry, including disputes involving the interpretation of the American-APA CBA. It is not credible, in light of Arbitrator Nicolau's experience and the familiarity he demonstrates with the provisions of the American-APA CBA in the above-quoted portion of his decision, that he does not know the difference between (1) the 5-year vesting requirement for securing a pilot's rights under the A Plan and (2) credited service time, which plays a major role in determining the amount of a pilot's pension.  Hence the EDC did not act arbitrarily, discriminatorily or in bad faith in determining that Arbitrator Nicolau meant exactly what he wrote -- that the time between when the former Eagle pilots should have been allowed to flow through to American and the time when they actually did so should be "credited, but solely for vesting purposes."[67]

      b.    Former Eagle pilots have been discriminated against compared to former TWA pilots in the calculation of their dates of service for purposes of determining their allocations under the Years of Service and Pension Silos.

In calculating years of service for former Eagle pilots in the Years of Service Silo, the EDC followed Supplement W in assigning them an Occupational Date corresponding to the date they could have flowed up to American.[68]  In calculating former Eagle pilots' years of service for purposes of the Pension Silo, the EDC used the date on which they actually began working at American.

A group of former Eagle pilots challenge the EDC computation of their years of service in both the Pension and Years of Service Silos.  Their first argument is that to the extent that former TWA pilots prevail in obtaining their Date of Hire at TWA as the beginning point for their years of service at American under the Years of Service Silo, they want their Date of Hire at American to be when they began working at Eagle.  Inasmuch as the former TWA pilots were not successful in obtaining their Date of Hire at TWA as the beginning point of their years of service at American for purposes of the YOS Silo, the Eagle pilots' argument that their Date of Hire should be the date they began flying for Eagle falls of its own weight.

The Eagle pilots' second argument is that they are being discriminated against because they are not being treated equally in comparison to the former TWA pilots for purposes of pension credit.  They point out that under Supplement CC, the former TWA pilots' pension accrual began as early as January 1, 2002, even though many of those pilots did not actually begin working at American until years later due to furloughs.  In comparison, they state that

---

[67] The challenge of FO Eric Sapp raises essentially the same issues discussed above and is denied for the same reasons.
[68] *See* Suppl. W § III.B.

many former Eagle pilots became eligible to flow through to American but were delayed in doing so due to Eagle exercising its right under the Nicolau Award to hold them back.  They further state that their A Plan pension accrual did not begin until they actually began working at American.  The former Eagle pilots want credit in the Pension Silo from the date they could have flowed through to American but for the Eagle hold back.[69]  They believe this is consistent with the treatment of the former TWA pilots.

APA pointed out, however, that there is a difference between Supplement W (governing the former Eagle pilots) and Supplement CC (governing former TWA pilots).  Under Supplement CC, former TWA pilots became eligible to accrue and did accrue pension credit as early as January 1, 2002 (less time on furlough or leave).  Under Supplement W, the former Eagle pilots did not become eligible to participate in the A Plan until they actually flowed through to American. EDC Chair Michael Mellerski testified that every pilot was credited in the Pension Silo with the years of service established by the A Plan, along with the applicable supplement to the CBA -- Supplement CC for the former TWA pilots and Supplement W for the former Eagle pilots.  This uncontradicted testimony provides a rational basis for the EDC calculation of years of service in the Pension Silo for former Eagle pilots.

The former Eagle pilots also argue that APA breached its duty of fair representation in negotiating more favorable terms for former TWA pilots in Supplement CC than for former Eagle pilots in Supplement W.  Whatever the merit of that contention, on which I express no opinion, it is not relevant in these proceedings which are limited to an examination of APA's distribution of the Equity Fund, not what it did or did not do in the years preceding that distribution.[70]

        c.      AA pilots who were forced to remain on furlough because Eagle pilots were allowed to flow through to American should receive pension credit for that furlough time.

In calculating each pilot's credited years of service for pension purposes, the EDC did not count the years during which a pilot was on furlough, as neither the 2003 CBA nor the A Plan itself provides pension credit for time on furlough. For example, a pilot who was trained and hired by American on January 1, 2001 but was immediately placed on furlough not to return until January 1, 2012, would receive only one year's credited service for pension purposes (i.e.,

---

[69] This argument is similar to that raised by the former Eagle pilots who challenged their pension credit based on the Nicolau Award.  This argument, however, is based not on the Nicolau Award but on the theory that it is discriminatory to treat former Eagle pilots differently than former TWA pilots.

[70] Some former Eagle pilots' also argued they should be given an Occupational Date that corresponds with the date on which they *could have* flowed through to American but for the holdbacks. EDC Chairman Mellerski testified that this was in fact the date that was used for them in the Years of Service Silo.  The former Eagle pilots accepted this explanation at the hearing, but later complained in a post-hearing brief that they could not verify whether their YOS calculations are correct because the information was not available to them.  APA has since confirmed that the Occupational Date and seniority number of all pilots is available on the APA website. Other Eagle pilots complained that APA did not furnish them with the amount of pension credited service of former TWA pilots who eventually flowed up to Eagle.  Inasmuch as pension credited service dates of former TWA pilots were established by Supplement CC and those of Eagle pilots going to American were established by Supplement W, the pension credited data of former TWA pilots is not relevant for former Eagle pilots.

the difference between January 1, 2012 and January 1, 2013) even though his or her Occupational Date was January 1, 2001.

FO Glenn Dominy challenges the application of this rule as applied to him and other legacy American pilots.  FO Dominy alleges that as a result of the Nicolau Award, Eagle pilots were permitted to flow through from Eagle to American ahead of legacy American pilots who were then on furlough, including himself.  This preference in favor of Eagle pilots, he argues, has caused harm to legacy American pilots that should be compensated through an adjustment to the Pension and Years of Service Silos for the furloughed legacy American pilots.

The harm of which FO Dominy complains occurred many years prior to the 2013 CBA. Hence, it is not subject to redress under the Equity Fund, which is limited to providing compensation for those harms arising from concessions in the 2013 CBA compared to the 2003 CBA.[71]

### D.    Challenges to Eligibility Criteria

1.    <u>Challenges related to pilots on furlough</u>

     a.    The distribution unfairly penalizes furloughed pilots who exercise their contractual right to defer recall.

Approximately 2,900 pilots were on furlough from American on January 1, 2013, the effective date of the 2013 CBA.  Each of the furloughees was offered recall before May 6, 2013.  Approximately 1,200 elected to defer recall pursuant to Letter T of the CBA.[72]

The APA Equity Plan of Distribution provides that pilots on furlough as of January 1, 2013 are only eligible for the distribution if they satisfy the following criteria between January 1, 2013 and August 1, 2013, the Supplementary Eligibility Qualification Period ("SQP"): (1) accept recall to active service; (2) register for a training class set to begin by October 30, 2013; and (3) sign an enforcement letter and promissory note agreeing to remain on active status for 12 months.  A furloughed pilot who satisfies these conditions but does not complete 12 months on active status will be required to repay all or some portion of his/her Equity Fund distribution.[73]

---

[71] FO Dominy, who was on furlough from 2001 to 2013, also asserts that he should receive pension credit for that furlough time because APA was successful in 2001 in negotiating pension credit for pilots who had previously been furloughed.  That contention has been rejected (*see* p. 30), and will not be addressed again here.

[72] Letter T provides, in relevant part:

    A furloughed pilot may defer recall to American Airlines for three (3) years after the last pilot with recall rights is notified of recall. Pilots should keep their current contact information on file with the Company. For planning purposes, a pilot electing to defer recall shall notify the Company of the length of deferral desired. The pilot can notify the Company if the pilot's situation changes such that the pilot desires to end the recall deferral. In such case, the Company will recall the pilot in seniority order to the next available class date.

[73] The original version of the Plan of Distribution did not contain the August 1, 2013 ending date of the SQP.  That date was added, and communicated to all pilots, on May 20, 2013.

APA explained the rationale underlying the Equity Fund eligibility standards for furloughed pilots as follows (APA Statement of Position at 45-46):[74]

> Furloughed pilots are not currently affected by the concessions in the 2013 CBA for the simple reason that they are not working at American Airlines.  And furloughed pilots may never be affected by those concessions because they may never return to American.  Indeed, many furloughed pilots do not return.  Many of these pilots have established careers at other airlines or in other fields of work.  The APA was not obligated to reduce the equity payout to working American pilots in order to provide equity to pilots who might never return to American, many of whom now work for competitors.
>
> The APA's decision was particularly reasonable because all pilots on furlough have now been offered an opportunity to return to American – meaning that any pilot who remains on furlough made a voluntary choice not to return.  Every furloughed pilot at American was offered recall by May 6, 2013, and every pilot who accepted recall by that date has been scheduled for a training class.  Pilots who have chosen not to accept recall are particularly unlikely to return in the future.

Many furloughees challenged APA's decision to exclude them from the Equity Fund distribution if they elected to defer recall past August 1, 2013.  Their initial argument is that by excluding them from the Equity Fund distribution, APA is infringing upon their contractual right, pursuant to Letter T, to defer recall for three years after the last furloughed pilot is offered recall.

That argument is without merit.  APA did nothing to interfere with furloughed pilots' contractual right to defer recall pursuant to Letter T.  To be sure, APA denies participation in the Equity Fund to those furloughed pilots who do not terminate their deferral within the SQP, but there is nothing in the text or spirit of Letter T that requires APA to allocate Equity Fund resources to pilots who choose to remain on furlough.

The challengers next argue that APA discriminated against furloughed pilots who deferred their opportunity to return by requiring them to return before August 1, 2013, and to satisfy the other elements of the Plan of Distribution applicable to furloughees.  According to the challengers, this is discriminatory because other pilots not on active duty – those on LTD less than five years, those on TAG status, those on military leave, and those on personal leave – are not required to meet the obligations imposed on furloughees, but are eligible to receive a full share of the Equity Fund.

---

[74] (internal citations omitted).

