## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## PALM BEACH FLORIDA

CASE NO.: 14-80518-CIV-DIMITROULEAS

FILED by _____ D.C.

SEP 19 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

KATHY E. EMERY,

     Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

     Defendant.

_____/

### MOTION TO FILE FIRST AMENDED COMPLAINT

Pursuant to Fed, R. Civ. P. 15(a)(1)(B), the Plaintiff, Kathy E. Emery, hereby,

seeks to exercise her right to, file this Motion to File First Amended Complaint as a matter of

course. (Attached hereto as Exhibit 1)

Dated this 19th of September, 2014

Respectfully submitted,

*Kathy E Emery*

Kathy E. Emery
Mailing Address:
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served by US Mail on September 19, 2014 on all counsel of record listed below.

Stephen K. Hoffmann
Darin M. Dalmat
JAMES & HOFFMANN, P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, D.C. 20036

Attorney's for Allied Pilots Association

Signed and dated this 19th day of September, 2014

*Kathy E Emery*

Kathy E. Emery
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650

*Exhibit 1*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### PALM BEACH DIVISION

KATHY E. EMERY,

      Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

      Defendant.

_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### PLAINTIFF DEMANDS TRIAL BY JURY

Kathy E. Emery
Mailing Address:
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650

[1]

## COMPLAINT

COMES NOW, Plaintiff, Kathy E. Emery, and hereby files her Complaint against the Defendant, ALLIED PILOTS ASSOCIATION, and says:

### I. JURISDICTION AND VENUE

1.   Plaintiff Kathy E. Emery brings this action against defendant Allied Pilots Association (the "APA") The suit is based upon defendants breach of its duty of fair representation, under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 (1976) *et seq,* (LMRDA) Civil Enforcement of Union Bill Of Rights, 29 U.S.C 411-412

### II. PARTIES

*2.*   Plaintiff, Kathy Emery ("Emery"), is a citizen of the United States, who resides in the State of Florida.  At all times relevant to the facts and claims asserted herein, plaintiff is and had been a member in good standing of the defendant Allied Pilots Association and a pilot who is covered under the Collective Bargaining Agreement between American Airlines, Inc., and the pilots in the service of the company as represented by the Allied Pilots Association.

3.   Defendant Allied Pilots Association (the "APA") is a labor organization with its principal office in the State of Texas. The APA has been accorded exclusive recognition, and is the exclusive representative of the pilot employees in the service of American Airlines, Inc., ("American" or "AA") and is entitled to act for, and negotiate collective bargaining agreements covering all pilots in the bargaining unit.

### III.   INTRODUCTION

4.     Kathy E. Emery brings this action against the Allied Pilots Association (the "APA") for the Defendants Breach of its Duty of Fair Representation owed to her in relation to the APA Equity Distribution Allocation and Award and for violations of (LMRDA) Civil Enforcement Of Union Bill Of Rights, 29 U.S.C. 411-412.

5.     American Airlines ("American") gave American Airlines pilots a 13.5% "Equity Stake" in the new American Airlines which was estimated by the Allies Pilots Association ("APA" or the "Union") to be worth approximately 1.2 billion dollars.  American permitted the APA to distribute the equity shares among its pilots conditional upon the APA's indemnification of American Airlines for any legal challenges brought by any pilot or group of pilots relating to equity distribution.  Currently, there is a set aside for such legal challenges.

6.     This action is based upon the APA's arbitrary, discriminatory and bad faith treatment of Plaintiff, in the APA Equity Distribution Scheme.  The APA Equity Distribution Eligibility and Allocation Award published in November 2013 treated Plaintiff less favorably than other similarly situated pilots.  The APA actions have and will continue to have a disparate impact on Plaintiff in comparison to other American Airlines pilots.  Other similarly situated pilots were awarded equity shares worth an estimated $125,000 to $150,000.  Plaintiff was awarded a much smaller number of shares worth an estimated value of $20,000.

