UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-80518-CIV-HURLEY

KATHY E. EMERY,

    Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

    Defendant.

_____/

## ORDER CONTAINING FINDINGS OF
## OF FACT & CONCLUSIONS OF LAW

Certain aspects of the employment relationship between American Airlines, a major commercial air carrier, and its pilots form the background to this case. The dispute at issue, however, involves a policy promulgated by the pilots' union, the Allied Pilots Association. The policy denies a minority of disabled pilots, who are inactive members of the union and are referred to as "MDD" (medically disabled dropped) pilots, access to "Challenge & Response," a website chat room maintained by the union. For reasons that will be apparent, the Court concludes that the union's policy violates the union member's "bill of rights" contained in the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(2).

Based upon the testimony and evidence presented, the Court makes the following

### FINDINGS OF FACT

1. American Airlines ("American" or "the airline") has approximately 15,000 pilots

1

consisting of captains, first officers and flight engineers. Trial Tr. vol. 1, 124.  Every pilot is listed sequentially on a seniority list maintained by the airline.  A pilot's position on the seniority list is considered to be vitally important because virtually everything about a pilot's job is based on seniority. Seniority determines "your ability to bid for different equipment. The bigger equipment pays more.  Even within the same equipment, your seniority on that equipment determines . . . whether you are a captain or first officer, and it can determine what equipment you are eligible to bid for and be paid for." Trial Tr. vol. 1, 147.

2. American classifies pilots who have incurred a medical disability and cannot work as "MDS" (medically disabled sick).  While on disability, these pilots retain their positions on the seniority list.  If the period of continuous disability exceeds five years, the airline terminates the pilot's employment and removes her from the seniority list.

3. The Allied Pilots Association ("APA" or "the union"),  for its own administrative purposes, uses time-on-disability classifications to differentiate disabled pilots:

> (a) **"MDS"** (medically disabled sick)  – pilots who have exhausted accrued sick leave and are in the first twelve months of disability. APA designates these pilots as active members. (They also retain their position on the airline's seniority list.)
>
> (b) **"MDI"** (medically disabled inactive) – pilots on disability for more than one but less than five years.  APA designates these pilots as inactive members. (They also retain their position on the airline's seniority list.)
>
> (c) **"MDD"** (medically disabled dropped) – pilots on disability for more than five years.  APA designates these pilots as inactive members. (They have been removed from the airline's seniority list.)

4. Plaintiff Kathy E. Emery was employed by American as a flight engineer.  As such, she

was a member of the APA, the collective bargaining representative for American's pilots.

5. In March of 2003, while retraining to qualify as a pilot, Ms. Emery took sick leave and qualified for long-term disability benefits from American.

6. The collective bargaining agreement between American and the APA, effective May 1, 2003, specified that "[w]hen leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his seniority . . . ." Pl. Ex. 3A, § D(1). It further states that "[s]uch leave of absence . . . may not exceed a total continuous period of three (3) years unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years." *Id.*

7. In September of 2007, American, in accord with its normal practice, provided the APA with an Status 1 Report Summary which for the first time omitted Ms. Emery's name. Def. Ex. 9. The omission indicated that American had removed Ms. Emery from its seniority list. This caused the APA to reclassify Ms. Emery as an "MDD pilot" (medically disabled dropped). Ms. Emery has maintained this status within the APA to the present date.

8. The Constitution and Bylaws is the APA's controlling document. Among other provisions, it states that the APA exists "[t]o protect the individual and collective rights of the members of the APA and to promote their professional interests . . . ." Def. Ex. 1 art. II, § B.

9. The Constitution and Bylaws Art. III. § 7 establishes the union's general policy with regard to inactive members.

> A member in good standing is entitled to participate actively in all APA activities and is entitled to all of the rights, privileges, and benefits of membership in the APA.

3

> Apprentice and inactive members shall enjoy all the benefits of active membership except the privileges of voting, holding elected office, and participation in Association sponsored programs where specific requirements prohibit such participation (10/18/74).

10. The Constitution and Bylaws further provide that the APA's "Board of Directors shall approve a Policy Manual . . . which will provide the mechanism whereby the collective and individual rights of the pilots in the APA are safeguarded . . . ." Def. Ex. 1, art. I, § 4, subsec. (B).

11. Section 2.04 (B) of the Policy Manual states the "APA will maintain and support a website and an electronic forum system to be called Challenge & Response that will continue to support the free and democratic discussion of issues between members of the Association. The APA Board of Directors will approve an Acceptable Use Policy (AUP) applicable to those who wish to have access to the APA website." Def. Ex. 2, § 2, subsec. 2.04(B).