Although the challengers accurately state the facts, I do not accept their conclusion that these facts demonstrate invidious discrimination against furloughees. The key factor in distinguishing among the pilots in the different categories described by the challengers is whether those pilots have given any indication that they will not return to American when they are able to do so. Pilots on LTD for less than five years have given no indication that they will not return to work when they are able to do so. Those in TAG status are fighting (metaphorically) for their return to American. As for pilots on military leave and those on personal leave, there is no reason to suppose that they will not return to American at the conclusion of their leaves.[75]

In contrast, there was every reason for APA to suppose that the pilots who declined recall to American in the circumstances of this case, preferring to "defer" their return, would never return. Not only had they opted not to return when they could have done so, but they did so at a time when they knew that they would be guaranteed a full share in the Equity Fund if they accepted that offer. Under these circumstances, it was hardly arbitrary for APA to conclude, as it did, that such furloughed pilots were unlikely to return to American on a permanent basis. Nor was it discriminatory for APA to limit Equity Fund resources to those pilots who would work under the 2013 CBA and sustain the harms associated with that contract. The furloughed pilots who declined offers to return to American and share in the Equity Fund were unlikely candidates to return to American and work under the 2013 CBA.[76]

To overcome the doubts concerning their return to American, the challengers suggest that APA could establish a reserve account and make distributions to furloughed pilots on deferral if and when they return to active service at American (presumably signing the enforcement letter and promissory note at that time, although challengers are silent on this point). Any amount not distributed from this reserve account after the deferral period could then be redistributed *pro rata* to all eligible pilots.[77]

---

[75] Admittedly, the likelihood that a pilot on personal leave will not return to flying for American is greater than is that likelihood for a pilot on military leave. APA has recognized the difference between those two categories of leaves by requiring pilots who return from a personal leave of absence to sign the same letter and promissory note as furloughed pilots, thus deterring them from returning solely to collect a share of the Equity Fund, then leaving American (and APA). One pilot challenged the Equity Distribution Plan on the ground that pilots on personal leave who return to work after the SQP will not receive a full share of the equity allocation. As noted in the preceding sentence, however, such pilots are eligible for a full distribution as long as they satisfy the APA requirements for doing so.

[76] FO Lloyd Hamlin asserts that APA may not require the enforcement letter and promissory note because doing so puts pressure on pilots to remain employed by American even if they would prefer to leave the Company's employ. He characterizes the enforcement letter and promissory note as "punitive damages on active pilots who decide to leave the Company." In fact, however, the enforcement letter and promissory note are required only of those pilots who were not active on January 1, 2013 and either deferred their recall from furlough during the SQP, were on a personal leave of absence or were management pilots. As noted above, APA had a legitimate interest in ensuring that these pilots did not collect a distribution from the Equity Fund by returning to active duty for a brief period, only to leave the Company a short time later without having sustained to any significant degree the harms imposed on pilots by the 2013 CBA that the Equity Fund distribution was designed to address. The enforcement letter and promissory note were intended to further that legitimate APA interest, and whatever pressure they may exert on pilots who have returned to active duty and obtained a share of the Equity Fund to remain with the Company for the term of the enforcement letter or surrender their Equity Fund allocation is entirely warranted.

[77] Challengers proposed several permutations of this basic proposal. *See, e.g.*, FO Andrew Weingram Challenge 1132: "[W]e now can figure out the exact potential costs of any combination of returns or resignations that will

APA asserts that establishing a reserve fund for furloughed pilots would have been legally and logistically unworkable. According to Captain Mark Stephens, the EDC concluded "that it was impractical, if not virtually impossible, to delay or withhold part of the distribution until the status of each and every pilot could be determined for the entire duration of the new CBA."[78] That position was affirmed by the testimony of APA's tax counsel, Gregory Kidder of the law firm Steptoe & Johnson LLP, who testified that due to logistical and tax complications he "advised the APA to make the allocations in the distribution immediately" and not provide for a holdback.[79]   It was further affirmed by APA's financial advisor, Andrew Yearley, Managing Director of Lazard Frères & Co. LLC, who testified:

> [W]hat concerns me about having a class sort of opt in later over time is we may not have a lot of shares on the back end left to sort of reallocate to everybody, which I think would force the APA to distribute less or somehow -- I don't know what they'd do. Maybe they'd take that 50 percent and set some aside and not distribute them yet, which would hurt, obviously, pilots who would want them earlier.[80]

Upon confirmation of the Plan of Reorganization and the beginning of public trading in American stock, American will determine the value of the 13.5% of its equity that has been assigned to APA. It will then distribute shares to eligible pilots identified by APA in two or more tranches.  The first tranche will be distributed on the effective date of the bankruptcy reorganization plan or as soon thereafter as is practicable.  It is anticipated that a second tranche will be distributed 120 days later.[81]   Pilots who receive stock in the first tranche may elect to hold or sell it.[82]  Mr. Yearley, APA's financial advisor, described the distribution mechanics in detail at the Merits Hearing.  According to him, after 120 days, on the basis of the market price of its shares at that time, American will distribute sufficient shares to bring the total value of the distribution equal to the value of APA's 13.5% share as of the Plan confirmation date.[83]  If the stock price increases between Tranche 1 and Tranche 2, then eligible pilots will receive fewer shares in Tranche 2 because the shares that they previously received will be worth more.[84]  For example, if the stock price doubles over those 120 days, the pilots and APA could receive few if any shares in the second tranche.[85]  APA asserts that, if this were to happen, it would not have

---

occur in 3 years' time.  We should escrow the worst case scenario.  If they return they get their prorated share.  If they don't return that money stays in Escrow.  Once the last pilot is back on the property or resigned 3 years from now, we then distribute the remaining escrow balance to all pilots who received a check from the equity settlement using the exact same multiplier."

[78] Stephens Declaration ¶ 45.

[79] Tr. 171:21-24.

[80] Tr. 295:13-20.

[81] *See* APA's Supplemental Brief (Aug. 19, 2013) (attached letter agreement from American Airlines dated July 30, 2013 ¶ 2).

[82] *See* Tr. 293:17-23; Yearley Declaration ¶ 10.D; Allied Pilots' Association's Supplemental Brief at 2 (Aug. 19, 2013).

[83] Tr. 293:8 - 294:9.

[84] *Id.*

[85] *Id.*

enough shares remaining to establish a reserve fund; alternatively, it would have to establish such a large reserve fund up front that it would significantly dilute the distribution to active pilots.[86]  Out of concern that the Arbitrator's final decision might come after confirmation of the bankruptcy plan, American and APA have signed a letter agreement dated July 30, 2013 providing that the first tranche could be put in trust if APA is unable to provide a definitive list of eligible pilots as of confirmation.[87]  APA has stated that "the backup trust arrangement, while it may be necessary, imposes enormous market risk on APA and the pilots."[88]

APA also cites logistical and tax reasons why it could not establish a reserve.[89] According to Mr. Kidder, American instructed APA that it was important for shares to be distributed to individual pilots soon after emergence from bankruptcy so that those shareholders could be factored into the calculations relevant to the tax implications of a change in control of the company.[90]  For the new American to take advantage of the old American's net operating losses for tax purposes, there cannot be a change in control of the company.  Mr. Kidder represented that American has determined that the stock must be received by the pilots in order for their shares to not count toward this tax threshold.[91]  A reserve, therefore, could have negative tax consequences to the new American.

Moreover, according to Mr. Kidder, individual pilots could owe significant tax obligations but not have funds from the distribution with which to pay those obligations if APA were to establish a reserve.[92]  Mr. Kidder testified that American is required to serve as the withholding agent for any proceeds that have been allocated to individual pilots.  To the extent that individual pilots are not identified for distribution, APA would have to take on the withholding responsibility.  According to Mr. Kidder, if American is not the withholding agent, then no portion of the amounts paid to the pilots will be eligible for contribution into an eligible

---

[86] APA Post-Hearing Brief at 17 ("As a result of the complicated structure of the distribution of equity to AMR creditors and labor groups, along with the significant risks of fluctuations in the stock price, the APA has been advised [by tax counsel Greg Kidder and financial advisor Andrew Yearley] that it is impractical, and potentially impossible, to adjust the pool of eligible pilots after the first tranche of stock has been distributed."); *see also* Tr. 312:6 - 313:13, 313:23 - 314:20.

[87] APA's Supplemental Brief at 1(Aug. 19, 2013) (attached letter agreement from American Airlines dated July 30, 2013 ¶ 7).

[88] *Id.* at 2.

[89] *See* APA Statement of Position at 7 ("The equity distribution scheme is also the product of the Association's recognition that it cannot reserve any significant portion of the Equity Stake for any significant period following its receipt.  The reasons for this flow from tax law and from other logistical considerations."); Kidder Decl. ¶¶ 6-33 (describing tax consequences of reserve fund); Tr. 311:9-13 (CA Mellerski: "So who assumes the risk here of the change in stock price?  In the scenario that we are in, the pilot has to assume the risk.  He also assumes the reward, as Mr. Yearley pointed out, but we don't know what's going to happen.").

[90] Tr. 166:14-15 ("We did ask American to hold on to the equity for a period of time, and they refused.").

[91] Kidder Decl. ¶¶ 14-25; *see* Tr. 295:21 - 296:7 (Yearley: "I won't get into the tax issues, but what American says is we need those shares on day one distributed to individual pilot accounts for NOL [net operating loss] purposes because the NOL is based on a change of control concept.  Every share distributed to a pilot is a good guy share. It's to a holder of less than five percent of the overall shares, so it goes in the good guy camp.  If we can't distribute shares in the individual pilot accounts, if we have to set some aside, you know, to be distributed later, that hurts in the overall NOL calculation because we have -- there aren't as many good guys is what they would say.").

[92] Kidder Decl. ¶¶ 6-12, 26-33.

tax deferral retirement plan because such contributions must be made by the "employer."[93]  The IRS may deem the distributions to be constructively received by the pilots at the time they are provided to APA and thus taxable income at that time.[94]

In sum, I find that in declining to establish a reserve fund to take account of the possible return of pilots who had deferred their return from furlough, APA relied on the advice of qualified outside lawyers, tax counsel, and financial advisors.  The conclusions APA drew from that advice – that establishing such a reserve fund would create significant logistical, legal, and tax problems – can under no stretch of the imagination be described as arbitrary.   Accordingly, I find it was well within the range of APA's discretion to decline to establish a reserve for furloughed pilots who deferred their possible return.[95]

b.    The distribution unfairly penalizes furloughed pilots who have deferred recall and are currently employed by US Airways.

APA treated current US Airways pilots who deferred recall the same as all other furloughees, advising them that they would be eligible for Equity Fund distributions if they met the conditions established by APA – notably that they accept recall to active duty by August 1, 2013.

US Airways furloughees contend that they should be eligible for distributions from the Equity Fund without satisfying any conditions because they will return to American by operation of the anticipated merger between the airlines, and thus will be governed by the 2013 CBA. They also argue that it would be illogical for them to leave US Airways to return to American only to be merged with US Airways, and that it was arbitrary, discriminatory, and in bad faith for APA to make their Equity Fund eligibility contingent upon such return.