[3]

### III.  STATEMENT OF FACTS

### **Employment History**

7.    On September 2, 1992 Plaintiff Kathy Emery was hired as a Commercial Pilot for American Airlines, Inc.  Prior to that date Plaintiff had enjoyed a successful career as a pilot for Pan American World Airways (Pan Am)

8.    Plaintiff was hired by American Airlines after Pan Am ceased operations in 1991.

9.    When Plaintiff was hired by American, she was a highly qualified individual and had always held a FAA First Class Medical Certificate.

10.    After more than ten (10) years of service with American Airlines, Plaintiff was medically disqualified from performing duties as a pilot following a required medical evaluation, conducted by the company.

11.    In April 2003 Plaintiff filed for long-term disability benefits under the American Airlines Pilot Retirement Benefit Program.

12.     Prior to approving Plaintiff's benefits, American Airlines Corporate Medical Director, Thomas H. Bettes, M.D. Dr., directed Plaintiff to contact and begin treatment with an American Airlines assigned physician, Dr. Enrique M. Suarez.  Initiating this treatment and following Dr. Suarez recommendations was a pre-condition for receipt of disability benefits and eventual medical clearance to return to work.  Failure to comply with AA's directives would subject Plaintiff to terminations for insubordination.

13.    After Plaintiff initiated treatment with Dr. Suarez, Dr. Bettes approved Plaintiff for long term disability benefits under the Program, effective March, 2003.

14.     During the next four years, Plaintiff satisfied all Program requirements and continuously received monthly disability benefits, including continuous medical care and

[4]

treatment for her disability from Dr. Suarez, who regularly provided American's medical department with updates regarding Plaintiff's condition.

### Termination of LTD Benefits

15.     On January 25, 2007, notwithstanding American's full knowledge of Plaintiff's medical condition and direct contact with her treating physician, Dr. Bettes terminated Plaintiff's disability benefits without prior notice and without requesting any additional documentation from her doctors.

16.     Plaintiff's disability benefits were automatically stopped when Dr. Bettes, notified American Airlines Pension Plan Administration, "that medical information pertaining to the continuation of Plaintiff's long term disability benefits had been requested and due to lack of substantiation disability benefits cease on January 31, 2007."

17 .    Plaintiff received notice from Dr. Bettes that disability benefits are being terminated ex post facto.  The notice stated in part, "it cannot be established, that you continue to remain disabled and unable to pursue obtaining your FAA medical certificate with the goal of returning to your job as a pilot for American Airlines."

18.     Upon Plaintiff's receipt of that notice, Plaintiff immediately contacted American Airlines Medical Department and AA's Disability Nurse Case Manager, Jeanne Spooned seeking further clarification.

19.     Plaintiff was informed that no additional information would be provided and Plaintiff's only recourse was to file an administrative appeal with American Airlines Pension Benefits Department (PBAC).

20.     On February 28, 2007 Plaintiff wrote Dr. Bettes a letter requesting further clarification and requesting that he schedule her for a FAA First Class Medical and AA Medical Clearance to return to work (RTW), pursuant to Section 20 and other provisions of the CBA.

21.     Dr. Bettes never responded to Plaintiff's letter.

22.     Plaintiff also contacted the Miami Flight Office who advised her that she should direct all inquiries to Dr. Bettes, American Airlines Corporate Medical Director.

### The Disability Appeal

23.     August 2007, Plaintiff appealed the adverse benefit determination with AA's Pension Benefits Administration Committee (the "PBAC") which appeal was denied on October 22, 2007

24.     The denial notice stated in part, "As a result of your appeal request, the PBAC determined that discontinuance of long term disability benefits was both proper and in accordance with the provisions of the Plan."

25.     The decision further stated, that Western Medical Evaluators, Inc. (a medical consulting company under contract with American Airlines) determined that the evidence presented does not document your continued disability or receipt of continued appropriate medical care.

26.     This, despite the fact that since 2003 through the decision date, Plaintiff was under the care of a physician selected and assigned to her by American Airlines (See ¶ 6 above) and was fully compliant with all treatment recommendations.

27.     In rendering its decision, the PBAC purported to rely on evaluations made by Western Medical Evaluators ("WME"), to determine the clinical validity of Plaintiff's disability based only on a peer review.