12. APA's website contains over 300,000 pages. "Challenge & Response" ("C&R"), the title of the website's chat room was taken from the well-known process that pilots and co-pilots engage in when implementing required functions to fly an aircraft. C&R is unmonitored by the APA and is used by members for a variety of purposes, *e.g.*, gathering support to advance a position before the APA board of directors, discussion about common problems, listing thoughts about hotels and available exercise locations.

13. In July of 2007, the APA's board of directors entertained a motion to enact a comprehensive amendment to the Acceptable Use Policy governing the website. It described C&R as a "virtual union hall" and proposed that "[a]ll use of C&R is restricted exclusively to Apprentice, Active, and Inactive members in good standing, in addition to members who were Active or Inactive

4

members when they retired." Def. Ex. 17 at 8. Per normal procedure, the motion was referred to the APA's legal staff for review. On November 5, 2007, the board of directors was presented with an altered version of the proposed motion. It restricted access to Challenge & Response "exclusively to active, retired, and furloughed APA members." Def. Ex. 3 at 44 (emphasis in original).

14. The record in this case is devoid of any evidence that the board of directors, in adopting the 2007 amendment, discussed the status of MDD pilots. Former APA President Captain Keith Wilson testified about the board's custom and practice, saying that it usually discussed matters prior to their adoption. He attended the meeting in question, but could not recall any of the details of the board's discussion. Trial Tr. vol. 3, 42-52.

15. Captain Arthur "Rusty" McDaniels, another board member, testified that in 2007 he and others believed that MDD pilots were no longer members of the union because American had terminated their employment by removing their names from the seniority list. Trial Tr. vol. 1, 29-31. Pressed on this point, he said, "I know past history, the union in the past considered [MDD pilots] nonmembers as a general policy." Trial Tr. vol. 1, 38. This view persisted into 2014 when Captain McDaniels, in his capacity as chairman of the IT steering committee, wrote an email to APA's IT department stating MDD pilots "are nonmembers, they should not have access to the website, period." Trial Tr. vol. 1, 40. The Court finds Captain McDaniels' testimony to be credible and worthy of belief.

16. Despite the 2007 amendment to the Acceptable Use Policy, MDD pilots continued to utilize C&R until 2014. During this period, the unresolved status of MDD pilots within the APA was further evidenced by the software governing C&R. When a recognized APA member posted

5

a comment on C&R, the software listed the writer's name above the term "Member." However, when an MDD pilot posted an item on C&R, the software listed the writer's name above the term "Anonymous."

17. The status of MDD pilots within the APA was not resolved conclusively until June 30, 2016, when APA President Keith Wilson issued a written "presidential constitutional interpretation" indicating that MDD pilots are inactive members of the APA. Def. Ex. 16.

18. American declared bankruptcy in November 2011. Prior to this time, MDD pilots had begun to complain vigorously about the airline's imposition of unduly stringent reviews of their entitlement to disability benefits. Also, they often voiced the criticism that the APA was not taking sufficient steps to protect their benefits.

19. As a result of the airline's bankruptcy, a new collective bargaining agreement was negotiated between American and the APA. In exchange for various concessions, American granted a 13.5% equity share in the ownership of the airline to the members of the APA. Furthermore, the APA was given the authority to distribute the equity among its members. Suffice it to say this proved to be a major bone of contention between the APA and some MDD pilots who received lesser amounts than active pilots.

20. Tension between MDD pilots and the APA grew in the post-bankruptcy period. This is evidenced by posts on C&R. For example, Plaintiff Emery posted this comment on April 7, 2014:

> I am one of the pilots who was stripped of disability benefits when AA implemented the "disability nurse case management and cost savings program." Even though I was not on disability more than 5 years and still have sick time, I was also stripped on my seniority number and according to the APA terminated, (while awaiting

6

> scheduling of my arbitration) which was submitted to the System Board by Loyd Hill [in] 2009. Anyone know what the average time to have an arbitration scheduled? . . . I still have not received any positive feed back from my January 23rd meeting with APA and my request to have APA form a disability committee make (sic) up of disabled pilots.

Steven Salmirs, a non-MDD pilot, posted this comment on April 22nd, 2014:

> Don, Thanks for posting this and keeping it alive. It is something the membership needs to know about their union that when the time comes when they need help, the union will arbitrarily ignore you and actually work against you WITH management. Unheard of but there you are . . . I hope Larry is successful in his court cases.