It is unclear, however, if and when the US Airways pilots will be covered by the 2013 CBA, the concessionary terms of which provide the basis for Equity Fund distributions. Several procedural hurdles must be overcome before the companies merge.[96] Even if the merger does

---

[93] Kidder Decl. ¶ 29.
[94] Kidder Decl. ¶ 30 ("If the APA were to receive the proceeds and hold them on behalf of the pilots, there is significant risk that the amounts would be deemed to be constructively received by the pilots when received by the APA.").
[95] This conclusion is supported by the district court's decision in *Hudson v. Air Line Pilots Ass'n Int'l*, 415 B.R. 653 (N.D. Ill. 2009), in which the court addressed the same issue under comparable facts involving the United Airlines pilots' union. The court held that the union's decision to exclude pilots who deferred recall from furlough from participating in an equity distribution when United emerged from bankruptcy was not arbitrary, discriminatory, or made in bad faith.  The union there presented evidence of the same types of logistical and tax concerns here raised by APA, and the court found that the furloughed pilots "failed to provide any evidence or cite any authority from which a jury reasonably could find that the [union's] decision was wholly irrational." *Id.* at 661.  The court further stated that "[r]egardless of whether  [the union's] concerns ultimately proved correct, no jury reasonably could find that they were anything other than legitimate reasons for the [union] to decide against setting aside funds to distribute to later returning furloughees." *Id.* (quoting *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1529-30 (7th Cir. 1992) ("[A] mistake in judgment does not violate the duty of fair representation.").  This analysis applies equally here.
[96] The U.S. Department of Justice has brought suit to prevent the merger of AA and US Airways; if that suit is successful, there will be no merger.

take place, it is not certain that current US Airways pilots will ever be covered by the 2013 CBA. As APA points out, American and US Airways will not be considered a single bargaining unit until the National Mediation Board determines the two carriers to be a single transportation system. Even then, the US Airways pilots and the American pilots will continue under separate collective bargaining agreements until the union representing them – presumably APA – has negotiated a single collective bargaining agreement covering the employees of both carriers. There is no certainty that agreement will incorporate the terms of the 2013 CBA. Even if it does, APA witness Mark Stephens testified, and there is no record evidence to the contrary, that for US Airways pilots, the 2013 CBA would be an improvement on their current terms and conditions of employment, rather than a concessionary agreement, as it is for the American pilots.

For all of these reasons, I reject the contention that APA acted arbitrarily, discriminatorily or in bad faith in determining that US Airways pilots were not eligible for distributions from the Equity Fund unless they  satisfied the conditions placed upon all furloughees.

c.      The distribution irrationally assumes that furloughed pilots who return will not ultimately get credit for their time on furlough.

Several pilots argue that they should get credit for their time on furlough or leave of absence in determining their equity distribution share.  In Section III.B.2.b, above, I explained why it was reasonable for APA not to credit pilots' time on furlough when calculating distributions from the Pension Silo, and thus need not address that silo here.  Because distributions from the Per Capita Silo are the same for each eligible pilot (before prorating is taken into account), the only silos left to address are YOS and Inverse Seniority.

FO Richard Elder stated in his challenge that furloughees have been "doubly harmed by the YOS Silo, and other silos to a lesser degree, due to the impact of the lower years of service on longevity pay increases, benefit accrual, bid status and pay rates and overall compensation."

Payouts from the YOS Silo are calculated based on the difference between each eligible pilot's Occupational Date and January 1, 2013.[97]  Similarly, Occupational Date is used to determine pilots' seniority number, upon which payouts from the Inverse Seniority Silo are based.[98]  The Equity Distribution Plan expressly provides that "Occupational Seniority Date does not change as the result of furlough."[99]

Because furloughed pilots will in fact get credit in the Years of Service and Inverse Seniority Silos for their time on furlough, these challenges are denied.

---

[97] As explained above, "Occupational Date" is the approximate date a pilot actually begins to perform work for American, with certain exceptions.

[98] Tr. 816:23 -818:12 (seniority number is used to determine distributions from Inverse Seniority Silo); *see* Tr. 137:8-13 ("The occupational date, in essence, defines your seniority number.  It is what is used to place pilots in seniority order.  So any pilot with an occupational seniority date of, say, July 16th will be senior to a pilot with an occupational seniority date of July 17th or any date after that.").

[99] Equity Distribution Plan: APA Board of Directors-Approved Eligibility and Allocation at Appendix E(3) n. 11.

2.      Challenges related to pilots on Long Term Disability (LTD)

      a.      It was arbitrary for APA to treat some LTD pilots as if they would not return to active duty.

The Equity Distribution Plan does not treat all LTD pilots equally.  Rather, it provides three tiers of eligibility for those pilots, varying by length of disability leave.  LTD pilots whose disability benefits commenced on or after January 1, 2008, *i.e.*, less than five years before the January 1, 2013 date for determining Plan eligibility, are eligible to receive a distribution from each of the four silos ("Category 1 pilots").  Pilots whose LTD benefits commenced between February 1, 2004 and December 31, 2007 ("Category 2 pilots") are eligible to receive distributions only from the Pension and Per Capita Silos.  Pilots who began receiving LTD benefits before February 1, 2004 ("Category 3 pilots") are eligible only to receive a distribution from the Pension Silo.

APA justifies this differential treatment of LTD pilots on the ground that Category 1 pilots are more likely than other LTD pilots to return to active duty.  After five years, an LTD pilot is removed from the seniority list and can only return to active status by agreement of the Company and APA.  Such agreements are rare.  EDC Member Rusty McDaniels, who was in charge of the seniority list from May 2003 until May 2010 and still helps maintain that list, testified that only 1-2 LTD pilots were reinstated to the seniority list each year, pre-bankruptcy. He also testified, "Well, rate of return, anybody who has been out over five years, the odds are very, very low at that point that they get their medical back and return.  I mean, very -- only, normally, one or two a year."[100]  Similarly, EDC Member Mark Stephens testified: "Our experience is that the less time a pilot has spent on LTD, the more likely that pilot is to return. And pilots that have been on for five years or more return at very -- a very low rate, one or two, a couple a year."[101]

As pilots with a contractual right to return to active duty, Category 1 pilots are likely to suffer the harms addressed by all silos. In contrast, Category 2/3 pilots are unlikely to return to active duty, hence unlikely to suffer the negative effects of work rule changes and the increased freedom of the Company under the Scope clause to outsource flying. According to APA (Statement of Position at 48-49):

> The eligibility criteria created by the APA are a reasonable attempt to match these pilots' payouts to the actual harm they may experience as a result of the 2013 CBA.  Pilots who began receiving disability benefits prior to February 1, 2004, receive their medical coverage from the retiree medical coverage provided under the A Plan; pilots who began receiving disability benefits after that date receive the same medical coverage as active pilots. Because this second group of pilots was harmed by changes to the active medical plan, but the first group was not, the APA made the second group eligible for a payout from the Per Capita Silo.  APA

---

[100] Tr. 180:20-23.
[101] Tr. 95:16-20.

is making both groups eligible for a distribution from the Pension Silo because, under the A Plan, all pilots on disability continued to accrue credited service for pension benefits until age 60.

According to several challengers, it was arbitrary for APA to treat all Category 2 and 3 pilots as if they would not return to active duty. None of the challengers, however, denied that five years of LTD status operated as a cut-off date after which pilots lose their contractual right to return to active service. Nor did they dispute the testimony of EDC Members McDaniels and Stephens that pilots with over five years on LTD were less likely to return to active service than pilots who had been on LTD leave for under five years. Although some Category 2 and 3 pilots stated that they hoped to return to active duty, none presented any evidence that he or she would be able to do so.

Inasmuch as pilots lose their contractual right to return to active duty after five years on LTD and are rarely successful in returning to active duty and the seniority list, it was rational for APA to treat Category 2 and 3 pilots as unlikely to return to active duty.

b.     LTD Category 2 and Category 3 pilots should be eligible for recovery from the Years of Service Silo.

As previously noted, Category 2 pilots are eligible for recovery from the Pension Silo. They are also eligible for recovery from the Per Capita Silo because among the harms mitigated by that silo are changes in the active pilots medical plan, which covers Category 2 pilots. Category 3 pilots are eligible for recovery only from the Pension Silo because, while on LTD status, they are covered by the retiree medical plan rather than the active pilots medical plan.

Category 2 and Category 3 pilots assert that they should also be eligible for recovery from the Years of Service Silo because they will sustain harms covered by that silo. Both will lose the benefit of the lump sum option in the pension plan as well as the Company subsidy for retiree medical care upon their retirement. Even if, as APA suggests,[102] the right of Category 3 pilots to receive retiree medical benefits while on LTD status were to be addressed in the Section 1114 proceeding now pending in the Bankruptcy Court (an issue on which I express no opinion), the harm these pilots will suffer from elimination of the Company subsidy for retiree medical care upon retirement is no different from the impact that loss will have on Category 1 pilots who are eligible to receive compensation for this harm through the Years of Service Silo. The impact also is the same on Category 2 pilots.

Inasmuch as APA included Category 2 pilots in the Per Capita Silo because they were affected by changes in the active employee medical plan, which was but one of the harms covered by the Per Capita Silo, it was arbitrary for APA to exclude Category 2 and 3 pilots from the Years of Service Silo, under which they have two compensable harms – loss of the lump sum option and loss of Company contributions to their retiree medical care.

---

[102] APA Statement of Position at 49, n. 25.

The challenge of the Category 2 and Category 3 pilots to their exclusion from the Years of Service Silo is sustained.  APA will be directed to treat all such pilots as eligible for distribution from the Years of Service Silo.[103]

      c.     Pilots in LTD Category 2, whose disability benefits began between February 1, 2004, and December 31, 2007 should be eligible for the same four silos as LTD Category 1 pilots whose disability benefits began on January 1, 2008.

Some challengers contend that it was arbitrary, discriminatory, and in bad faith for APA to limit the distribution for Category 2 pilots to two silos while pilots who began LTD on January 1, 2008, only one day after the cutoff for the Category 2 pilots, may participate in all four silos.

APA's use of the January 1, 2008 cutoff date to determine eligibility for Category 1 status and its concomitant distribution from all silos was rational.  Pilots who were placed on LTD before January 1, 2008, even as late as December 31, 2007, would have been on LTD for more than five years as of January 1, 2013.  Consequently they would have been removed from the seniority list and have no contractual right to return to active service on January 1, 2013 -- the date for determining pilot eligibility for distributions from the Equity Fund.  In contrast, pilots placed on LTD status on January 1, 2008, albeit only a day later, would be on the seniority list as of January 1, 2013, hence eligible for distribution from all silos.  It was thus neither arbitrary, discriminatory, nor in bad faith for APA to treat pilots who began receiving LTD benefits on January 1, 2008, differently from those whose benefits began before that date.[104]

---

[103] Some Category 3 pilots assert that they should also be eligible for recovery from the Per Capita Silo and the Inverse Seniority Silo.  Inasmuch, however, as these pilots are unlikely to return to active duty, they are equally unlikely to sustain the harms associated with these silos.

[104] Three of the challenges state individualized grievances.  FO Melanie Jarvi criticizes APA for "bending over backwards to help people who willfully violate American policies and procedures or show up to the Flight Deck and report to work intoxicated."  She seems to take issue with the fact that Category 2 and 3 pilots are not eligible for all four silos while TAG pilots whose grievance process had not been completed as of January 1, 2013 are treated as active pilots for purposes of the distribution.  TAG pilots, however, are viewed by APA as having a greater likelihood of returning to active duty than pilots with more than five years on LTD, who have been contractually removed from the seniority list.  While I note subsequently (page 61) the lack of evidentiary support for APA's assertion that it has been "substantially successful" in returning discharged pilots to active duty, I cannot conclude, in light of the evidence that very few pilots who are removed from the seniority list after five years ever return to active duty (*see* pp. 55-56) that it was irrational to treat Category 2 and 3 pilots, who have been removed from the seniority list, as less likely to return to active duty than TAG pilots.