[6]

28.     Citing WME's peer review report, on October 22, 2007 the PBAC upheld Dr. Bette's termination of Plaintiff's benefits.

29.     Years later, Plaintiff discovered that WME was not a clinical source, but was instead a small workers-compensation claims processor that worked for companies and insurers.  WME's history during the period of FO Emery's peer review was riddled with fraud.

30.     The medical license of WME's principal and Corporate Medical Director, Dr. Howard Douglas, had been revoked by the Texas Medical Board for "dishonorable, and unprofessional conduct likely to defraud or deceive public in the future, and professional failure to practice medicine in an acceptable manner consistent with public welfare."

31.     In July of 2008, WME was sued by Capital Funding Solutions, Inc. in the US District Court, FLSD, Case No. 08-61106-SEITZ, for "perpetrating two separate and distinct fraudulent schemes," which consisted of acts of medical claim fraud, and billing fraud, involving false claim forms.   These acts were committed from January 2007 through July 2008, during the precise time-frame American Airlines PBAC Committee used WME to review pilot's disability claims.

32.     Significantly, in that case, former WME employees testified that WME paid doctors 120% of their normal fee to wrongfully deny claimant's benefits, that WME's principal directed employees to perform illegal acts, and that WME's principal would not wait on doctors to complete reports, and instead would create and sign the evaluation report herself.

33.     In August 2008, WME was permanently shut down by the Texas State Insurance Board and WME and its principals were charged with felony workers compensation claim and billing fraud and subsequently convicted and sentenced.

33.    In 2010 WME's principal Howard Douglas was again convicted for Workers Compensation fraud involving three separate companies and sentenced to five-years incarceration.

34.    During the period of time from 2004 through 2007, Americans defined benefit pension plans were grossly under-funded.  American's annual SEC 10K Report shows substantial pension funding obligations ranging from $2.1 billion to $2.5 billion and that this could affect American's long-term sustainablility.

35.    During discovery in several pilots ERISA cases, FO Emery has learned that American Airlines created a Disability Nurse Case Management Cost Savings Program.

36.    Deposition testimony from key individuals in American's medical department and human resources department, including senior budgeting analyst Susan Roberson, admitted that the Cost Savings Program was administered by the American medical department overseen by AA's Corporate Medical Director, Thomas Bettes, M.D.

37.    Cost savings from AA Medical's premature termination of pilots disability benefits and WME's decisions to uphold these terminations were tracked on Nurse Spoon's spread sheets.

38.    During the period of time from 2005 through 2008, Defendant, Allied Pilots Association also sought to significantly reduce its disability costs under the APA's voluntary disability plan.   Several revisions were made to the APA Disability Income Plan (Loss of License) in order to reduce costs of the plan and in 2008 the Loss of License Plan was terminated and replaced with the Pilot Occupational Disability Plan.

39.    During the same period of time, Plaintiff had a claim for APA disability benefits under the APA Loss of License Plan.  Not unlike American, Defendant APA failed to pay all

disability benefits under the plan and failed to administer the claim within the time prescribed by law.  So in 2011, after a protracted claim process lasting nearly eight years, Plaintiff filed suit against Defendant APA in the FLSD to enforce her rights under ERISA.

40.     On April 17, 2013, Judgment was granted in the favor of Plaintiff Kathy Emery against the Defendant APA in the amount of $47,058.29 for pre judgment interest on delayed benefit payments on her ERISA action.

41.     On November 5, 2013, an order was entered awarding Plaintiff Kathy Emery prevailing party costs in the matter.

42.     During this period of time, the APA issued the Equity Distribution APA Board of Directors-Approved Eligibility and Allocation document dated April 3, 2013, memorializing the final decision that the APA Board of Directors (BOD) made concerning the APA equity distribution, including silo structure and allocation, eligibility criteria and the methodology and the Dispute Resolution Procedure (DRP).

46.     The APA Board of Directors-Approved Eligibility and Allocation decision dictated APA's Legal Responsibilities as follows: (1) APA BOD <u>must</u> fairly represent all pilots who are subject to the provisions of the CBA; (2) The distribution methodology <u>must</u> be non-arbitrary, non-discriminatory, and made in good faith.