On the same day, Larry Meadows, an MDD pilot, posted the following comment:

> Don, I see you posted last week's news story that ran on April 15th about my SEC-Whistleblower Complaint under another thread. I don't know how you find all this stuff but thanks for posting it, and informing the membership. I'm going to repost it here (in-line text below), as that story directly related to this thread.
>
> [Mr. Meadows reprinted the following assertions from his pending law suit.]
>
> American knowingly failed to pay many of its pilots their otherwise rightful long-term disability benefits, which amounted to well over a 100 million dollars of obligations under its defined benefit pension plans. . . . American's Medical Department implemented the Nurse Case Management Pilot Disability Cost Savings scheme . . . . This scheme targeted the most costly pilot claimants by prematurely terminating their long-term disability benefits.

Ptf. Ex. 25.

21. The APA's board of directors held its spring meeting on April 22, 2014. By this time, American had emerged from two years in bankruptcy and had merged with U.S. Airlines. The APA was confronting a host of difficult issues including significant changes in the collective bargaining

7

agreement and the task of integrating the two airlines' seniority lists. Captain McDaniels explained, "There had been major changes in our contract. Many of the changes were in dispute . . . and not being implemented as we believed they were supposed to be implemented." Trial Tr. vol. 1, 146. In the midst of these discussions, as the board was about to take a short recess, one member drew the board's attention to recent comments posted by MDD pilots on C&R. In response, Captain McDaniels reviewed the Acceptable Use Policy and pointed out that MDD pilots were not listed as permitted users. He urged the board to enforce the policy as written. The board acceded to this suggestion and directed Captain McDaniels, the chairman of the IT steering committee, to implement the board's decision.

22. The APA's 2007 Acceptable Use Policy for Challenge & Response was intentionally confirmed in April 2014 to exclude MDD pilots. While the Court finds that the board member who raised the topic of the MDD pilots' postings was likely motivated by a desire to silence a group he viewed as combative and litigious, his motivation cannot be ascribed to the board as a whole. Rather, the Court finds the following testimony of Captain McDaniels to be credible and worthy of belief. He explained,

> I looked up what the [Acceptable Use Policy] was to see what it said, and we quickly . . . saw . . . only active members, furloughs and retirees . . . are supposed to be on C&R. The board more or less – the concept was, okay, fine, this [Acceptable Use Policy] is not being enforced by the IT department, somebody go tell the IT department to fix the programming, and we are done and moving on. We have other things to talk about.
>
> I don't think we spent three to five minutes in casual conversation on it. From the board's standpoint, it never should have come up as a subject, it was an administrative programming glitch even to allow it

8

>to happen. They were looking for a way to get it off the table to move
>on to higher priority items.

Trial Tr. vol. 1, 149.

23. The initial implementation of the board's decision resulted in MDD pilots being denied access to the entire website. APA President Wilson, however, quickly rectified the error and limited the exclusion to C&R. Thus, from shortly after the April 2014 board meeting to the present, MDD pilots have been denied access to C&R.

24. Shortly after the 2014 board meeting, APA president Wilson, relying on his prerogative to interpret the APA constitution, ruled that MDI (medically disabled inactive) pilots – pilots who were on medical disability for more than one year, but less than five years, and were classified as inactive members of the APA, were entitled to access C&R.

25. Thus to recap, the APA grants the following groups access to C&R:

1. All **active members** of the APA (including **"TAG pilots"** -- pilots who have been terminated but are awaiting a grievance determination, and **"MDS pilots"** – pilots on disability for less than one year);
2. **"MDI pilots"** (medically disabled inactive) – pilots on disability for more than one but less than 5 years (classified as inactive members of APA);
3. **Furloughed pilots** (classified as inactive members of APA);
4. **Retirees** (who are classified as neither active nor inactive members of APA).

26. The rationale for granting "TAG" (terminated awaiting grievance) pilots access to C&R is the APA's view that a TAG pilot is entitled to the presumption that he was improperly terminated in violation of the collective bargaining agreement and will return to work unless his grievance is denied. Trial Tr. vol. 1, 118.