CA Stephen Davidson is a Category 3 pilot who is eligible to receive a payout from the Pension Silo.  He asserts that his disability is the result of having been attacked in 1999 by an AA check airman.  He further asserts that he was wrongfully terminated by American in December 1999, and reinstated as the result of an arbitration award in September 2004.  On the basis of these facts, as well as approximately 25 years of what he describes as "dedicated pilot service" for American, he asserts that equity requires him to be eligible for a payout from all silos. Assuming the facts to be as CA Davidson states, he falls, nonetheless, within the Category 3 group of pilots – those who have been on LTD since before February 4, 2004.  Accordingly, he is eligible only to receive a distribution from the Pension Silo, as well as, pursuant to this Decision, the Years of Service Silo.

CA Sammy Lynn Sevier and FO B.D. Lomax each contend that they are LTD pilots whom APA erroneously left out of the Pension Silo.  According to APA, it treated CA Sevier and FO Lomax as eligible for the Pension Silo, but

3.      Pilots not receiving LTD benefits and not on the Seniority List

As a general rule, APA required a pilot to be on active duty on January 1, 2013, to be eligible for a full share of the Equity Fund.  Among the exceptions to that rule were pilots who had been on LTD status for less than five years as of January 1, 2013 (their LTD benefits having commenced on or after January 1, 2008), and TAG (Terminated Awaiting Grievance) pilots who, as of January 1, 2013, had been terminated by American but had not yet completed the grievance process.   Pilots in each of these categories are eligible to participate in the equity distribution because, according to APA, they are reasonably likely to return to active duty during the term of the 2013 CBA, and thus will suffer economic harm as a result of the concessions in the 2013 CBA.

With respect to pilots on TAG status, APA stated that they should be eligible for full participation in the Equity Fund because eligibility would be "consistent with APA's advocacy for these pilots' reinstatement to active status and with the fact that a substantial portion of pilots on TAG have been reinstated."[105]

Partial shares in the Equity Fund are available to pilots who, as of the date for determining eligibility for the equity distribution (January 1, 2013) had been on LTD for more than five years.  These pilots have been dropped from the seniority list and are only eligible to return to active duty upon the agreement of both AA and APA. Inasmuch as such agreements are rare,[106] APA assumes that these pilots will not return to active duty and limits their participation in the Equity Distribution to those silos that APA deemed to address concessions that affect inactive pilots on LTD.

Finally, APA excluded from participation in the Equity Fund "former pilots who are no longer on the seniority list, are not on leave, and are not receiving LTD benefits," because it concluded that these pilots would not suffer any harm from the concessions in the 2013 CBA. Three pilots who were denied Equity Fund participation on these grounds – FO Lawrence Meadows, FO Kathy Emery, and FO Wallace Preitz –have filed challenges protesting these eligibility criteria.

---

their proposed distributions from that silo are $0 because they are over 60 years old and, as LTD pilots, they stopped accruing pension credited service under the A Plan at age 60.  The question, therefore, is whether APA's calculations of a $0 payout from the Pension Silo were correct.  Because American will pay pilots the value of the pension as it stood before the freeze, payouts from the Pension Silo are based on the difference between that payment and the amount a pilot would have been paid if the A Plan had not been frozen.  (Equity Distribution: APA Board of Directors-Approved Eligibility and Allocation at 17).  CA Sevier's and FO Lomax's pension benefits stopped accruing before the A Plan was frozen because they had already reached age 60, the cutoff for LTD pilots to accrue pension benefits.  Thus, they will receive from American the full value of their pensions despite the freeze of the A Plan.  Accordingly, APA was not arbitrary in concluding that their payouts from this silo should be $0.

The challenges of  FO Melanie Jarvi, CA Stephen Davidson, CA Sammy Lynn Sevier, and FO B.D. Lomax are denied.

[105] APA Statement of Position at 18.
[106] *See* Section III.D.2.a (pp. 55-56).

a.      FO Lawrence Meadows.

First Officer Lawrence Meadows began LTD status on April 19, 2004.  In December 2007, AA terminated his disability benefits on the ground that he was no longer disabled.  AA thus placed him on Sick Leave of Absence.  FO Meadows filed an ERISA action in the U.S. District Court for the Southern District of Florida challenging the termination of his disability benefits.  This action was dismissed on summary judgment in March 2011, and an appeal from that decision is pending before the U.S. Court of Appeals for the Eleventh Circuit.

On or about September 12, 2011, FO Meadows filed a complaint with OSHA, alleging that AA's termination of his disability benefits in 2007 had been part of a scheme to deny disability benefits to many pilots in order to reduce American's obligations under its defined benefit plan, thus violating the Sarbanes-Oxley Act. According to FO Meadows, he informally advised AA counsel of his intention to file this action and, on July 18, 2011, he reported the allegedly unlawful scheme to AA managers and counsel.[107]

On August 5, 2011, shortly after FO Meadows informed American of his pending Sarbanes-Oxley complaint, he was advised by American that because he had been on Sick Leave of Absence (SLOA) since April 19, 2004, he had exceeded the contractual and Company policy time limit of five years on SLOA, and his administrative separation from employment was required.[108]  FO Meadows was administratively separated from the Company and removed from the seniority list on November 4, 2011.

On February 4, 2012, FO Meadows filed a grievance claiming that his November 4, 2011, removal from the AA seniority list and his discharge were in retaliation for his having filed a Sarbanes-Oxley complaint.  By agreement of American and APA, that grievance, along with several others, was preserved in the AA bankruptcy proceedings. FO Meadows' grievance was denied by American on June 6, 2013. On June 28, 2013, APA submitted the grievance to the System Board for a Pre-Arbitration Conference, noting that the grievance "protest[ed] the Company's action in removing him from the seniority list and discharging him from American Airlines."

APA determined that for Equity Fund distribution purposes, FO Meadows was an LTD Category 2 pilot, no longer on the seniority list, hence eligible for distributions solely from the

---

[107] FO Meadows' Sarbanes-Oxley complaint was scheduled for hearing before a Department of Labor Administrative Law Judge on June 10, 2013.  That hearing was stayed at American's request because of the pending bankruptcy proceedings.

[108] Article 11.D(1) of the 2003 CBA provides:

When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty or is found to be unfit for such duty.  A leave of absence for sickness or injury shall not commence until after a pilot has exhausted accrued sick leave credits provided under Section 10 of this Agreement.  Such leave of absence for sickness or injury may not exceed a total continuous period of three (3) years *unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years*. . . . (Emphasis added).

Pension and Per Capita Silos. FO Meadows asserts that he should be eligible for distributions from all four silos as a result of his February 4, 2012, grievance.

APA defends its determination on the grounds that:

> FO Meadows has been inactive for more than five years, starting when he began receiving disability benefits in 2004. He is no longer on the seniority list and APA reasonably determined that pilots in his condition were very unlikely to be affected by the concessions associated with the Inverse Seniority Silo and the Years of Service Silo.[109]

It is true that FO Meadows has been inactive and on sick leave for more than five years, and that in the normal situation the CBA would call for his administrative separation and removal from the seniority list. But those are not the only relevant facts. FO Meadows filed a grievance in February 2012 alleging that the reason why American removed him from the seniority list was not that he had been on sick leave for more than five years (which would have called for his removal in 2009), but because he had filed a 2011 Sarbanes-Oxley complaint against American. APA has submitted that grievance to a Pre-Arbitration Conference, noting that the grievance "protest[ed] the Company's action in removing him from the seniority list and discharging him from American Airlines." Hence, if his grievance is sustained, FO Meadows' administrative termination will be overturned, and he will be back on the seniority list, presumably retroactive to the date he was removed, *i.e.*, November 4, 2011. It is equally safe to assume that if his grievance is sustained, the arbitrator would not countenance his removal from the seniority list in the period between November 4, 2011, and the date of the arbitration award. In sum, then, it is reasonable to assume that if the grievance is sustained, FO Meadows would be treated by the arbitrator as a pilot who should have been on the seniority list on January 1, 2013, the date on which pilots on the seniority list are eligible for recovery from all four silos, even if they were on LTD status.

FO Meadows argues that he should be treated like a TAG pilot because of his pending grievance. Much like a TAG pilot who will be returned to active duty if his grievance is successful, Meadows will be returned to the seniority list if his grievance is successful. To be sure, the outcomes are different, but in each case the grieving pilot may obtain an advantageous change of status. And in each case APA supports the pilot's efforts at reinstatement, whether it is to active duty for a TAG pilot or to the seniority list for Meadows.

APA claims that Meadows cannot be treated as a TAG pilot because TAG is an internal APA code, which has always been used to describe pilots who have a pending grievance challenging their termination for cause, not an administrative termination such as the one underlying FO Meadows' grievance. APA states, "TAG is a code entirely internal to the APA; the arbitrator should defer to APA's interpretation of its own internal policy."[110]

---

[109] APA Post-Hearing Brief at 34-35.
[110] APA Post-Hearing Brief at 32.

I accept APA's position and do not require APA to deviate from its policy of using the TAG denomination solely to refer to pilots who have a grievance pending that challenges their termination for cause. I do, however, hold that it is arbitrary for APA to treat pilots who have a pending TAG grievance as sufficiently likely to be successful that they will be treated, for purposes of Equity Fund eligibility, as if they will be successful, while treating differently pilots who have a pending non-TAG grievance that challenges an administrative termination.

APA offers no explanation for this different treatment, other than to state, as previously noted, that its treatment of TAG pilots is "consistent with APA's advocacy for these pilots' reinstatement to active status and with the fact that a substantial portion of pilots on TAG have been reinstated." APA ignores the fact that it also is advocating for FO Meadows, albeit for reinstatement to the seniority list. Furthermore, while the assertion that "a substantial portion of pilots on TAG have been reinstated" may be true, it is wholly unsupported by evidence in the record. Nor is there record evidence that a grievance seeking reinstatement to active duty is more likely to be successful than a grievance seeking reinstatement to the seniority list.

FO Meadows' challenge is sustained and APA will be directed to make him eligible for a distribution from all silos.

        b.     FO Kathy Emery and FO Wallace Preitz.