47.     The APA Board of Directors-Approved Eligibility and Allocation decision provided an eligibility protocol establishing a supplemental eligibility qualification period ("SQP") guaranting that a pilot who met the eligibility requirements on either the Initial Eligibility Determination Date of January 1, 2013 or the Final Eligibility Determination Date will be eligible for the equity distribution.

48.    Plaintiff Emery met the eligibility requirements established by the Board of Directors on both of these dates and was entitled to be treated as fully eligible.

49.    Plaintiff Emery met the Special Status Eligibility Criteria for a pilot *Terminated Awaiting Grievance.*

50.    *Terminated Awaiting Grievance* is clearly and unambiguously defined in the final Equity Distribution APA Board of Directors-Approved Eligibility and Allocation document dated April 3, 2013 as follows:

> *"A pilot who has been terminated by the company as of January 1, 2013 but has not yet completed the grievance process will be considered an "active" pilot for this distribution."*

51.    A flow chart incorporating the criteria was contained in the BOD approved document showing Plaintiff Emery to be *"fully eligible."* For all four silos from the APA Equity Distribution

### FO Emery Met The Special Eligibility Criteria Terminated Awaiting Grievance

52.    By letter dated November 12, 2007, from Captain Tom Hynes, Managing Director of Flight Miami, Plaintiff was advised, "As a result of your failure to qualify for Long Term Disability, you are on unauthorized leave of absence." A hearing was scheduled to discuss Plaintiff's plan to return to work on November 20, 2007.

53.    At the onset of the hearing held by Captain Brian Fields, Base Manger-Chief Pilot Miami, Plaintiff was handed letter dated November 20, 2007, signed by Captain Fields, directing Plaintiff to take all steps necessary to return to work… and directing her to contact AA Medical to coordinate clearance to active duty no later than November 30, 2007. The letter further threatened Plaintiff with termination stating, "Failure to comply with this directive will be

considered a violation of American Airlines Rules and Regulations, Rule 7, insubordination and <u>will result in immediate termination</u>.

54.     At the hearing Plaintiff informed Captain Fields of her disability history with American Airlines as described above and of her immediate desire to return to work.

55.     Plaintiff also testified at the hearing about her prior attempts beginning in February 2007 to coordinate with AA Medical for medical clearance to return to work.

56.     Plaintiff, requested and Captain Fields agreed to intercede on Plaintiff's behalf and scheduled an appointment with American Airlines Corporate Medical Director, Thomas Bettes for the purpose of getting her FAA First Class Medical and return to work clearance.

57.     Following the hearing, by e-mail to Plaintiff's Miami Union Representatives, Captain Fields confirmed that Plaintiff was in compliance with AA's November 20, 2007 directive and confirmed her scheduled appointment with Dr. Bettes for December 12, 2007.

52.     Captain Fields further stated that Plaintiff's failure to appear at the scheduled appointment would be considered insubordination, thereby subjecting Plaintiff to immediate termination. (See ¶ 18 above)

53.     December 10, 2007 the APA prepared a Grievance, signed by Plaintiff protesting the hearing conducted November 20, 2007 and Company's violation of the CBA and past practices (in connection with among other things) improperly removing her from disability, placing her on an "unauthorized" leave of absence while failing to place Plaintiff on a proper pay status of PW and improperly investigating her.

54.     December 12, 2007, Plaintiff appeared as scheduled for her appointment with Dr. Bettes, but he would not conduct the required medical evaluation as directed by Captain Fields nor did he grant Plaintiff medical clearance to RTW.

[11]

55.     During discussions with Dr. Bettes, Plaintiff requested she be placed on a proper paid status, PW or Awaiting Training or be granted a reasonable accommodation.

56.     Beginning in or around June 2008 American Airlines initiated an investigation following Plaintiff's complaint to American Airlines Business Ethics & Compliance Department alleging unfair treatment and discrimination. [Case No. 803035660].

57.     On March 18, 2009 the APA, submitted Plaintiff's Grievance No: 07-082 to the System Board of Adjustment seeking to place Plaintiff of a proper paid status of PW or Awaiting Training, which can only be held by employees of American Airlines.