27. MDI pilots are classified as inactive members of the APA. The rationale for granting

9

MDI pilots access to C&R is APA's commitment to ensuring that this group of pilots will have full access to APA's information and benefits during the time they are deactivated and on disability leave. The APA recognized it did not control the decision to place a pilot on disability leave or to recall the pilot to active service. This presented administrative issues from APA's point of view. Captain Wilson explained that "a person can be on MDI, [and] on the seniority list . . . but he could come back tomorrow and we wouldn't know about it for a month, month and a half, two months." Therefore, "to make sure as many people have access to as many of the benefits that the association offers, I made a determination . . . . I made a decision to let them stay on [C&R]." Trial Tr. vol. 2, 42.

28. The events of September 11, 2001 led to a contraction in the airline industry. American furloughed "almost 3,000 pilots . . . ." Trial Tr. vol. 1, 26. Some remained on furloughed status for up to ten to thirteen years. The APA classifies furloughed pilots as inactive members. The rationale for granting furloughed pilots access to C&R is the fact that they retain their positions on the seniority list and have a high probability of returning to active status. "[A]nd the vast majority did return." Trial Tr. vol. 1, 153. Thus, there was an obvious benefit in keeping these members current on a variety of industry and union issues.

29. Retired pilots have terminated their employment with the airline and are no longer on the seniority list. The APA classifies them as neither active nor inactive. The rationale for granting them access to C&R, aside from promoting camaraderie, is to maintain connection with a valuable historical legacy. "[A]s a group, they have a lot of historical knowledge, mentoring – most of the retirees have mentored the active pilots throughout their careers. They have knowledge of events

10

and things that went on in a large group of people relative to aircraft and training and safety, and just the industry as a rule." Trial Tr. vol. 2, 48. Unlike MDD pilots, all of who have been away from work for at least five years, retired pilots include individuals who may have left the flight line recently and have valuable knowledge.

30. The APA's stated reasons for denying MDD pilots access to C&R include the following:

1. The 2007 version of the Acceptable Use Policy did not list MDD pilots as entitled to access C&R;
2. In 2014, the board decided to apply the 2007 policy as written, understanding this would deny MDD pilots access to C&R;
3. MDD pilots are inactive members of the APA;
4. MDD pilots have been removed from the seniority list;
5. Relatively few MDD pilots return to active service;
6. MDD pilots have alternative means to voice complaints to APA's leadership and contact other APA members.

31. Without passing on the validity of the foregoing justifications, the Court finds these statements reflect the true mind set of the APA. In other words, the proffered explanations were not offered to mask an impermissible discriminatory animus.

32. In the past, MDD pilots rarely returned to active status. The situation, however, has begun to change and a small number of MDD pilots are returning to work. Captain Wilson offered this explanation: "Now the FAA has been more open and science and technology and medicine have improved to the point where they are allowing pilots to fly on certain medications and with certain oversight . . . ." Trial Tr. vol. 2, 34.

33. The APA's membership consists of approximately 15,000 pilots. Trial Tr. vol. 1, 124. MDD pilots number somewhere between 200 to 250 pilots. Trial Tr. vol. 1, 160.

Based upon the foregoing, the Court reaches the following

## **CONCLUSIONS OF LAW**

Section 101(a)(2) of the Labor-Management Reporting and Disclosure Act ("the Act" or "LMRDA") provides in pertinent part:

> Every member of any labor organization shall have the right to . . . to express any views, arguments, or opinions . . . *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

The Act's legislative history "reveals that Congress modeled Title I after the Bill of Rights, and that the legislators intended § 101(a)(2) to restate a principal First Amendment value – the right to speak one's mind without fear of reprisal. However, there is absolutely no indication that Congress intended the scope of § 101(a)(2) to be identical to the scope of the First Amendment. . . . Union rules . . . are valid under § 101(a)(2) so long as they are reasonable . . . ." *United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski*, 457 U.S. 102, 111 (1982).

The Supreme Court set forth the following construct for determining whether a § 101(a)(2) free speech violation has occurred. First, a court must "consider whether the rule interferes with an interest protected by the first part of § 101(a) (2). If it does, we then determine whether the rule is 'reasonable' and thus sheltered by the proviso to § 101(a)(2)." *Id.* The critical question under the second step is "whether a rule that partially interferes with a protected interest is nevertheless reasonably related to the protection of the organization as an institution." *Id.* A union rule which interferes with rights Congress intended to protect will nonetheless be upheld if "it is rationally related to a legitimate and protected purpose." *Sadlowski,* 457 U.S. at 120.