Both FO Emery and FO Preitz have presented voluminous evidence regarding the termination of their LTD benefits, including their efforts to have those benefits reinstated. Not all of this evidence is ultimately relevant to the disposition of their challenges, but I summarize much of it here.

        i.     *FO Kathy Emery: summary of the evidence.*

FO Kathy Emery joined American Airlines in September 1992 and flew for more than 10 years before she was medically disqualified from flying. In April 2003, she applied for LTD benefits and her application was approved. Her benefits were terminated on January 25, 2007, due to a lack of substantiation of her medical disability. FO Emery appealed this denial to AA's Pension Benefits Administration Committee ("PBAC"), seeking reinstatement of her LTD benefits. As part of its consideration of FO Emery's appeal, PBAC purported to rely on evaluations made by Western Medical Evaluators ("WME"). No one from WME ever examined FO Emery and the record suggests that someone from PBAC may have influenced WME's opinion.[111] FO Emery's appeal to the PBAC was denied on October 22, 2007.

After FO Emery's appeal was denied, she received a letter from her supervisor advising her that she needed to return to work or be terminated. She asserts that a hearing was held with

---

[111] In addition, FO Emery and FO Preitz both suggest that fraud at WME contributed to the PBAC denial of their appeals. As outlined by FO Preitz in his Post-Hearing Brief, WME and its principals were indicted by the State of Texas and entered pleas of no contest on charges of securing execution of documents by deception. (FO Preitz Post-Hearing Br. at 6.) WME and its principals have also been accused of sending out forged or fraudulent doctors' reports and one of the two doctors who allegedly wrote a report in support of the termination of FO Preitz's benefits has sworn that the alleged report was forged. (FO Preitz Post-Hearing Br. at 7, 10.) While troubling, these allegations of fraud are not necessary to my decision on these challenges.

Miami Chief Pilot Brian Fields on November 20, 2006. The record does not reflect what happened at that hearing, but on December 10, 2007, FO Emery filed a grievance protesting the Company's actions in "improperly removing [her] from medical disability, improperly placing [her] on an 'unauthorized' leave of absence, failing to place [her] on proper pay status of [Pay Withheld], investigating [her], and the hearing conducted on November 20, 2006."  On October 22, 2008, her grievance was denied. APA subsequently sought to present FO Emery's grievance to the System Board of Adjustment, requesting that the System Board of Adjustment "[m]ake First Officer Emery whole for losses sustained plus interest, and place her on a paid status."  The record does not reflect any further action with respect to the 2007 grievance.

In September 2009, FO Emery, who by then had been on sick leave for more than five years, was dropped from the seniority list and administratively terminated, as called for by Article 11.D (1) of the CBA.  Prior to that date, in December 2008, FO Emery had filed an ERISA action in the U.S. District Court for the Southern District of Florida seeking to have her benefits restored. The case had proceeded through discovery and FO Emery had filed a motion for summary judgment when, on November 29, 2011, American Airlines filed a voluntary petition for bankruptcy thus triggering an automatic stay.  On March 30, 2012, the court dismissed the case without prejudice.  In its order, the court said:

> This Court shall retain jurisdiction over this matter and the cause shall be restored to the Court's docket upon motion of a party if circumstances change this action, or if the bankruptcy stay is lifted, so that it may proceed to final disposition.  This Order shall not prejudice the rights of the parties to this litigation.

U.S. District Court, Southern District of Florida, Case No. 1:08-cv-22590-WMH, dkt no. 185.

> ii.    *FO Wallace Preitz: summary of the evidence.*

FO Preitz joined American Airlines in June 1992, and flew for approximately twelve years before he was medically disqualified from flying.  On July 3, 2005, he applied for LTD benefits and his application was approved on August 4, 2005.   He continued to receive benefits until November 12, 2007, when his benefits were terminated.  The record does not disclose the reason for the termination. FO Preitz appealed the termination to PBAC, requesting reinstatement of his LTD benefits.  PBAC denied his appeal on June 23, 2008.  As with FO Emery, the PBAC relied in part on the opinion of WME in denying FO Preitz's request for reinstatement of benefits.

In or around June 2010, FO Preitz was dropped from the seniority list.  He subsequently filed an ERISA action in the U.S. District Court for the Eastern District of Pennsylvania seeking reinstatement of his LTD benefits and reinstatement to the seniority list.  Following the filing of American Airlines' voluntary bankruptcy petition, the court entered an order staying the proceedings.  Those proceedings have not been dismissed.

        *iii.*     *Did APA act arbitrarily in declining to treat FO Emery and FO Preitz similarly to TAG pilots – assuming for Equity Fund purposes that their grievances and/or ERISA suits would result in a change of status that would make them eligible for Equity Fund participation?*

FO Emery and FO Preitz, like FO Meadows, argue that they should be treated as TAG pilots because, in FO Emery's case, she has a grievance pending, and in FO Preitz' case, he has an ERISA suit pending.  APA asserts that these pilots do not fall within its definition of TAG because neither has a pending grievance that challenges a termination for cause that, if sustained, would lead to a reinstatement to active duty.

I accept APA's argument, as I did in the case of FO Meadows, that neither FO Emery nor FO Preitz is a TAG pilot as that term is used by APA.  That, however, does not end the inquiry, but raises the further question of whether it was arbitrary for APA not to treat FO Emery and FO Preitz in the same fashion as TAG pilots – assuming, for Equity Fund purposes, that they were sufficiently likely to be successful in their grievances and/or ERISA suits that they should be treated as if they would be successful in obtaining a change in their status, and thus make them eligible for Equity Fund distributions in accord with their changed status.

FO Kathy Emery's 2007 grievance claims that American improperly removed her from medical disability.  APA does not claim that the 2007 grievance cannot result in the reinstatement of her LTD benefits.  In the absence of any evidence, or even argument, to the contrary, I must conclude that it could.  Moreover, FO Emery's 2007 grievance is one of approximately 40 grievances that APA and American agreed would not be extinguished by the bankruptcy.  Thus, it remains as a procedural avenue by which FO Emery's LTD benefits may be restored.

Under these circumstances, I conclude that it was arbitrary for APA to treat FO Emery differently from TAG pilots.  She, just as they, has a grievance pending that APA referred to the System Board.  Hence, she, just as they, was entitled to the presumption, at least for Equity Fund purposes, that her grievance would be successful, resulting in her LTD benefits being restored and her no longer being excluded from Equity Fund eligibility.  APA stated that the inactive pilots who were ineligible for Equity Fund distributions were those who were "no longer on the seniority list, are not on leave, *and are not receiving LTD benefits . . . ."*[112]  FO Emery, if her grievance is sustained, would receive LTD benefits, hence she would no longer satisfy that definition, and she was entitled to the presumption that it would succeed.

Accordingly, I sustain FO Emery's challenge and treat her as if her disability benefits had never been terminated, the result she seeks through her grievance.  Since she entered on sick leave in April 2003, I direct APA to treat her as a Category 3 pilot, eligible for recovery from the Pension and the Years of Service Silos.[113]

---

[112] APA Post-Hearing Brief at 31 (emphasis supplied).
[113] Although LTD Category 2 and 3 pilots are not eligible for the Years of Service Silo under the proposed Equity Distribution Plan, for the reasons explained in Section III.D.2.b, *supra*, I shall direct APA to include these pilots in that silo.

The challenge of FO Wallace Preitz raises a slightly different issue in that he has not filed a grievance that, if successful, would result in the restoration of his LTD benefits, but rather an ERISA lawsuit seeking restoration of those benefits.  Inasmuch as I have held that APA is required, for Equity Fund purposes, to treat a grievance seeking the restoration of LTD benefits as if it would be successful, the next question is whether a similar obligation is imposed on APA when the restoration of LTD benefits is sought, not through a grievance, but through a court which has the authority to grant such relief.

APA's sole response to this question is to state that it "is not obligated to assume that these pilots will return to LTD, regardless of pending grievances and lawsuits."[114]  APA thus makes no effort to distinguish its obligation to assume the likelihood of success of a grievance seeking restoration of LTD benefits from a lawsuit seeking the same result.  Had APA presented a reasoned argument for distinguishing the two situations, I would have been obliged to consider that argument.  In the absence of such an argument, however, I, like APA, shall treat the lawsuit seeking restoration of LTD benefits no differently from a grievance seeking that result.  And, having held that APA acted arbitrarily by not assuming the likely success of a grievance seeking restoration of LTD benefits, I reach the same conclusion with respect to APA's failure to assume the likely success of a lawsuit seeking restoration of LTD benefits in a case in which the power of the court to award that remedy is unquestioned.

The challenge of FO Wallace Preitz is sustained.  As I did with Emery, I shall direct APA to treat FO Preitz as an LTD pilot whose benefits are ongoing -- consistent with the relief FO Preitz seeks in his grievance.  Inasmuch as his LTD benefits commenced between February 1, 2004 and December 31, 2007, I direct APA to treat him as an LTD Category 2 pilot, eligible for distributions from the Pension, Per Capita, and Years of Service Silos.[115]

4.      CA Ann Singer -- currently receiving LTD benefits and not on the seniority list

Captain Ann Singer went on LTD in 2007, and was administratively terminated some time between March and December 2012.  (The record is silent on this issue.)  Unlike FO Meadows, FO Emery, and FO Preitz, CA Singer's LTD benefits have not been terminated and she is already receiving a partial share of the Equity Distribution.  Specifically, as a pilot whose LTD benefits began between February 1, 2004 and December 31, 2007, she is an LTD Category 2 pilot eligible for distributions from the Pension, Per Capita, and Years of Service Silos.  She seeks a full distribution, however, on the basis that she is on TAG status and/or because it would be arbitrary to treat her differently than TAG pilots.

For the reasons explained above, I conclude that CA Singer was not on TAG status as of January 1, 2013.  I must nevertheless consider whether she should have been treated as if she were.  Unlike FO Meadows, FO Emery, and FO Preitz, there is no evidence that CA Singer has filed a grievance or an ERISA lawsuit.  Instead, she relies exclusively on the pending Dallas-Fort Worth domicile grievance ("DFW Domicile Grievance"), arguing that, if sustained, that

---

[114] APA Statement of Position at 58 n.34.
[115] Both FO Emery and FO Preitz raised a host of arguments, not discussed here, why their challenges should be sustained.  Having sustained their challenges on the grounds set out in this Decision, I see no reason to comment on their other arguments.

grievance would result in her reinstatement to the seniority list.  Hence, she reasons, she should be treated similarly to a TAG pilot and benefit from the presumption that the DFW Domicile Grievance will be successful.

There is no basis to conclude that the DFW Domicile Grievance will result in CA Singer being reinstated to the seniority list.  On its face, the DFW Domicile Grievance is unclear as to what relief will be available if the Union prevails.  But according to APA's Director of Representation, J. Bennett Boggess, the purpose of the grievance was solely to improve procedures going forward, not to secure the reinstatement of any pilot.  CA Singer has not presented any evidence to the contrary,[116] so I must accept Boggess's explanation of the DFW Domicile Grievance.  Accordingly, APA did not act arbitrarily when it declined to treat CA Singer similarly to TAG pilots eligible to receive an Equity Fund distribution from all four silos.