58.     Plaintiff's internal business ethics Complaint No. 8030356601 was assigned to investigator Michael Chianese, who was instructed to contact Kathy Koorenny, APA legal "because it appears there is some history"

59.     Michael Chianese reported that he spoke with David Gilbert, Miami Flight Administration Manager, who falsely advised him that,

> *"she refused to substantiate her disability, including not showing up for a required medical evaluation, and therefore she is not eligible for her FAA Certification.  Dr. Bettes requested medical info on 1/25/07 that was not provided and her LTD Benefits were ceased on 1/31/07 per AA Medical, of which she had 180 days to file an appeal, which she didn't do.  Gilbert has reams of documentation on this issue.*

60.     Based on patently false information provided by Dave Gilbert and without any communication at all with FO Emery, Mr. Chianese determined that her allegations were unsubstantiated and closed the case with no action.

61.     Subsequently, Plaintiff Emery, was wrongfully terminated by American Airlines effective October 18, 2007 without notice, a date which pre-dates her company grievance.

62     Plaintiff's termination was improper under the terms of the pilots CBA and there is certainly a reasonable presumption that FO Emery would prevail on her grievance.

[12]

63.    Plaintiff's grievance challenging her employment status seeks to place Plaintiff in a proper paid status, such as PW or Awaiting Training, which can only be held by an active American Airlines employee.

64.    On March 18, 2009, The APA submitted Plaintiff's grievance to the Five-Member System Board of Adjustment, which was to be scheduled for arbitration.

65.    The arbitration had not yet been scheduled by the APA when American Airlines filed Bankruptcy on November 29, 2011.

66.    The APA which is the certified collective bargaining representative, under the Railway Labor Act, for American Airlines pilots, filed a Proof of Claim #8331 on July 13, 2012 against the debtor American Airlines for claims related to grievances involving APA and/or its member pilots that rise from conduct or breaches of the 2003-2008 CBA (including the supplemental Agreements) and other separate agreements between American and the APA.

67.    November 16, 2012, APA and Debtor entered into a Letter of Agreement (Settlement Consideration and Bankruptcy Protection) providing for among other things, the settlement of claims of APA, on behalf of itself or the pilots represented by the APA, against American.

68.    The Agreement which was incorporated into the new Collective Bargaining Agreement excluded all pending grievances with the exception of the most serious grievances. Plaintiff's grievance No. 07-082 was one of the named grievances incorporated by settlement into the new Collective Bargaining Agreement.

69.    Plaintiffs  APA Grievance No. 07-082 has not been completed.  Currently, FO Emery is awaiting notice from the APA of the scheduled arbitration date before the 5 Member System Board of Adjustment.

[13]

## The APA Equity Distribution Proceedings

70.   With the U.S. Bankruptcy Judge's approval of the new Collective Bargaining Agreement the APA secured a 13.5% equity stake in the reorganized airline.

71.   In anticipation of receiving that equity interest estimated to be worth as much as $1.2 billion dollars, the APA established an Equity Distribution Committee charged with making recommendations on the division and distribution of the equity interest.

72.   On February 5, 2013, The APA advised the Company, that the APA had devised an internal policy, that it will use in determining how it will allocate the funds it obtained  as un unsecured claim as part of the Collective Bargaining Agreement reached during the Bankruptcy Proceedings.

73.   The parties agreed that any dispute about the distribution of the unsecured claim, including disputes over the APA's methodology for allocating such funds, the factors used to determine the allocation of funds, or regarding the amount allocated to any pilot shall be subject to the APA's Lump Sum Resolution Procedure ("Procedure") which is contained in a provision in the APA Constitution and Bylaws ("C & B") and shall not constitute a grievance or other forms of resolution under the Collective Bargaining Agreement.