12

"LMRDA gives unions the right to provide reasonable rules in three situations: (1) for conducting union meetings; (2) for insuring individual responsibility to the union as an institution; and (3) for preventing any interference with the union's performance of its legal or contractual obligations." *Knight v. Int'l Longshoremen's Ass'n*, 457 F.3d 331, 336 (3d Cir. 2006)(quoting *Semancik v. United Mine Workers of Am. District #5*, 466 F.2d 144,153 (3d Cir. 1972). Case law teaches that only those exceptions listed in the statute are to be considered. *See Salzhandler v. Caputo*, 316 F.2d 445 (2d Cir. 1963). Inasmuch as exceptions 1 and 3 are not applicable to this case, the question before the Court is whether the APA's denial of access to MDD pilots can be justified as a rational measure aimed at insuring individual responsibility to the union as an institution.

As a preliminary matter, the Court rejects the APA's contention that litigation under § 101(a)(2), imposes a burden upon a plaintiff/union member to prove that a union's rule is unreasonable. Rather, the plaintiff's burden is to prove that the union's rule interferes with an interest protected by the first part of § 101(a) (2). Once satisfied, the burden shifts to the defendant union to demonstrate that its rule is reasonable. *See, e.g., Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461 (6th Cir. 1992). This is an academic discussion in the case at bar for the Court would reach the same conclusion irrespective of which party bore the burden of proof.

Three observations deserve mention at the outset. First, all of the APA's proffered reasons for denying MDD pilots access to C&R are after-the-fact justifications, *i.e.*, no evidence has been offered to link any of the proposed justifications to matters discussed at the time of the policy's enactment. Recall that in 2007, a board member proposed a revision to the Acceptable Use Policy

13

which would have granted access to C&R to all active and inactive members. The motion was referred to the APA's legal staff which came forward with altered language indicating that access to C&R be "restricted <u>exclusively</u> to active, retired, and furloughed APA members." Def. Ex. 3 (emphasis in original). This version was then adopted by the board of directors. Other than this, we know nothing about the reasons for the board's decision. On the other hand, there is clear evidence in the record that some board members held the mistaken belief that MDD pilots were not members of the union. Indeed, APA President Wilson acknowledged this misapprehension continued into 2014. He testified, "[t]here were actually people who believed they [MDD pilots] weren't members." Trial Tr. vol. 2, 33. The evidence further establishes that in 2014, when the board hastily, but definitively, voted to apply the written policy and exclude MDD pilots from C&R, there was no discussion as to the merits of the decision. The board's aim was to deal with the issue quickly and move on. Captain McDaniels testified, "I don't think we spent three to five minutes in casual conversation on it. . . . They were looking for a way to get it off the table to move on to higher priority items." Trial Tr. vol. 1, 149. Thus, the reasons put forth today to justify APA's denial of access to MDD pilots cannot be connected by evidence to the reasons underlying the policy's enactment. This does not render the proffered justifications invalid, but it does require that they be given careful scrutiny.

Second, the undisputed evidence in this case shows that retired pilots are regarded as a valuable resource by the APA. *See* paragraph 29, *supra*. Consistent with this view and since at least 2007, retirees – who are not members of the APA – have been granted access to C&R. Def. Ex. 1, art. III; *see also* Def. Ex. 16. No one questions the legitimacy of this decision. But in evaluating

14

the reasonableness of the APA's decision to deny access to C&R to a small minority of its *members*, one is compelled to note the odd juxtaposition of granting access to a vastly larger number of *nonmembers*.

Third, there is the malleability of the APA's policy, *i.e.,* the ease with which it has been amended to include other inactive members. Recall that the 2007 version of the Acceptable Use Policy was specific in indicating which categories of inactive members would be granted access to C&R. MDI (medically disabled inactive) pilots, *i.e.*, pilots on medical disability leave for more than one but less than five years, were not listed as permitted users. Nonetheless, APA President Wilson in 2014 invoked his power of constitutional interpretation to grant MDI pilots access to C&R. Here again, no one questions the legitimacy of his decision, but it draws into sharp contrast the disparate treatment afforded to MDD pilots.

There can be no dispute that the Plaintiff's efforts utilize C&R and speak out about perceived unfair treatment of her and other MDD pilots by the APA constitute protected speech within the first part of § 101(a)(2). "LMRDA . ... was designed to protect the rights of union members to discuss freely and criticize the management of their union and the conduct of their officers." *Salzhandler v. Caputo, supra* at 448-449. Furthermore, "internal political struggle and critical debate, which may unsettle current leadership [does] not undermine the union as an institution." *Aircraft Mechanics Fraternal Ass'n v. Transp. Workers Union of Am., Local 514, Air Transp. Div., AFL-CIO*, 98 F.3d 597, 600 (10th Cir. 1996).