5.    <u>Retired Pilots</u>

Consistent with APA's forward-looking approach, pursuant to which allocations from the Equity Fund are based on harm sustained as a result of the concessions in the 2013 contract compared to the abrogated 2003 contract, APA limited Equity Fund distributions to those pilots who were in the AA bargaining unit on January 1, 2013, the effective date of the 2013 contract. Excluded from equity distributions were pilots who left the employment of the Company prior to January 1, 2013, whether through retirement, resignation or termination.[117]  This exclusion was decided upon by the APA Board of Directors in July 2012, and was communicated to the pilots months before January 2013.

Pursuant to this policy, APA determined that CA Stephen Cox, who retired on November 1, 2012, shortly before his age 65 mandatory retirement date of December 16, 2012, was ineligible for participation in the Equity Fund.  CA Cox challenges this exclusion on the grounds that (1) the selection of January 1, 2013 as the eligibility date for Equity Fund participation was arbitrary and capricious; (2) he has had difficulty securing the retiree medical benefits to which he is entitled since the 2013 contract went into effect; and (3) he has sustained harm under the 2013 contract in that he lost the lump sum option for pension benefits.

APA asserts that its selection of January 1, 2013 as the date for determining Equity Fund eligibility was based upon that being the effective date of the 2013 labor contract, pursuant to which it received the Equity Fund.  Fixing the eligibility date for participation in the Equity Fund on the date that it received the Equity Fund can hardly be characterized as arbitrary.  *Cf. Bondurant v. Air Line Pilots Ass'n*, 679 F.3d 386, 396 (6th Cir. 2012).

As for CA Cox's claim that he has suffered as a result of changes to his retiree medical benefits, it was established during the hearing that his difficulties in obtaining medical benefits were due to bureaucratic errors, not to a loss of those benefits.  Indeed, Cox currently receives retiree medical benefits.

---

[116] Nor did FO Emery or FO Preitz, who also argued that the DFW Domicile Grievance entitled them to be treated as if they were on TAG status.

[117] APA Statement of Position at 44.  The exclusion of terminated pilots was subject to certain exceptions.  *See* p. 58, *supra.*

Finally, APA points out that pilots such as CA Cox who retired on or before December 31, 2012 did not lose the lump sum option as a result of the 2013 CBA.  Rather, only pilots who retired after December 31, 2012 lost this benefit.[118]  Although Cox and other pilots who retired between the bankruptcy filing and December 31, 2012 were not able to receive the lump sum option immediately upon retirement, this inability was due to federal law, which temporarily prohibited AA from distributing lump sum pension payments as a result of the bankruptcy, not because retired pilots lost their right to collect the lump sum.[119]  CA Cox's complaint about his inability to obtain the lump sum payment, therefore, is beyond the purview of this arbitration, which is limited to complaints about the structure of the Equity Plan and payouts under that Plan.

For all these reasons, CA Cox's challenge to the APA determination that he was ineligible to participate in the Equity Fund is denied.

### 6. Management Pilots

One pilot, CA Roy Wall, argued that management pilots should not be permitted to participate in the Equity Fund distribution because, "management pilots have not endured the loss of quality of life incurred because of contractual changes nor the changes in compensation due to contractual losses."  The Equity Distribution Plan provides that management pilots will not be eligible for the equity distribution unless they "return to line flying during the SQP, remain in active line pilot status throughout the remainder of the SQP, and . . . sign an enforcement letter and promissory note agreeing to remain at AA in active status as a non-management pilot for at least 12 months after the end of the SQP. . ."[120]  Because management pilots who return to active status during the SQP will be affected by the concessions contained in the 2013 CBA, APA's decision to include them in the equity distribution is neither arbitrary, discriminatory nor in bad faith.

### E. Challenges to APA's Administration of the Equity Distribution Process

FO Mark Hass asserted that APA should have provided greater transparency in the Equity Distribution process.  He was particularly concerned that his inability to learn the amount of the proposed payouts to pilots similar to him in bid status or seniority would prevent him from discovering that they had received higher payouts than he had received in time to file a complaint.  He testified:

---

[118] *See* APA Exhibit 41 (bankruptcy order confirming elimination of lump sum benefit for pilots who retire after December 31, 2012).

[119] Tr. 277:24-278:10; 26 U.S.C. § 436(d)(2) ("A defined benefit plan which is a single-employer plan shall provide that, during any period in which the plan sponsor is a debtor in a case under title 11, United States Code, or similar Federal or State law, the plan may not pay any prohibited payment. . ." ); *see In re AMR Corp.*, S.D.N.Y. Case  No. 11-15463 (SHL), Dkt. No. 5414, Memorandum of Law in Support of Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. Section 363(b) and Treas. Reg. Section 1.411(d)-3(g)(4)(C) Finding that Amendment of American Airlines, Inc. Pilot Retirement Benefit Program Fixed Income Plan to Eliminate Lump Sum and Installment Forms of Benefits is Necessary to Avoid a Termination of the Plan (explaining how 26 U.S.C. § 436(d)(2) prevented payment of the lump sum option during the pendency of AA's bankruptcy so long as the plan exceeded a designated amount).

[120] Equity Distribution: APA Board of Directors-Approved Eligibility and Allocation at 4.

> I'm average age at APA, and when I look at another pilot 23 years
> old with my airplane, I'd like to see his payout. I'd hate to find out
> a year from now I got this amount and he got a higher amount . . .
> .[121]

APA declined to provide to FO Hass (or any other pilot) the amount of the proposed payouts to other pilots. It explained that it had significant privacy concerns associated with the release of pilot pay data and that American had required it to sign a non-disclosure agreement to obtain access to pilot pay data.

Putting to one side the effect of the non-disclosure agreement with American (on which I express no opinion), this is a classic case of weighing two competing interests, *i.e.*, the interest in transparency as a means of ensuring fair process and outcomes and the interest in pilots' privacy relating to their financial information.

APA assigned greater weight to the interest in privacy than it did to the interest in transparency. Regardless of whether I agree with this decision, I cannot hold that the APA choice was arbitrary, discriminatory or in bad faith.[122]

### F.    Challenges Alleging Data and Calculation Errors

All challenges of this nature were resolved by APA and the challengers. APA worked with American to correct initial data and calculation errors, and communicated the corrected information to the affected pilots. Although certain challengers maintained their challenges even after receiving the corrected information, the remaining challenges actually concerned claims by former Eagle pilots that the proposed distribution discriminates against them as compared to former TWA pilots (*see* Section III.C.3.b, above), rather than data and calculation errors.

## IV.    <u>AWARD</u>

All challenges are denied, with the exception of the following:

- The challenge of LTD Category 2 and Category 3 pilots to their exclusion from the Years of Service Silo is SUSTAINED. APA is hereby directed to treat all LTD Category 2 pilots (those whose LTD benefits commenced between February 1, 2004 and December 31, 2007) and LTD Category 3 pilots (those who began receiving LTD benefits before February 1, 2004) as eligible for distributions from

---

[121] Tr. 1091:10-15.

[122] A few pilots contended that the EDC members designed the equity distribution to benefit themselves. There is, however, no evidence of any such impropriety. Furthermore, to the extent these pilots contend that the EDC sought to benefit junior pilots at the expense of those more senior, or younger pilots at the expense of older pilots, these charges are effectively contradicted by the composition of the EDC, whose members range in seniority from number 311 to number 6764 on the AA seniority list and whose age range is 49-59.

the Years of Service Silo (as well as those silos for which they are currently eligible).

- The challenge of FO Lawrence Meadows is SUSTAINED. APA is hereby directed to treat FO Meadows as eligible for distributions from all silos.

- The challenge of FO Kathy Emery is SUSTAINED. APA is hereby directed to treat FO Emery as an LTD Category 3 pilot, eligible for distributions from the Pension Silo and the Years of Service Silo.

- The challenge of FO Wallace Preitz is SUSTAINED. APA is hereby directed to treat FO Preitz as an LTD Category 2 pilot, eligible for distributions from the Pension, Per Capita, and Years of Service Silos.

## V. ARBITRATOR'S RETENTION OF JURISDICTION

The Arbitrator shall retain jurisdiction over this matter to resolve any disputes about the interpretation or application of the Decision and Award that the parties are unable to resolve themselves. The Arbitrator will not exercise his retained jurisdiction until the parties have made a good faith effort to resolve the dispute without the Arbitrator's intervention.

_____
Stephen B. Goldberg, Arbitrator

October 15, 2013

Exhibit 9

## Stephen B. Goldberg – Dispute Resolution Services

Northwestern University Law School
357 E. Chicago Avenue • Chicago, Illinois 60611
Telephone (312) 503-8426 • Fax: (312) 503-0149

Melissa Cryder
Executive Assistant
Tel: (312) 503-0090
Fax: (312) 503-0149
E-mail: mrepchicago@aol.com

**MEMORANDUM**

Mediation-Arbitration
Negotiation Consulting
Dispute Systems Design
Training

| | |
|---|---|
| To: | All Participants in the APA Lump Sum Dispute Resolution Process |
| From: | Stephen B. Goldberg, Impartial Arbitrator |
| Subjects: | (1) Qualifications of the Impartial Arbitrator; |
| | (2) Communications with the Impartial Arbitrator |
| Date: | March 7, 2013 |

1. <u>Qualifications of the Impartial Arbitrator</u> . I am a retired Professor of Law (Northwestern University Law School, Chicago, IL). I have been an arbitrator and mediator of labor and commercial disputes for over 40 years and am a long-time member of the National Academy of Arbitrators. I was contacted by the Allied Pilots Association in December 2012, and asked if I would be willing to serve as Impartial Arbitrator to resolve disputes arising out of the proposed distribution of the equity received by APA through its recent collective bargaining agreement. It is my understanding that I was selected for this position because of my many years of experience, beginning in 1995, as an arbitrator and mediator of disputes between APA and American Airlines. My experience also includes arbitrations for Major League Baseball and its players association, as well as the U.S. Postal Service and the American Postal Workers Union, and I have mediated labor negotiations covering flight attendants at United Airlines and American.

   Additionally, I have particular experience in supervising the distribution of a Fund among claimants, which I previously did as the representative of the U.S. Securities and Exchange Commission in the distribution of $1.2 billion, recovered by the SEC from Michael Milken and Drexel Burnham Lambert, and as co-designer of the claims resolution process resulting from the settlement of <u>Cremin v. Merrill Lynch</u> (Women on Wall Street litigation.) Further details of my experience as a neutral arbitrator and mediator are set out in the attached resume.

2. Communications with the Impartial Arbitrator. I have been asked by APA on 2-3 occasions since my selection as Impartial Arbitrator to comment on the proposed procedure for the distribution of funds. I have had no communication from APA concerning the plan of distribution itself other than that which has been shared with all pilots, nor will I accept any such communication in the future, except as such communications are part of the Lump Sum Dispute Resolution process

With respect to communications between all parties to this proceeding and the Impartial Arbitrator, I hereby direct that:

(1) All communications with the Impartial Arbitrator shall be posted on the public side of the APA website.
(2) Additional rules of procedure may be promulgated by the Impartial Arbitrator and distributed to all parties.