74.   The APA Constitution and Bylaws state as follows:

*In the event that the Association has discretion to distribute a lump sum payment ("Lump Sum Payment"), which shall be defined by the Board in the Lump Sum Dispute Resolution Procedure, any pilot or group of pilots who wishes to challenge the distribution shall be required to exhaust the Lump Sum Dispute Resolution Procedure.  No pilot or group of pilots may take legal action against the Association with respect to any matter unless this particular Procedure has been invoked and exhausted  by the pilot or group of pilots. (11/28/2012).*

75.   A DPR requirement to exhaust dispute resolution procedure states as follows:

[14]

> "*No pilot or group of pilots may take legal action against the Association*
> *with respect to any Lump Sum Payment unless the Procedure has been invoked*
> *and exhausted by the pilot or group of pilots.*

76.     Understanding the significant legal risks and potential for legal action, the APA,
maintained jurisdiction and maintained the right to amend and modify the arbitrators final
distribution decision.

77.     The APA created an internal Error and Omissions claim process to review disputes.
Payments have been held in a secure account or trust for an appropriate period pending legal
determination.    Based on the foregoing, it cannot reasonably be construed that the arbitrators
decision was final and binding.

78.     The APA Equity Distribution, APA Board of Directors-Approved Eligibility and
Allocation document dated April 3, 2013 memorialized and finalized the decisions that the APA
Board of Directors (BOD) made concerning the equity distribution, including silo structure,
allocation and eligibility criteria.

79.     Initially, the APA did not notify FO Emery about the APA Equity Distribution or
that she had been excluded.  She learned about it only by happenstance, during a casual call from
a fellow pilot and was subsequently allowed to submit a challenge to the APA decision.

80.     Pursuant to the published *Terminated Awaiting Grievance* criteria for "special
status" situations a pilot who has been terminated by the Company as of January 1, 2013 but
has not completed the grievance process will be considered an active pilot for the distribution.
(emphasis added).

81.     Appendix C, to the Equity Distribution document clearly shows that ACTIVE pilots
for the purposes of the distribution are entitled to *full eligibility.*

82.     This means that the pilot is eligible for all (4) silos of the Equity Distribution.  Here

1, 2013.  The evidence is clear.  FO Emery has been wrongfully terminated by the Company as of January 1, 2013 but has not completed the grievance process initiated by the APA on December 10, 2007.

83.    The APA Board of Directors made a policy decision to treat pilots *Terminated Awaiting Grievance* as active pilots for the purpose of the equity distribution.

84.    However, without the Board of Directors having amended the Equity Distribution eligibility criteria in anyway and after FO Emery's Challenge had been submitted, and the dispute proceedings began, APA Representatives argued the eligibility criteria to mean only those pilots "terminated for cause" (testing positive for drugs, felony convictions, etc.) that were awaiting grievance, and sought to exclude FO Emery who was wrongfully terminated "without cause" from obtaining a full equity share.

85.    There were thirteen pilots, including Plaintiff, that had been terminated by the Company as of January 1, 2013 that had not yet completed the company grievance process.

86.    Unlike Emery, these pilots were afforded the presumption that they would prevail on their grievance because APA was advocating for them.  They were all given 4 silos from the Equity Distribution.

87.    The arbitrator's explanation as to why Plaintiff was not afforded the same presumption other pilots were given, except arbitrators statement,  "the APA does not claim that the 2007 grievance cannot result in reinstatement of LTD benefits."   It is readily apparent that the arbitrator was improperly swayed by APA representatives deliberate misstatements during the dispute proceedings leading him to believe she only sought to be placed back on disability.

88.    The remedy FO Emery sought in her grievance was to be placed on PW or

Awaiting Training which is an active employee status, the APA argued against the grievance that they themselves had prepared. Subsequently, the arbitrator reduced Plaintiff's equity stake in the new American Airlines by nearly $100,000.00.

89.   Of those thirteen pilots, Plaintiff is the only one that was not made fully eligible for the Equity Distribution. Those pilots, including one or more terminated without cause, were awarded all four silos valued at approximately $130,000.00-$160,000.00

90.   Plaintiff was granted only two silos out of four one with a $0.00 value (based on age and the presumption that Plaintiff would not return to work), for a total of approximately $20,000.00, a difference in excess of $100,000.00

91.   In regard to Equity Distribution, the APA BOD had a legal responsibility to represent all of its pilot members and to ensure that the distribution was fair and reasonable, non-arbitrary, non-discriminatory, and made in good faith. The APA's actions toward Plaintiff Emery were more than mere negligence and fell out of a wide range of reasonableness. As seen below, APA's discrimination of Plaintiff Emery was invidious and unrelated to any legitimate objective under Federal Labor law.