As stated, the issue before the Court is whether the union's policy of denying MDD pilots access to C&R can be justified as a rational effort to insure individual responsibility to protect the

union as an institution. To this end, the APA offered substantial evidence at trial to demonstrate that its decisions to grant access to C&R conferred benefits on the union as an institution. Aside from arguing that some of these justifications could apply with equal force to MDD pilots, the Plaintiff left this evidence unchallenged. Nonetheless, it contributes nothing to assist the APA in meeting its statutorily-imposed obligation to prove that its decision to deny access is justified as a rational measure to protect the union as an institution. The closest the APA came to addressing this issue was evidence showing that the 2007 enactment of the policy, and its confirmation in 2014, resulted from votes by its board of directors. APA's president, Keith Wilson, testified that the board's practice was to engage in a deliberative process before voting on proposals. Thus, the APA argued that the board's decisions to deny MDD pilots access to C&R support an inference that the board acted with reasonable justification. What that justification was, however, remains a mystery. The record is devoid of any evidence about the content of the board's deliberations in 2007. The record of the 2014 board meeting is clearer, but it offers no support to the contention that the board engaged in a reasoned analysis of the merits of denying MDD pilots access to C&R. In short, this evidence is woefully inadequate to prove that denying MDD pilots access to C&R was rationally related to protecting the union as an institution.

The APA repeatedly cited a major difference between MDD pilots and other categories of inactive pilots, *viz.*, that MDD pilots have been removed from the seniority list. Furloughed and MDI pilots retain their positions on the seniority list. Moreover, pilots in these two categories have a much higher probability of returning to the flight line than MDD pilots. Thus, the APA offered testimony that it was beneficial for all concerned that furloughed and MDI pilots have access to

C&R. Again, the legitimacy of the decision to grant access to C&R is not in question. However, this evidence says nothing about the validity of the union's decision to deny access to the remaining minority of disabled pilots. LMRDA imposes a demanding requirement that union rules which impinge on a member's right to free speech have a rational connection to protecting the union as an institution. Faced with the task of evaluating such rules, courts demand verifiable evidence to support a union's proposed justification. *See, e.g., Aircraft Mechanics Fraternal Ass'n v. Transp. Workers Union of Am., Local 514, Air Transp. Div.,* AFL-CIO, 98 F.3d 597 (10th Cir. 1996)(reasonable to suspend union member who promoted a rival union); *Quigley v. Giblin*, 569 F.3d 449 (D.C. Cir. 2009)(reasonable to require candidates for union office to have password protection on campaign websites because it prevented hacking by non-union members and protected the integrity of the election process).

The APA acknowledges that a union cannot impair a members's right of free speech merely because it disagrees with the content of that speech. "The importance of protecting the free speech rights of union members has been consistently recognized by court asked to consider the scope of Section 101(a)(2) of the LMRDA." *Helton v. NLRB*, 656 F.2d 883, 895 (D.C. Cir. 1981). In this case, however, the APA has argued that its policy denying access to MDD pilots can be justified on the ground that the union provides adequate alternative means to communicate with other union members. The Court rejects this contention on two grounds. First, "the existence of alternatives is irrelevant." *Id.* at 896. Second, the cited alternatives are neither equal nor adequate. "Member lookup" – the ability to look up another member's profile and contact him directly, "sound-off" – the ability to contact a board member directly, and attendance at "domicile meetings" – traveling

17

around the country to attend local union meetings, all lack the ease. spontaneity and scope of C&R.

While not designed to do so, the APA's policy of denying MDD pilots access to C&R acts to silence criticism of the union's management by a discreet minority of disabled members. Inasmuch as the evidence in the record fails to establish that the APA's policy can be justified under the second clause in § 101(a(2), it is

**ORDERED and ADJUDGED** the APA's policy of denying MDD pilots access to Challenge & Response constitutes in an impermissible infringement on Plaintiff's right to free speech guaranteed by LMRDA. Therefore, the Court, by separate order, will issue a mandatory injunction requiring the Defendant Allied Pilots Association to grant Plaintiff Kathy E. Emery access to Challenge & Response.

**DONE and SIGNED** in Chambers at West Palm Beach, Florida, this 4th day of January, 2017.

Daniel T. K. Hurley
United States District Judge

cc: Copies provided to both parties.