STEPHEN B. GOLDBERG

**357 E. Chicago Avenue**

**Chicago, IL 60611**


**Telephone:    (312) 503-8426**

**Facsimile:    (312) 503-0149**

**E-mail:  stephen.goldberg.apa@gmail.com**


| | |
|---|---|
| **Occupation:** | Dispute Resolution |
| **Education:** | A.B., Harvard College |
| | J.D., Harvard Law School |
| **Professional Memberships:** | National Academy of Arbitrators |
| | Mediation Research & Education Project (president) |
| | College of Labor and Employment Lawyers |
| | Labor and Employment Relations Association |
| **Panel Memberships:** | Federal Mediation and Conciliation Service |
| | American Airlines/Allied Pilots Association |
| | Major League Baseball/MLBPA (salary arbitration) (1982-2009) |
| | Bituminous Coal Operators' Association/UMWA (national jobs monitor) |
| | U.S. Postal Service/APWU (national arbitration panel) |
| | Court of Arbitration for Sport (Lausanne, Switzerland) |
| | Trucking Management, Inc./IBT (Chair, National Arb'n Panel, 1997-1999) |
| | New York City Office of Labor Relations |
| **Experience:** | Professor of Law, University of Illinois, Northwestern University. Taught Labor Law, Labor Arbitration, Negotiation, ADR for 30 years. Have arbitrated and mediated hundreds of cases, dealing with nearly all issues. |

Interest arbitration experience includes USPS-APWU, largest interest arbitration in U.S.

Mediation experience includes United Airlines and AFA, American Airlines and APFA (both nation-wide agreements).

Supervised, on behalf of the U.S. Securities and Exchange Commission, the distribution of $1.2 billion recovered by the SEC from Michael Milken and Drexel Burnham Lambert

**Publications:**     Getting Disputes Resolved (with William Ury, Jeanne Brett)(1995);

Dispute Resolution (with Frank Sander, Nancy Rogers, Sarah Cole)(6th ed. 2012); dozens of articles focusing on mediation and arbitration.

This document was created with Win2PDF available at http://www.win2pdf.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.
This page will not be added after purchasing Win2PDF.

# Exhibit 10

ALLIED PILOTS ASSOCIATION EQUITY DISPUTE ARBITRATION

In the Matter of:

DISTRIBUTION OF EQUITY BY THE          ARBITRATOR STEPHEN B. GOLDBERG
ALLIED PILOTS ASSOCIATION

_____/

**REQUEST FOR CLARIFICAION
AND MODIFICATION OF DECISION AND AWARD**


**CHALLENGE NO. 1149**

FO Kathy E. Emery
Emp. No. 354954
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650
a.l.combs@aol.com

## REQUEST FOR CLARIFICATION
## AND MODIFICATION TO DECISION AND AWARD

I, Kathy E. Emery respectfully requests clarification and a modification of my award from the APA Equity Distribution Fund.   In the Decision and Award dated October 15, 2013 it was determined that I would be treated as a Category 3 pilot, and eligible for recovery from two silos only, the Pension and the Years of Service Silos, with the Pension Silo having a $0.00 value to me because of my age.[1]   However, after reading the entire Decision and Award, and based on the facts in my case and the precedents established in the Decision and Award in Meadows case, I believe I should be eligible for recovery from all four silos.  The reasons are as follows:

1.   FO Meadows filed a grievance on February 4, 2012 asserting a number of improper actions by the company with respect to his employment status, his seniority and the company's 5 years max sick leave rule, further alleging violations of federal law (i.e. American with Disabilities Act (ADA and Sarbanes-Oxley Act).  The grievance was denied and the APA submitted that grievance to a Pre-Arbitration Conference on June 28, 2013 noting that the grievance "protest[ed] the Company's action in removing him from the seniority list and discharging him from American Airlines".

2.   Like FO Meadows, for purposes of the Equity Distribution, I argued that I should have been treated like a TAG pilot because of my pending grievance seeking reinstatement to active pilot employee status.  The APA disagreed, claiming that both FO Meadows and FO Emery were administratively terminated pursuant to Section 11.D since they had been inactive for more than 5 years. The APA argued that the TAG status applied only to pilots terminated for cause.

3.   However, in the Decision and Award, the Arbitrator determined it was arbitrary to treat pilots who have pending non-TAG grievances differently than pilots having a TAG grievance as sufficiently likely to be successful for purposes of the Equity Fund as if they will be successful, while treating differently pilots who have a pending Non-TAG Grievance **[See Decision and Award, at 61]**, also noting that the APA ignores the fact it is also advocating for FO Meadows, albeit for reinstatement to the seniority list**. [See Decision and Award, at 62]**

_____

[1]Pilots like myself were stunned to learn that the APA arbitrarily treats LTD A and LTD B as if they <u>will</u> be retiring at age 60 instead of age 65,  Pilots I have talked to thought the calculations were in error and based their challenge on that rather than the merits. Like the ISS, I believe this is discriminatory, on the basis of age <u>and</u> disability.

[2]

4.    Based on that premise and the assumption that FO Meadows grievance like a TAG grievance is sufficiently likely to be successful, the Arbitrator made FO Meadows eligible for a distribution from all four silos.

5.    FO Emery filed a grievance December 11, 2007. On March 18, 2009, Captain Lloyd D. Hill, APA President submitted FO Emery's grievance to the Five Member System Board of Adjustment protesting the Company's violation of §10, §11, §21, Supp F, all other related sections of the Agreement and past practice, in connection with (among other things) *failing to place her on proper pay status of PW or Awaiting Training*.  The grievance sought to make FO Emery whole for all losses sustained plus interest, and place her in a paid status (***PW or Awaiting Training***).  The APA does not and cannot deny this would result in FO Emery's reinstatement of her status as an employee of American Airlines.  The remedy sought, to be put on a proper paid active status (PW or Awaiting Training), with the goal of returning to active flight duty, is consistent with the APA's advocacy for TAG pilots **[See Decision and Award ¶ 2 at 61]** Thus Emery's grievance remains as a procedural avenue by which FO Emery may be restored to active flight duty. **[See Tr 321(20-25), 322(1-25) ,323(1-9), 324(21-25), 325(1-25), 326(1-14)(19-25) ,327(1-25),  328(1-25), 329(1-5),  Also see Ex.Emery  11(3-5), 17(1-2)**

6.    PW Status or Awaiting Training means a pilot is being withheld from flying or training, but being paid.  A pilot on PW or Awaiting Training (not performing regular flying duties) receives pay on the basis of scheduled flight time for the trips such pilot was scheduled to fly as a result of a pilots trip selection.  Trips for which a pilot is scheduled are awarded based on the pilot's <u>seniority</u> in the equipment held (in FO Emery's case, the 737)

7.    By Agreement of American Airlines and the APA dated January 1, 2013 (LOA 12-01), FO Emery's grievance 07-082 along with several others was preserved in the AA Bankruptcy Proceedings and incorporated into the new Collective Bargaining Agreement.

8.    In the Decision and Award, I believe the Arbitrator may not have fully considered the remedies sought in my grievance and overlooked key relevant facts which would have completely changed the analysis of my challenge, and would have resulted in me being awarded all four silos, just as FO Meadows received.

9.    The overriding factor in Meadows situation, was that the Arbitrator believed like TAG pilots, his grievance should have been considered sufficiently likely to prevail, and if so

[3]

would have resulted in his reinstatement to the seniority list effective before the date of the initial eligibility date for the ED.  Under a similar analysis FO Emery's grievance should also be deemed to result in her retroactive reinstatement to the seniority list as of the date she was removed, *i.e.,* October 18, 2009.  The Arbitrator also believed it was equally safe to assume that if Meadows grievance is sustained, FO Meadows would be treated by the arbitrator as a pilot who should have been on the Seniority list on January 1, 2013, the date on which pilots on the seniority list are eligible for recovery from all four silos, even if they were on LTD status.

10.    The record evidence shows that I should never have been removed from the seniority list in the first place, and wasn't  removed until 10/18/09 seven (7) years after I was medically disqualified and placed on LTD.  Like FO Meadows, I was removed only after I reported and continued to pursue a business ethics complaint/s both to AA Legal in Tulsa, OK and to the outside agency charged with documenting and investigating business ethics complaints against American Airlines. **NW Case 803035660.**

11.    Furthermore, I was not improperly removed until well after I filed my grievance which sought my reinstatement to a proper paid status of PW or Awaiting Training.  Regardless, even if I'm not now on the seniority list, if I am treated sufficiently likely to prevail on my grievance the immediate is that I must be retroactively reinstated to the seniority list no matter what, whether I'm reinstated to PW or disability; as I explain in further detail below.

12.    First and Foremost, as part of my closing Brief I presented Exhibit 17-2, which is an HII document from AA, which shows I still have 65 hours of accrued sick time remaining.  This fact was undisputed by APA.  Under CBA Section 11.D.1, a pilot cannot be removed from the seniority list until five (5) years after a pilots paid sick leave is fully exhausted, and states in relevant part;

"When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty or is found to be unfit for such duty.  A leave of absence for sickness or injury shall not commence until a pilot has exhausted accrued sick leave credits provided under Section 10 of this Agreement.  Such leave of absence for sickness or injury may not exceed a total continuous period of three (3) years unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years."

[4]

13.    Therefore, I could not and should not have been removed from the seniority list, which would entitle me to all four silos even if I was on LTD like was decided in Meadows case.

14,    Second, I filed my grievance 07-082 on December 10, 2007; which primarily sought reinstatement to a PW Status or Awaiting Training.  Sometime thereafter, around December 2009, the Company improperly removed me from the seniority list without notice, purportedly under Section 11.D.1, and unwound my already accrued seniority.  So to the extent that happened post-filing of my pending grievance, my improper removal from the list should now be considered to be incorporated into my pending grievance (per Tricia Kennedy, APA Staff Attorney on 10/26/2009).  Regardless, if I prevail on my grievance, any form of a make whole remedy cannot be effectuated without first reinstating me to the seniority list.  If I prevail on my grievance there can be but two logical outcomes; 1) If I am put in an active PW or Awaiting Training status, then I must first be reinstated to the seniority list.  2) If the award is to reinstate my disability benefits, I must first be reinstated to the list, placed in active status, then exhaust my remaining paid sick leave, and only then can I be placed into disability status[2] under the Company's disability plan.


**CONCLUSION**

Based on all the foregoing, I believe the Arbitrator should treat my grievance just as he did Meadows.  More specifically, he should rule that the APA treated me arbitrarily, and should have treated my grievance to be as sufficiently likely to prevail in my reinstatement as an active employee and to the system seniority list, for all the reasons above.   I therefore, respectfully request the Arbitrator revise my decision accordingly, and direct the APA award me a full share payout from all four silos.