92.   The APA failed in their legal responsibility to fairly represent Kathy Emery with regard to the APA Equity Distribution, when, in an effort to defeat Kathy Emery's right to a fair allocation of the APA Equity Distribution funds, the APA, (a) claimed no duty of representation to her; (b) knowingly took a position inconsistent with and in contradiction to Kathy Emery's pending Grievance No. 07-082; (c) knowingly took a position inconsistent with and in contradiction to APA president Lloyd Hill's submission of Kathy Emery's grievance to the 5 member System Board of Adjustment; (d) falsely claimed Kathy Emery had been removed from the seniority list pursuant to the collective bargaining agreement, and then sought to defeat her

[17]

challenge because she was not on the seniority list;  sought to defeat her challenge because she

was not receiving LTD benefits; (f) falsely claimed that Kathy Emery's grievance does not seek

her reinstatement as an employee of American; (g) misrepresented that Ms. Emery was dropped

from the seniority list pursuant to Section 11.D of the CBA; (h) knowingly took a position

inconsistent with and in contradiction to DFW Base Grievance 12-012 and LGA Base Grievance

11-054 which is now languishing; (i) argued in bad faith that FO Emery should not be treated as

terminated awaiting grievance because she was not terminated for cause; (j) misled the arbitrator

to believe that FO Emery was appropriately terminated in accordance with the CBA under 11.D;

(k) failed in their duty of candor to the arbitrator; (l) treated FO Emery less favorably than other

similarly situated pilots; (m) treated FO Emery who was wrongfully terminated, without cause

less favorably than pilots terminated for cause (i.e., insubordination, felony convictions, testing

positive for alcohol, testing positive for drugs, etc...); (n) unreasonably assumed that FO Emery

who has been terminated w/o cause, awaiting grievance (inactive) more than 5 yrs. Is unlikely to

return to active flying, while assuming pilots terminated for cause, awaiting grievance (inactive)

more than 5 years is likely to return to active flying); (o) failed to afford FO Emery the benefit of

presumptions afforded other pilots "that they would prevail on their grievance"; (p) stated under

oath that TAG pilot status is given to only "active" pilots who have been terminated by the

company." while failing to disclose that TAG pilot status was also given to inactive pilots who

have been terminated by the company, including pilots unable to hold a FAA First Class

Medical)

    93.    The parties did not agree that the APA Dispute Resolution Proceedings, conducted

in violation of the Railway Labor Act were final and binding.

    94.    Subsequent to the APA Equity Distribution, disabled pilots were speaking openly

[18]

about APA's treatment of disabled pilots.

96.    APA  classifies Emery's member status as "MDD", which is an internal APA code which is defined by APA as Medical Disability Dropped from AA.

97.    APA documents show "MDD", Medical Disability Dropped as members in good standing.

98.    APA is a labor organization as defined under the Labor-Management Reporting and Disclosure Act of 1959, as amended ("LMRDA"), 29 U.S.C. 402.

99.    Without explanation or notice, on April 22, 2014 the Allied Pilots Association (APA), the collective bargaining agent for all American Airlines (AA) pilots locked out Plaintiff Kathy Emery and 233 other pilots from the Challenge and Response ("C&R") section of the APA website after a number of disabled and formerly disabled pilots began to complain about disparate treatment by the APA on the basis of disability.

100.    C&R is a pilot discussion forum which is the equivalent of a virtual union hall.

100.    The 233 pilots are believed to be internally classified by the APA as  "MDD" or medical disability dropped from AA.  This policy has been and is the subject of an ongoing dispute between the APA, AA and its disabled pilots.

101.    Many pilots have insisted the APA grieve the policy on the grounds that it violates the Collective Bargaining Agreement and currently there are several company grievances and arbitrations pending related to this issue filed by the APA which now appear to have been stymied.