---

[2] The **American Airlines Pilot Long Term Disability Plan** (PLTD Plan), **Sec V. "Disability Benefit Eligibility"** requires that, "Pilot Employees, who are not active on Feb. 1, 2004, for example those (1) receiving disability benefits under the program(old A Plan), (2) on an authorized leave, (3) on furlough, and (4) (other similar situations) will become automatically eligible for coverage on their first day of Service upon return to active duty with the employer" Further, the PLTD plan defines the **"Elimination Period,"** which states, "The benefits shall commence ninety (90) days after the onset of the Disability or related Disability or on the expiration of paid sick leave and/or vacation, whichever occurs later…"

[5]

### .**CERTIFICATE OF GOOD FAITH EFFORT TO RESOLVE ISSUES**

**I HEREBY CERTIFY** that a good faith effort was made to resolve the issues outlined in my Motion for Clarification by agreement with the APA before seeking your intervention.  I provided the APA with a detailed outline of my concerns in multiple e-mails and spoke to Mark Myers.  The APA's position is that they accept the Arbitrators Decision and Award.  For purposes of your Meet and Confer requirement, the APA advises me that we have satisfied that obligation.  They have advised me that if I want to pursue the matters further I must address the issues with the Arbitrator Goldberg.

Signed and dated this 15th day of November, 2013

/s/Kathy E. Emery

Kathy E. Emery
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650
a.l.combs@aol.com

[6]

# Exhibit 11

**ALLIED PILOTS ASSOCIATION EQUITY DISTRIBUTION ARBITRATION**

| | |
|---|---|
| **In the Matter of** | |
| **DISTRIBUTION OF EQUITY BY ALLIED PILOTS ASSOCIATION** | **REQUESTS FOR CLARIFICATION: FO KATHY EMERY; FO MARK HASS** |

## ORDER

The requests for clarification filed by FO Emery and FO Hass are DENIED on the same grounds as were those of FO Wallace T. Preitz II and CA Stephen C. Davidson in the Arbitrator's November 15, 2013, Order.

The requests of both FO Emery and FO Hass, while stated to be requests for clarification of the Arbitrator's October 15, 2013, Decision and Award, are actually requests for modification of that Award. As such, their filing was not authorized by the October 17, 2013, Notice, and are DENIED for that reason. They are also DENIED because they state no grounds that would compel the Arbitrator to reach results for FO Emery or FO Hass different from those set out in the October 15, 2013, Decision and Award.


/s/ Stephen B. Goldberg
_____

November 16, 2013

Exhibit 12

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms. Pam Torrell<br>H.R. Director<br>**ALLIED PILOTS ASSOCIATION**<br>14600 Trinity Boulevard, O'Connell Building, Suite 500<br>Fort Worth, TX 76155 | **Kathy E. Emery**<br><br>THIS PERSON *(check one or both)*<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s)<br><br>EEOC CHARGE NO.<br>**510-2014-02394** |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)   [ ] The Equal Pay Act (EPA)   [X] The Americans with Disabilities Act (ADA)

[X] The Age Discrimination in Employment Act (ADEA)   [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **11-MAY-14** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [X] Please respond fully by **11-MAY-14** to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by to

If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

**RECEIVED APR 14 2014 APA LEGAL DEPT.**

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**FERNELLA PETERS,**
Enforcement Supervisor

*EEOC Representative*

Telephone   **(305) 808-1877**

**Miami District Office**
**Miami Tower, 100 S E 2nd Street**
**Suite 1500**
**Miami, FL 33131**
**Fax: (305) 808-1855**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race   [ ] Color   [X] Sex   [ ] Religion   [ ] National Origin   [X] Age   [X] Disability   [ ] Retaliation   [ ] Genetic Information   [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| April 11, 2014 | **Malcolm S. Medley,**<br>**District Director** | |

Enclosure with EEOC
Form 131 (11/09)

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14  Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 510-2014-02394 |

| Florida Commission On Human Relations | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Kathy E. Emery** | **(305) 758-9650** | **10-19-1952** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1050 N.E. 91 Street, Miami, FL 33138** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **ALLIED PILOTS ASSOCIATION** | **15 - 100** | **(786) 797-6522** |

| Street Address | City, State and ZIP Code |
|---|---|
| **808 Brickell Key Drive,  Unit 1408,  Miami, FL 33131** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☒ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **10-15-2013**   Latest **03/20/2014**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

1. I was hired as a Pilot for American Airlines in 1992. During my tenure, I was discriminated against because of my sex, female, age, sixty one and my disability. American Airlines gave the Pilots a (13.5) percent equity stake in the company. American Airlines permitted the Allied Pilots Association (APA) to distribute the equity shares. The APA Equity Distribution Eligibility and Allocation Award was finalized in October 2013. Pilots outside of the protected class were awarded significantly more equity shares valued at approximately $125,000 to $150,000 dollars. I was awarded a smaller number of shares worth an estimated $23,000 dollars. The criteria used to determine how equity shares were distributed has an adverse impact on members of the protected class.

2. The Respondent failed to address my concerns in a timely manner.

**(Continued)**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| X 3/20/2014   *Kathy E Emery*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 510-2014-02394 |

| Florida Commission On Human Relations | and EEOC |
|---|---|
| *State or local Agency, if any* | |

3. I believe that I and other similarly situated individuals were discriminated against because of age, in violation of The Age Discrimination in Employment Act of 1967, as amended and because of disability, in violation of The Americans With Disabilities Act Amendment Act of 2008, (ADAAA) and because of sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| x 3/20/2014 x *Kathy E Emery* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date                     Charging Party Signature | |



**U.S. Equal Employment Opportunity Commission**
**Miami District Office**

Miami Tower, 100 S E 2nd Street
Suite 1500
Miami, FL 33131
(305) 808-1740
TTY (305) 808-1742
Fax: (305) 808-1855

Charging Party: Kathy E. Emery
EEOC Charge No.: 510-2014-02394

Ms. Pam Torrell, H.R. Director
ALLIED PILOTS ASSOCIATION
14600 Trinity Boulevard
O'Connell Building, Suite 500
Fort Worth, TX 76155

Dear Ms. Torrell:

Your organization is hereby requested to submit information and records relevant to the subject charge of discrimination. The Commission is required by law to investigate charges filed with it, and the enclosed request for information does not necessarily represent the entire body of evidence which we need to obtain from your organization in order that a proper determination as to merits of the charge can be made. Please submit a response to the requested information by the deadline cited below.

The information will only be disclosed in accordance with 29 C.F.R. 1601.22, or otherwise made public if the charge results in litigation.

Sincerely,

FERNELLA PETERS
Enforcement Supervisor

Response Deadline Date:

The following dates are considered to be the "relevant period" for the attached Request for Information:
March 1, 2013 - March 20, 2014

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### REQUEST FOR INFORMATION

Charging Party: Kathy E. Emery
Respondent: ALLIED PILOTS ASSOCIATION
EEOC Charge No.: 510-2014-02394

1. Give the correct name and address of the facility named in the charge.

2. State the total number of persons who were employed by your organization during the relevant period. Include both full and part-time employees. How many employees are employed by your organization at the present time?

3. Supply an organizational chart, statement, or documents which describe your structure, indicating, if any, the relationship between it and superior and subordinate establishments within the organization.

4. Supply a statement or documents which identify the principal product or service of the named facility.

5. State the legal status of your organization, i.e., corporation, partnership, tax-exempt non-profit, etc. If incorporated, identify the state of incorporation.

6. State whether your organization has a contract with any agency of the federal government or is a subcontractor on a project which receives federal funding. Is your organization covered by the provisions of Executive Order 11246? If your answer is yes, has your organization been the subject of a compliance review by the OFCCP at any time during the past two years?

7. Submit a written position statement on each of the allegations of the charge, accompanied by documentary evidence and/or written statements, where appropriate. Also include any additional information and explanation you deem relevant to the charge.

8. Submit copies of all written rules, policies and procedures relating to the issue(s) raised in the charge. If such does not exist in written form, explain the rules, policies and procedures.

9. Submit a true and accurate copy of the Charging Party's personnel and disciplinary and medical files.

10. Submit a copy of the Disciplinary and Disability Policies.

11. Submit a copy of the Equity Distribution and Allocation Award.

12. Submit the criteria used to determine how many equity shares were distributed to each Pilot.

13. Submit a list of Pilots who received equity shares, annotate to show: name, sex, age, date of hire and the number of shares distributed, attach supporting documentation.

14. Submit the value of one equity share.

15. Are terminated Pilots who filed a grievance that is still pending, considered "Active Pilots", for the distribution of equity shares?

16. Describe your policy on distributing equity shares, note any limitations or exclusions.

17. Submit a copy of the Charging Party's most recent union grievance.

18. Submit a copy of the Employee Handbook for Pilots.

19. Submit a copy of the Collective Bargaining Agreement, for 2013 and 2014.

20. Submit a copy of Robert Murphy's personnel, disciplinary and medical files.

21. Submit a copy of the APA Settlement Consideration and Bankruptcy Protections document.

22. Submit a copy of the Equity Distribution APA Board of Directors-Approved Eligibility and Allocation, dated April 3, 2013.

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Miami District Office**

Miami Tower
100 SE 2nd Street, Suite 1500
Miami, FL 33131
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Miami Status Line: (866) 408-8075
Miami Direct Dial: (305) 808-1740
TTY (305) 808-1742
FAX (305) 808-1855
Website: www.eeoc.gov

Dear Small Business Manager:

EEOC is the federal agency with primary responsibility for enforcing our nation's equal employment opportunity (EEO) laws. The laws we enforce prohibit job discrimination based on race, color, religion, sex, national origin, age and disability. We have enclosed a Fact Sheet which provides an overview of EEOC's procedures from the time a charge of employment discrimination is filed to the point that it is resolved.

In most cases, as our first step in processing a charge, we offer mediation as a neutral, voluntary and confidential way to achieve a mutually satisfactory resolution for all parties. Sixty-five percent of charges that are mediated are successfully resolved. In an independent study, 96% of employers who tried mediation said they would use it again if the need arose.

In addition to the EEOC representative identified on the "Notice of Charge of Discrimination," each of our district offices has a Small Business Liaison to provide technical assistance and help to resolve questions about the laws we enforce, mediation, and the charge process. We have also developed a user-friendly Internet Web site (www.eeoc.gov) which has a special site designed to help small businesses who need to know more about EEO laws and the EEOC charge process. The names and phone numbers of our Small Business Liaisons are also listed on our Web site. We have noted some of the pages on our Web site that may be of particular interest to you on the attachment.

I encourage you to contact the Small Business Liaison in your area to answer any questions you may have and assure you that any inquiry or request for information will not adversely affect the investigation of the charge filed.

Yours truly,

District Director
U.S. Equal Employment Opportunity Commission

Attachments:  Get the Facts: Small Business Information
Answers to Your Questions May Be Only a "Click" Away