102.    Historically APA has classified "MDD's" as members in good standing, and as members in good standing they have always been granted access to Challenge and Response, but

[19]

now Emery and others have been prevented from entering APA's virtual union hall only after openly challenging the APA's treatment of disabled pilots on Challenge and Response.

103.    Plaintiff, Kathy Emery was informed by APA President Keith Wilson on July 28 2014 at a Miami Base Union Meeting that she was not and would not be permitted to speak at or attend APA union hall meetings.  During that meeting Plaintiff Emery was treated with open hostility and publically rebuffed by Captain Wilson who stated from the speakers position "your are suing the union."

## IV.  CAUSE OF ACTION

### COUNT I: BREACH OF THE DUTY OF FAIR REPRESENTATION IN VIOLATION OF THE RAILWAY LABOR ACT/ BREACH OF FIDUCAIRY DUTY

90.    Plaintiff incorporates the allegations contained in Paragraphs above as if fully stated herein and says further that:

91.    The failure of the Defendants to allocate in good faith the proceeds of the APA Board of Directors approved Equity Distribution to Plaintiff is a breach of the APA's duty to fairly represent Kathy Emery

92.    The effect of Defendants' failure to fairly represent in the allocation of the same payment of compensation and benefits as is enjoyed by similarly-situated pilot members of the APA is in violation of the Railway Labor Act ("RLA")

93.    The Equity Distribution Decision and Award dated October 15, 2013 determined that Kathy Emery would be denied payments from the APA Equity Distribution that other similarly situated pilots will receive or have received..

94.     But for the arbitrary, discriminatory and deliberate, bad faith actions of the APA, Kathy Emery would have enjoyed the same payment of benefit as is enjoyed by active members and similarly-situated pilot members of the APA.

.      95.     The APA's bad faith acts perpetrated by certain APA representatives during the proceedings impaired the impartial performance of the arbitrator's task resulting in significant losses to Plaintiff.

## COUNT II: LABOR MANAGEMENT REPORTING AND DISCLOSURE ACT (LMRDA) CIVIL ENFORCEMENT OF UNION MEMBER BILL OF RIGHTS, 29 U.S.C. 411-412

95.     Plaintiff incorporates the allegations contained in Paragraphs above as if fully stated herein and says further that:

104.     Title I of the LMRDA; Bill of Rights of Members of Labor Organizations, 29 U.S.C., 411, SEC. 101;  provides among other things that every member of a labor organization shall have equal rights and privileges to participate in union activities, freedom of speech and assembley in the union hall and protection of the right to sue.

105.     Title I of the LMRDA; Bill of Rights of Members of Labor Organizations, 29 U.S.C. 412, SEC. 102. Civil Enforcement; provides, any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief, (including injunctions) as may be appropriate.

106.     Accordingly, Plaintiff respectfully requests that this Court grant her injunctive relief prohibiting the APA from denying her and other similarly situated pilots full access to the APA website, particularly the Challenge and Response ("C&R") discussion forum  and prohibiting the

APA from denying her full access to APA union hall meetings.    Additionally, Plaintiff seeks

the opportunity to participate in these forums without fear of threats, intimidation or retaliation.

## V. PRAYER FOR RELIEF

**WHEREFORE,** Kathy Emery respectfully request that the Court enter judgment in her

favor against the Allied Pilots Association for damages resulting from the breach of duty of fair

representation, consisting of, among other things, granting her the equivalent market value of the

AA compensation (equity shares of stock) she has lost due to the discriminatory, arbitrary and

bad faith actions of the APA; modify, amend the APA allocation and award,  require the APA to

make FO Emery whole; and cost of suit.  Additionally Plaintiff prays this Court will grant

Plaintiff's request for injunctive relief and award such further relief as the Court deems just and

proper.

Respectfully submitted this 7th day of August 2014.

_Kathy E Emery_

Kathy E. Emery
Mailing Address
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served by US Mail on September 19, 2014 on all counsel of record listed below.

Stephen K. Hoffmann
Darin M. Dalmat
JAMES & HOFFMANN, P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, D.C. 20036

Attorney's for Allied Pilots Association

Signed and dated this 19th day of September, 2014

*Kathy E Emery*

Kathy E. Emery
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650